LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
Jonathan D. Selbin (State Bar No. 170222)
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
Daniel M. Hutchinson (State Bar No. 239458)
Nicole D. Reynolds (State Bar No. 246255)
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

MEYER WILSON CO., LPA
Matthew R. Wilson (admitted *pro hac vice*)
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066

*Attorneys for Plaintiffs and the Proposed Class*

CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
Mark Ankcorn (State Bar No. 166871)
mark@cglaw.com
110 Laurel Street
San Diego, CA  92101
Telephone:  (619) 238-1811
Facsimile: (614) 224-6066

TERRELL MARSHALL DAUDT & WILLIE
PLLC
Beth E. Terrell (State Bar No. 178181)
bterrell@tmdwlaw.com
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 350-3528

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW STEINFELD and WALTER BRADLEY on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>DISCOVER FINANCIAL SERVICES, DFS SERVICES, LLC, and DISCOVER BANK,<br><br>                Defendants. | Case No. 3:12-cv-01118-JSW<br><br>**DECLARATION OF DANIEL M. HUTCHINSON IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT**<br><br>Judge:        Hon. Jeffrey S. White |

1    I, DANIEL M. HUTCHINSON, declare as follows:

2        1.      I am a member of the law firm of Lieff, Cabraser, Heimann & Bernstein, LLP

3    ("LCHB"), co-counsel of record for Plaintiffs in this matter.  I have been one of the lawyers

4    primarily responsible for the prosecution of Plaintiffs' claims on behalf of the proposed Class.  I

5    am admitted to practice before this Court and am a member in good standing of the bar of the

6    State of California; the United States District Court for the Central, Northern, and Southern

7    Districts of California; and the U.S. Courts of Appeals for the First, Third, Fourth, and Ninth

8    Circuits.  I respectfully submit this declaration in support of Plaintiffs' motion for preliminary

9    settlement approval.  I make these statements based on personal knowledge and would so testify

10   if called as a witness at trial.

11   **<u>Background and Experience</u>**

12       2.      LCHB is a national law firm with offices in San Francisco, New York, and

13   Nashville.  LCHB's practice focuses on complex and class action litigation involving product

14   liability, consumer, employment, financial, securities, environmental, and personal injury matters.

15   Attached hereto as **<u>Exhibit A</u>** is a true and correct copy of LCHB's current firm resume, showing

16   some of the firm's experience in complex and class action litigation.  This resume is not a

17   complete listing of all cases in which LCHB has been class counsel or otherwise counsel of

18   record.

19       3.      I graduated from Brown University in 1999.  I served as a judicial extern to the

20   Honorable Martin J. Jenkins, U.S. District Court, Northern District of California, in 2004.  I

21   graduated from the University of California at Berkeley, Boalt Hall School of Law in 2005.

22       4.      Since 2005, I have practiced with LCHB, where I became a partner in January

23   2011.  At LCHB, I have focused on focused on representing plaintiffs in consumer protection and

24   employment class actions.

25       5.      As an LCHB partner, I have gained extensive experience in the litigation, trial, and

26   settlement of consumer class actions as Class Counsel in several cases:

27          a.      I, along with other attorneys from my firm, served as chair of the Plaintiffs

28

1  Executive Committee in multi-district litigation ("MDL") against Bank of America and FIA Card

2  Services, challenging the imposition of charges for so-called "payment protection" or "credit

3  protection" programs.  In January 2013, the Court approved a $20 million settlement including

4  required practice changes;

5          b.     I, along with other attorneys from my firm, served as co-lead counsel in a

6  series of groundbreaking nationwide class actions under the Telephone Consumer Protection Act,

7  47 U.S.C. § 227 *et seq.* ("TCPA").  In September 2012, the court approved a $24.15 class

8  settlement against Sallie Mae, the largest monetary settlement in the history of the TCPA.  *See*

9  *Arthur v. Sallie Mae, Inc.*, No. C10-0198 JLR, 2012 U.S. Dist. LEXIS 132413 (W.D. Wash. Sept.

10  17, 2012);

11          c.     I, along with other attorneys from my firm and co-counsel, served as

12  counsel in *Connor v. JPMorgan Chase Bank*, Case No. 10 CV 1284 DMS BGS (S.D. Cal. Mar.

13  12, 2012), a nationwide TCPA class action.  In March 2012, the court preliminarily approved a $7

14  to $9 million cash settlement;

15          d.     In addition to the foregoing, I currently serve as co-lead counsel in the

16  following cases under the TCPA:  *Duke v. Bank of Am., N.A.*, 5:12-cv-04009-EJD (N.D. Cal.);

17  *Rose v. Bank of Am. Corp.*, 5:11-cv-02390-EJD (N.D. Cal.); *In re Capital One Telephone*

18  *Consumer Protection Act Litigation*, Master Docket No. 1:12-cv-10064 (N.D. Ill.); *Wannemacher*

19  *v. Carrington Mortgage Services LLC*, Case No. 8:12-cv-02016-FMO-AN (C.D. Cal.); *Cayanan*

20  *v. Citi Holdings, Inc.*, Case No. 3:12-cv-01476-MMA-JMA (S.D. Cal.); *Brown v. Directv LLC, et*

21  *al.*, Case No. 2:12-cv-08382-DMG-E (C.D. Cal.); *Mills v. HSBC Bank Nevada, N.A.*, Case No.

22  3:12-cv-04010-SI (N.D. Cal.); and *Martin v. Wells Fargo Bank, N.A.*, Case No. 3:12-cv-06030-SI

23  (N.D. Cal.);

24          e.     I am co-lead counsel in *Yarger v. ING Bank, fsb*, Civil Action No. 1:11-cv-

25  00154-LPS (D. Del.), representing consumers who charge that ING Direct breached its promise

26  to allow them to refinance their home mortgages for a fixed flat fee of $500 or $750, and instead

27  charged a higher fee of one monthly mortgage payment for refinancing.  In 2012, the court

28

certified a class of consumers in ten states who purchased or retained an ING mortgage during the class period.

6.     Prior to my elevation to partner, I participated in successful litigation of a wide variety of other complex federal and state consumer class actions during my professional career.  Class action cases I have successfully prosecuted to judgment or settlement, in addition to the foregoing, include: *Sutter Health Uninsured Pricing Cases*, Case No. J.C.C.P. 4388 (Sacramento Super. Ct.) (lead class counsel in consumer class action that resulted in over $275 million settlement and comprehensive pricing and collections policy changes for uninsured patients across all Sutter hospitals); *Catholic Healthcare West Cases*, Case No. J.C.C.P. 4453 (San Francisco County Super. Ct.) (lead class counsel in consumer class action that resulted in over $423 million settlement and pricing and collections policy changes for uninsured patients across all CHW hospitals); *Scripps Health Cases*, Case No. IC859468 (S.D. Super. Ct.) (lead class counsel in consumer class action that resulted in over $73 million settlement and pricing and collections policy changes for uninsured patients at Scripps hospitals); *John Muir Uninsured Healthcare Cases*, Case No. J.C.C.P. 4494) (Contra Costa County Super. Ct.) (lead class counsel in consumer class action that resulted in over $113 million settlement and pricing and collections policy changes for uninsured patients at John Muir hospitals); *Cincotta v. California Emergency Physicians Medical Group*, No. 07359096 (Cal. Supr. Ct.) (lead class counsel in consumer class action that resulted in over $27 million settlement and pricing and collections policy changes, including complete debt elimination—100% cancellation of the bill, for nearly 100,000 uninsured patients who alleged they were charged excessive and unfair rates for emergency room service across 55 hospitals throughout California).

7.     Additionally, as an LCHB partner, I have gained extensive experience in the litigation, trial, and settlement of complex employment class actions as Class Counsel in several cases:

a.     I served as co-lead counsel in *Vedachalam v. Tata Am. Int'l Corp.*, Case

No. 3:06-cv-00963-CW (N.D. Cal.), a case on behalf of a certified class of over 13,000 foreign nationals working in the United States who were denied promised wages and benefits.  In April 2013, the court preliminarily approved a $29.75 million nationwide class settlement.

b.      I, along with other attorneys from my firm and co-counsel, served as co-lead counsel in *Holloway v. Best Buy,* No. C05-5056 PJH (N.D. Cal.), representing a class of current employees of Best Buy that alleged Best Buy stores nationwide discriminated against women, African Americans, and Latinos.  In November 2011, the Court approved a settlement of the class action in which Best Buy agreed to changes to its personnel policies and procedures that will enhance the equal employment opportunities of the tens of thousands of women, African Americans, and Latinos employed by Best Buy nationwide.

c.      I, along with other attorneys from my firm and co-counsel, am court-appointed co-lead counsel in *Tatum v. R.J. Reynolds Tobacco Co.*, Case No. 1:02 CV 373 (M.D. N.C.), a class action on behalf of approximately 3,500 participants in the RJR pension plan who brought claims under the Employee Retirement Income Security Act of 1974 ("ERISA").  In February 2010, I, along with co-counsel, completed a five-week trial in this matter, with additional evidence and briefing submitted between December 2010 and February 2011.

d.      I am co-lead counsel in *Ellis v. Costco Wholesale Corp.*, No. 04-03341-MHP (N.D. Cal.), a case on behalf of female employees charging that Costco discriminates against women in promotions to management positions.  In September 2012, the court certified two litigation classes consisting of over 1,200 current and former female Costco employees nationwide, one for injunctive relief and the other for monetary relief.

8.      In addition to the foregoing, prior to my elevation to partner I participated in successful litigation of a wide variety of other complex federal and state employment class actions during my professional career:

a.      I, along with other attorneys from my firm and co-counsel, served as co-lead counsel in *Cruz v. U.S., Estados Unidos Mexicanos, Wells Fargo Bank, et al.*, No. 01-0892-CRB (N.D. Cal.), representing Mexican workers and laborers, known as Braceros ("strong arms"), who came from Mexico to the United States pursuant to bilateral agreements from 1942

through 1946 to aid American farms and industries hurt by employee shortages during World War II in the agricultural, railroad, and other industries. A settlement required the Mexican government to provide a payment of approximately $3,500 to Braceros, or their surviving spouses or children. In approving the settlement in February 2009, U.S. District Court Judge Charles Breyer stated:

> I've never seen such litigation in eleven years on the bench that was more difficult than this one… Notwithstanding all of these issues that kept surfacing ... over the years, the plaintiffs persisted…And, in fact, they achieved a settlement of the case, which I find remarkable under all of these circumstances.

b.      I, along with other attorneys from my firm and co-counsel, served as co-lead counsel in *Barnett v. Wal-mart Stores, Inc.*, Case No. 01-2-24553-8 SEA (Sup. Ct. Wash.), a certified statewide wage and hour class action filed on behalf of hourly employees challenging the company's failure to compensate its hourly employees for missed rest and meal breaks and off-the-clock work in stores throughout Washington state. This case settled for $35 million, as well as injunctive relief governing company policies.

c.      I, along with other attorneys from my firm and co-counsel, served as one of plaintiffs' lead counsel in *Amochaev v. Citigroup d/b/a Smith Barney*, Civ. No. 05-1298-PJH (N.D. Cal.), a gender discrimination class action on behalf of female Financial Advisors employed by Smith Barney that resulted in a settlement involving comprehensive injunctive relief and over $33 million in monetary relief.

9.      I have also served as Class Counsel in several antitrust and other financial fraud actions:

a.      I currently serve, with my co-counsel, as Lead Counsel in *Haley Paint Co. v. E.I. Dupont De Nemours and Co. et al.*, No. 10-cv-00318-RDB (N.D. Md.),  a certified nationwide class action lawsuit on behalf of direct purchasers of titanium dioxide charging that defendants conspired to fix, raise, and maintain the price of titanium dioxide in the United States. The case is set for a four-week trial in September 2013.

b.      I, along with other attorneys from my firm and co-counsel, served as

1    Plaintiffs' counsel in *Quantegy Recording Solutions, LLC, et al. v. Toda Kogyo Corp., et al.*, No.

2    C-02-1611 (PJH), antitrust litigation against manufacturers, producers, and distributors of

3    magnetic iron oxide ("MIO").   In August 2006 and January 2009, the Court approved final

4    settlements totaling $6.35 million.

5              c.     I have also successfully litigated complex individual actions, including

6    *Alaska State Department of Revenue v. America Online*, No. 1JU-04-503 (Alaska Supr. Ct.) (co-

7    counsel in securities fraud action brought by the Alaska State Department of Revenue, Alaska

8    State Pension Investment Board and Alaska Permanent Fund Corporation that settled for $50

9    million December 2006).

10        10.    I have received several awards and honors for my litigation efforts.  In 2012, The

11   Recorder named me as one of "50 Lawyers on the Fast Track."  From 2009 to the present, I was

12   named as a Super Lawyers Northern California Rising Star.

13        11.    In addition to being an active litigator, I have long been involved in many

14   educational and legal groups, including as Director of the Board of the Lawyers' Committee for

15   Civil Rights of the San Francisco Bay Area (2009-present; Secretary, 2011-present); American

16   Bar Association (Section of Labor & Employment Law Leadership Development Program);

17   Association of Business Trial Lawyers (Leadership Development Committee, 2008-2010); Bar

18   Association of San Francisco; Consumer Attorneys of California; and National Bar Association.

19        12.    I am a frequent speaker on employment topics, including at events sponsored by

20   the American Bar Association's Section of Labor and Employment Law, the National

21   Employment Lawyers Association, the Impact Fund, the UCLA School of Law, and the

22   Consumer Attorneys of California.

23        13.    I have published and presented papers on race and gender class actions under Title

24   VII, including "Ten Points from Dukes v. Wal-Mart Stores, Inc.," 20(3) CADS Report 1 (Spring

25   2010); "Pleading an Employment Discrimination Class Action" and "EEO Litigation:  From

26   Complaint to the Courthouse Steps," ABA Section of Labor and Employment Law Second

27   Annual CLE Conference (2008); and "Rule 23 Basics in Employment Cases," Strategic

28   Conference on Employment Discrimination Class Actions (2008).

**Investigation and Settlement Negotiation**

14.     Class Counsel thoroughly researched Discover's practices and their legal claims prior to filing suit by, among other things, interviewing several Class Members, reviewing Class Members' pertinent document and information including credit applications and recorded messages from Discover's prerecorded/automated calls  and reviewing their pertinent documents, and researching relevant TCPA case law and regulations.  This information was critical to Counsel's understanding of the nature of the problem, the scope of potential damages and remedies, and the potential risks and benefits of continued litigation.

15.     Before engaging in any settlement negotiations, the parties had fully briefed Discover's Motion to Compel Arbitration in the *Bradley v. Discover Financial Services*, Northern District of California Case No. 4:11-cv-5746-YGR (the "*Bradley* Action").  (Discover filed a substantively identical motion in the above-entitled action, hereinafter referred to as the "*Steinfeld* Action," on August 16, 2012.)  On March 30, 2012, Plaintiff Bradley filed an opposition to the motion, and on April 20, 2012, Discover filed its reply.  On May 9, 2012, the Court in the *Bradley* Action granted the parties' joint stipulation to postpone the May 22, 2012 hearing on Discover's motion to compel arbitration so that the parties could engage in mediation and Discover could voluntarily provide Plaintiffs with data and information prior to the mediation.  Thereafter, the parties entered into multiple stipulations to continue the arbitration hearing in the *Bradley* Action and to postpone the deadline for Discover to respond to the Complaint in the *Steinfeld* Action, so that they could engage in meaningful settlement negotiations and attend multiple mediations.

16.     During the next several months, the parties informally exchanged pertinent information and documents including client credit records and applications, form credit applications in use during the class period, and case law and relevant rulemaking by the FCC. Through this exchange, the parties thoroughly explored their respective positions on the merits of the action and viability of class certification.

17.     The parties participated in three full-day mediation sessions before the Honorable Carl West (Ret.) of JAMS, on May 31, 2012, July 10, 2012, and on September 27, 2012.  During these sessions, the parties discussed their relative views of the law and the facts and potential

relief for the proposed Class.  Counsel exchanged a series of counterproposals on key aspects of the Settlement, including the parameters of the practice changes and monetary relief for the Class and the meaning and interpretation of the eligibility requirements.  At all times, the parties' settlement negotiations were highly adversarial, non-collusive, and at arm's length.

18.     Through the mediated settlement negotiations and the investigation efforts, the parties reached an agreement in principle pursuant to a mediator's proposal.  After extensive, additional negotiations, the parties executed a Memorandum of Understanding ("MOU") on April 5, 2013.  The MOU outlined in detail the proposed settlement.  As agreed to in the MOU, Discover will continue to provide Class Counsel with additional facts necessary to reasonably confirm the material information provided to Class Counsel during settlement negotiations and administrative plans and procedures for compliance with the terms of the Settlement.  Such discovery will further confirm that the terms of the Settlement are fair, reasonable, and adequate.

19.     With the MOU in place, the parties turned to the settlement agreement, claim forms, and notice documents and executed a Settlement Agreement ("Agreement") on May 17, 2013.  A true and correct copy of the executed Settlement Agreement is attached hereto as **Exhibit B**.

**Class Notice**

20.     Discover has represented to Class Counsel that it would be overly burdensome, and thus economically unfeasible, to determine the precise number of persons Discover called using autodialers and/or artificial or prerecorded voices.  Nevertheless, Discover has confirmed that there are approximately 9,088,000 persons holding accounts with Discover who are potential class members, and that it has contact information through its autodialer records for approximately 4,808,000 such persons.

21.     Classwide notice will be disseminated to the approximately 9,088,000 potential Class Members in accordance with the Notice Plan, which include email and/or mail notice, website notice, and publication notice.  The parties, in conjunction with the Settlement Administrator, will design and agree to a publication notice that will satisfy due process and

1    provide sufficient reach to Class Members.  The costs of Class Notice and claims administration

2    will be paid from the Settlement Fund, per the Settlement Agreement.

3    **Class Representatives' Service Awards**

4        22.    The Agreement provides a $2,000 Service Award for each Plaintiff in recognition

5    of, and to compensate Plaintiffs for, their service and efforts in prosecuting the Actions on behalf

6    of the Class, subject to approval by the Court.  These awards are intended to recognize and

7    compensate Plaintiffs for their commitment to, and active participation in, this litigation,

8    including by assisting with the initial case investigation, providing Class Counsel with pertinent

9    documents and information, reviewing pertinent pleadings including the operative complaints,

10   and keeping abreast of, reviewing, and signing off on, the proposed Settlement.

11

12       I declare under penalty of perjury of the laws of New York and the United States that the

13   foregoing is true and correct, and that this declaration was executed in San Francisco, California

14   on May 17, 2013.

15

16   _____
                    Daniel M. Hutchinson

17

18

19

20

21

22

23

24

25

26

27

28

1107306.1                               - 10 -

# EXHIBIT A

**Lieff
Cabraser
Heimann&
Bernstein**
Attorneys at Law

275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  212.355.9500
Facsimile:  212.355.9592

One Nashville Place
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2415
Telephone: 615.313.9000
Facsimile: 615.313.9965

Email: mail@lchb.com
Website: www.lieffcabraser.com

***FIRM PROFILE:***

Lieff Cabraser Heimann & Bernstein, LLP, is a sixty-plus attorney, AV-rated law firm founded in 1972 with offices in San Francisco, New York and Nashville.  We have a diversified practice, successfully representing plaintiffs in the fields of personal injury and mass torts, securities and financial fraud, employment discrimination and unlawful employment practices, product defect, antitrust and intellectual property, consumer protection, environmental and toxic exposure, False Claims Act, and human rights.  Our clients include individuals, classes or groups of persons, businesses, and public and private entities.

Lieff Cabraser has served as court-appointed Plaintiffs' Lead or Class Counsel in state and federal coordinated, multi-district, and complex litigation throughout the United States. With co-counsel, we have represented clients across the globe in cases filed in American courts.

Lieff Cabraser is among the largest firms in the United States that only represent plaintiffs.  Described by *The American Lawyer* as "one of the nation's premier plaintiffs' firms," Lieff Cabraser enjoys a national reputation for professional integrity and the successful prosecution of our clients' claims.  We possess sophisticated legal skills and the financial resources necessary for the handling of large, complex cases, and for litigating against some of the nation's largest corporations.  We take great pride in the leadership roles our firm plays in

1043044.1

many of this country's major cases, including those resulting in landmark decisions and precedent-setting rulings.

Lieff Cabraser has litigated and resolved thousands of individual lawsuits and hundreds of class and group actions, including some of the most important civil cases in the United States over the past three decades. We have assisted our clients recover over $85 billion in verdicts and settlements. Fifteen cases were resolved for over $1 billion; another 30 cases resulted in verdicts or settlements in excess of $100 million.

In the 2012 edition of its annual list of the top plaintiffs' law firms, *The National Law Journal* again selected Lieff Cabraser. In compiling the list, *The National Law Journal* examines recent verdicts and settlements and looked for firms "representing the best qualities of the plaintiffs' bar and that demonstrated unusual dedication and creativity." Lieff Cabraser is one of only two plaintiffs' law firms in the United States to receive this honor for the last ten years.

For the past two years, *U.S. News* and *Best Lawyers* have selected Lieff Cabraser as a national "Law Firm of the Year." For 2011-2012, we were recognized in the category of Mass Torts Litigation/Class Actions – Plaintiffs. For 2013, the publications selected our firm as the nation's premier law firm in the category of Employment Law – Individuals. *U.S. News* and *Best Lawyers* ranked firms nationally in 80 different practice areas based on extensive client feedback and evaluations from 70,000 lawyers nationwide. Only one law firm in each practice area receives the "Law Firm of the Year" designation.

## *CASE PROFILES:*

## I.    Personal Injury and Products Liability Litigation

### A.    Current Cases

1.    ***In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation***, MDL No. 2151 (C.D. Cal.). Elizabeth J. Cabraser serves as Co-Lead Counsel for the plaintiffs in the Toyota injury cases in federal court and our firm represents individuals and families of loved ones nationwide who died in Toyota sudden acceleration accidents. Plaintiffs charge that Toyota knew of numerous complaints that its vehicles accelerated suddenly and could not be stopped by proper application of the brake pedal. Plaintiffs further charge that Toyota breached its duty to manufacture and sell safe automobiles by failing to incorporate within its vehicles a brake override system and other readily available safeguards that could have prevented sudden unintended acceleration. In 2010, U.S. District Court Judge James V. Selna denied Toyota's motion to dismiss the lawsuits. Discovery remains ongoing and cases are being selected and prepared for trial.

2.   ***Injury and Death Lawsuits Involving Wrongful Driver Conduct and Defective Tires, Transmissions, Cars and/or Vehicle Parts (Seat Belts, Roof Crush,  Defective seats, and Other Defects).***  Lieff Cabraser has an active practice prosecuting claims for clients injured, or the families of loved ones who have died, by wrongful driver conduct and by unsafe and defective vehicles, tires, restraint systems, seats,  and other automotive equipment.  We represent clients in actions involving fatalities and serious injuries from tire and transmission failures as well as rollover accidents (and defective roofs, belts, seat back and other parts) as well as defective transmissions and/or shifter gates that cause vehicles to self-shift from park or false park into reverse.   Our attorneys have received awards and recognition from *California Lawyer* magazine (Lawyer of the Year Award), the Consumer Attorneys of California, and the San Francisco Trial Lawyers Association for their dedication to their clients and outstanding success in vehicle injury cases.

3.   ***Actos Litigation.***  Lieff Cabraser represents patients who have developed bladder or prostate cancer linked to the prescription drug pioglitazone, sold under the brand name Actos by the Japan-based Takeda Pharmaceutical Company, Ltd.  Actos is prescribed for patients with Type 2 Diabetes.  In April 2012, Canadian health authorities reported that diabetes patients prescribed Actos for over a year had double the risk of bladder cancer compared to diabetes patients not taking Actos.

4.   ***DePuy Artificial Hip Implants Litigation***.  Lieff Cabraser represents patients nationwide who received the ASR XL Acetabular and ASR Hip Resurfacing systems manufactured by DePuy Orthopedics, a unit of Johnson & Johnson.  In 2010, DePuy Orthopedics announced the recall of its all-metal ASR hip implants, which were implanted in 40,000 patients from August 2005 through August 2010.  The complaints allege that DePuy Orthopedics was aware its ASR hip implants were failing at a high rate, yet continued to manufacture and sell the device.  In January 2011, in *In re DePuy Orthopaedics, Inc. ASR Hip Implant Products*, MDL No. 2197, the Court overseeing all DePuy recall lawsuits in federal court appointed Lieff Cabraser attorney Wendy R. Fleishman to the Plaintiffs' Steering Committee for the organization and coordination of the litigation. In July 2011, in the coordinated proceedings in California state court, the Court appointed Lieff Cabraser attorney Robert J. Nelson to serve on the Plaintiffs' Steering Committee. We also represent patients whose DePuy Pinnacle artificial hip with the metal insert, called the Ultamet metal liner, has prematurely failed.

5.   ***Fen-Phen ("Diet Drugs") Litigation.***  Since the recall was announced in 1997, Lieff Cabraser has represented individuals who suffered injuries from the "Fen-Phen" diet drugs fenfluramine (sold as

Pondimin) and/or dexfenfluramine (sold as Redux).  We served as counsel for the plaintiff that filed the first nationwide class action lawsuit against the diet drug manufacturers alleging that they had failed to adequately warn physicians and consumers of the risks associated with the drugs.  In *In re Diet Drugs (Phentermine / Fenfluramine / Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.), the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Management Committee which organized and directed the Fen-Phen diet drugs litigation filed across the nation in federal courts.  In August 2000, the Court approved a $4.75 billion settlement offering both medical monitoring relief for persons exposed to the drug and compensation for persons with qualifying damage.  We represented over  2,000  persons that suffered valvular heart disease, pulmonary hypertension or other problems (such as needing echocardiogram screening for damage) due to  and/or following exposure to Fen-Phen and obtained more than $300 million in total for clients in individual cases and/or claims.  We continue to represent persons that suffered valvular heart disease due to Fen-Phen and received compensation under the Diet Drugs Settlement who now require heart value surgery.  These persons may be eligible to submit a new claim and receive additional compensation under the settlement.

6.      ***Fosamax Litigation.***  Bisphosphonates such as Fosamax are part of a class of drugs used to slow bone loss associated with osteoporosis.  These drugs are primarily prescribed to post-menopausal women, and long-term use of these drugs has been linked to debilitating, atypical femur fractures.  An FDA Advisory Committee voted in September 2011 to change the label on bisphosphonates to warn of the unusual femur fractures, and voted to further consider adding a warning suggesting a "drug holiday" or cessation of use entirely after 3 to 5 years of use.  Many women who had osteopenia only, and not osteoporosis, were given bisphosphonates, as well.  We represent patients prescribed Fosamax who have suffered atypical femur fractures.

7.      ***Medtronic Infuse Litigation.***  Lieff Cabraser represents patients who have suffered serious injuries from the off-label use of the Infuse bone graft, manufactured by Medtronic Inc.  The Food and Drug Administration has approved Infuse for only one type of spine surgery, the anterior lumbar fusion.  Many patients, however, received an off-label use of Infuse were never informed of the off-label nature of the surgery.  Serious complications associated with Infuse include uncontrolled bone growth and chronic pain from nerve injuries.

8.      ***Mirena Litigation.***  A widely-used, plastic intrauterine device (IUD) that releases a hormone into the uterus to prevent pregnancy, Mirena is manufactured by Bayer Healthcare Pharmaceuticals.  Lieff Cabraser represents patients who have suffered serious injuries linked to the IUD.

These injuries include uterine perforation (the IUD tears through the cervix or the wall of the uterus), ectopic pregnancy (when the embryo implants outside the uterine cavity), pelvic infections and pelvic inflammatory disease, and thrombosis (blood clots).

9. ***Pradaxa Litigation.*** Lieff Cabraser represents patients who have experienced uncontrolled bleeding linked to Pradaxa, an anticoagulant used to prevent the clots that can lead to strokes.  In the event of an over-dose or other serious complications with Pradaxa, unlike Coumadin, an anti-clotting drug approved over 50 years ago, no antidotes exist.

10. ***Simply Thick Litigation.*** Lieff Cabraser represents parents whose infants have died or suffered life-threatening injuries linked to Simply Thick, a thickening agent added to the feeding regimen of premature infants with difficulties swallowing.  Earlier versions of the product have been linked to necrotizing enterocolitis (NEC), a life-threatening condition characterized by the inflammation and death of intestinal tissue.

11. ***SSRI Antidepressant Drugs and Birth Defects Litigation.*** Lieff Cabraser represents the parents of infants with birth defects whose mothers were prescribed antidepressant drugs during their pregnancy. The usage of these drugs during pregnancy has been linked to multiple types of birth defects, including, neonatal abstinence syndrome from experiencing withdrawal of the drug and persistent pulmonary hypertension of the newborn (PPHN).

12. ***Vaginal Mesh Litigation.*** Vaginal mesh is a polypropylene material implanted as a treatment for pelvic organ prolapse or stress urinary incontinence.  Gynecare Transvaginal products, manufactured and sold by Johnson & Johnson, as well as mesh products made by Boston Scientific, AMS, Bard, Caldera, and Coloplast, have been linked to serious side effects including erosion into the vaginal wall or other organs, infection, internal organ damage, and urinary problems.

13. ***Wright Medical Hip Litigation.*** The Profemur-Z system manufactured by Wright Medical Technology consists of three separate components:  a femoral head, a modular neck, and a femoral stem.  Prior to 2009, Profemur-Z hip system included a titanium modular neck adapter and stem which was implanted in 10,000 patients.  Lieff Cabraser represents patients whose Profemur-Z hip implant has fractured, requiring a second hip replacement surgery.

14. ***Yaz and Yasmin Litigation***. Lieff Cabraser represents women prescribed Yasmin and Yaz oral contraceptives who suffered blood clots, deep vein thrombosis, strokes, and heart attacks, as well as the families of loved ones who died suddenly while taking these medications.  The

complaints allege that Bayer, the manufacturer of Yaz and Yasmin, failed to adequately warn patients and physicians of the increased risk of serious adverse effects from Yasmin and Yaz. The complaints also charge that these oral contraceptives posed a greater risk of serious side effects than other widely available birth control drugs.

**B.      Successes**

1.      ***Multi-State Tobacco Litigation***. Lieff Cabraser represented the Attorneys General of Massachusetts, Louisiana and Illinois, several additional states, and 21 cities and counties in California, in litigation against Philip Morris, R.J. Reynolds and other cigarette manufacturers. The suits were part of the landmark $206 billion settlement announced in November 1998 between the tobacco industry and the states' attorneys general. The states, cities and counties sought both to recover the public costs of treating smoking-related diseases and require the tobacco industry to undertake extensive modifications of its marketing and promotion activities in order to reduce teenage smoking. In California alone, Lieff Cabraser's clients were awarded an estimated $12.5 billion to be paid over the next 25 years.

2.      ***In re Vioxx Products Liability Litigation***, MDL No. 1657 (E.D. La.). Lieff Cabraser represented patients who suffered heart attacks or strokes, and the families of loved ones who died, after having been prescribed the arthritis and pain medication Vioxx. In individual personal injury lawsuits against Merck, the manufacturer of Vioxx, our clients allege that Merck falsely promoted the safety of Vioxx and failed to disclose the full range of the drug's dangerous side effects. In April 2005, in the federal multidistrict litigation, the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Steering Committee, which has the responsibility of conducting all pretrial discovery of Vioxx cases in Federal court and pursuing all settlement options with Merck. In August 2006, Lieff Cabraser was co-counsel in *Barnett v. Merck*, which was tried in the federal Court in New Orleans. Lieff Cabraser attorneys Don Arbitblit and Jennifer Gross participated in the trial, working closely with attorneys Mark Robinson and Andy Birchfield. The jury reached a verdict in favor of Mr. Barnett, finding that Vioxx caused his heart attack, and that Merck's conduct justified an award of punitive damages. In November 2007, Merck announced it had entered into an agreement with the executive committee of the Plaintiffs' Steering Committee as well as representatives of plaintiffs' counsel in state coordinated proceedings. Merck paid $4.85 billion into a settlement fund for qualifying claims.

3.      ***In re Silicone Gel Breast Implants Products Liability Litigation***, MDL No. 926 (N.D. Ala.). Lieff Cabraser served on the Plaintiffs' Steering Committee and was one of five members of the

negotiating committee which achieved a $4.25 billion global settlement with certain defendants of the action. This was renegotiated in 1995, and is referred to as the Revised Settlement Program ("RSP"). Over 100,000 recipients have received initial payments, reimbursement for the explanation expenses and/or long term benefits.

4.  ***Sulzer Hip and Knee Prosthesis Liability Litigation.*** In December 2000, Sulzer Orthopedics, Inc., announced the recall of approximately 30,000 units of its Inter-Op Acetabular Shell Hip Implant, followed in May 2001 with a notification of failures of its Natural Knee II Tibial Baseplate Knee Implant. In coordinated litigation in California state court, *In re Hip Replacement Cases*, JCCP 4165, Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Co-Lead Counsel. In the federal litigation, *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, MDL No. 1410, Lieff Cabraser played a significant role in negotiating a revised global settlement of the litigation valued at more than $1 billion. The revised settlement, approved by the Court in May 2002, provided patients with defective implants almost twice the cash payment as under an initial settlement. On behalf of our clients, Lieff Cabraser objected to the initial settlement.

5.  ***In re Bextra/Celebrex Marketing Sales Practices and Products Liability Litigation***, MDL No. 1699 (N.D. Cal.). Lieff Cabraser served as Plaintiffs' Liaison Counsel and Elizabeth J. Cabraser chaired the Plaintiffs' Steering Committee (PSC) charged with overseeing all personal injury and consumer litigation in Federal courts nationwide arising out of the sale and marketing of the COX-2 inhibitors Bextra and Celebrex, manufactured by Pfizer, Inc. and its predecessor companies Pharmacia Corporation and G.D. Searle, Inc.

Under the global resolution of the multidistrict tort and consumer litigation announced in October 2008, Pfizer paid over $800 million to claimants, including over $750 million to resolve death and injury claims.

In a report adopted by the Court on common benefit work performed by the PSC, the Special Master stated:

> [L]eading counsel from both sides, and the attorneys from the PSC who actively participated in this litigation, demonstrated the utmost skill and professionalism in dealing with numerous complex legal and factual issues. The briefing presented to the Special Master, and also to the Court, and the development of evidence by both sides was exemplary. The Special Master particularly wishes to recognize that leading counsel for both sides

worked extremely hard to minimize disputes, and
when they arose, to make sure that they were raised
with a minimum of rancor and a maximum of
candor before the Special Master and Court.

6.     ***In re Guidant Implantable Defibrillators Products Liability
Litigation***, MDL No. 1708.  Lieff Cabraser serves on the Plaintiffs' Lead
Counsel Committee in litigation in federal court arising out of the recall of
Guidant cardiac defibrillators implanted in patients because of potential
malfunctions in the devices.  At the time of the recall, Guidant admitted it
was aware of 43 reports of device failures, and two patient deaths.
Guidant subsequently acknowledged that the actual rate of failure may be
higher than the reported rate and that the number of associated deaths
may be underreported since implantable cardio-defibrillators are not
routinely evaluated after death.  In January 2008, the parties reached a
global settlement of the action.  Guidant's settlements of defibrillator-
related claims will total $240 million.

7.     ***In re Copley Pharmaceutical, Inc., "Albuterol" Products
Liability Litigation***, MDL No. 1013 (D. Wyo.).  Lieff Cabraser served
on the Plaintiffs' Steering Committee in a class action lawsuit against
Copley Pharmaceutical, which manufactured Albuterol, a bronchodilator
prescription pharmaceutical.  Albuterol was the subject of a nationwide
recall in January 1994 after a microorganism was found to have
contaminated the solution, allegedly causing numerous injuries including
bronchial infections, pneumonia, respiratory distress and, in some cases,
death.  In October 1994, the district court certified a nationwide class on
liability issues.  *In re Copley Pharmaceutical*, 161 F.R.D. 456 (D. Wyo.
1995).  In November 1995, the district court approved a $150 million
settlement of the litigation.

8.     ***Mraz v. DaimlerChrysler***, No. BC 332487 (Cal. Supr. Ct.).  In March
2007, the jury returned a $54.4 million verdict, including $50 million in
punitive damages, against DaimlerChrysler for intentionally failing to
cure a known defect in millions of its vehicles that led to the death of
Richard Mraz, a young father.  Mr. Mraz suffered fatal head injuries when
the 1992 Dodge Dakota pickup truck he had been driving at his work site
ran him over after he exited the vehicle believing it was in park.  The jury
found that a defect in the Dodge Dakota's automatic transmission, called
a park-to-reverse defect, played a substantial factor in Mr. Mraz's death
and that DaimlerChrysler was negligent in the design of the vehicle for
failing to warn of the defect and then for failing to adequately recall or
retrofit the vehicle.

For their outstanding service to their clients in *Mraz* and advancing the
rights of all persons injured by defective products, Lieff Cabraser partners

Robert J. Nelson, the lead trial counsel, received the 2008 California Lawyer of the Year (CLAY) Award in the field of personal injury law, and were also selected as finalists for attorney of the year by the Consumer Attorneys of California and the San Francisco Trial Lawyers Association.

In March 2008, a Louisiana-state jury found DaimlerChrysler liable for the death of infant Collin Guillot and injuries to his parents Juli and August Guillot and their then 3-year-old daughter, Madison. The jury returned a unanimous verdict of $5,080,000 in compensatory damages. The jury found that a defect in the Jeep Grand Cherokee's transmission, called a park-to-reverse defect, played a substantial factor in Collin Guillot's death and the severe injuries suffered by Mr. and Mrs. Guillot and their daughter. Lieff Cabraser served as co-counsel in the trial.

9.    ***In re Telectronics Pacing Systems Inc., Accufix Atrial "J" Leads Products Liability Litigation***, MDL No. 1057 (S.D. Ohio). Lieff Cabraser served on the court-appointed Plaintiffs' Steering Committee in a nationwide products liability action alleging that defendants placed into the stream of commerce defective pacemaker leads. In April 1997, the district court re-certified a nationwide class of "J" Lead implantees with subclasses for the claims of medical monitoring, negligence and strict product liability. A summary jury trial utilizing jury instructions and interrogatories designed by Lieff Cabraser occurred in February 1998. A partial settlement was approved thereafter by the district court but reversed by the Court of Appeals. In March 2001, the district court approved a renewed settlement that included a $58 million fund to satisfy all past, present and future claims by patients for their medical care, injuries, or damages arising from the lead.

10.   ***In re Zimmer Durom Cup Product Liability Litigation***, MDL No. 2158. Lieff Cabraser served as Co-Liaison Counsel for patients nationwide injured by the defective Durom Cup manufactured by Zimmer Holdings. First sold in the U.S. in 2006, Zimmer marketed its 'metal-on-metal' Durom Cup implant as providing a greater range of motion and less wear than traditional hip replacement components. In July 2008, Zimmer announced the suspension of Durom sales. The complaints charged that the Durom cup was defective and led to the premature failure of the implant. In 2011 and 2012, the patients represented by Lieff Cabraser settled their cases with Zimmer on favorable, confidential terms.

11.   ***Advanced Medical Optics Complete MoisturePlus Litigation***. Lieff Cabraser represented consumers nationwide in personal injury lawsuits filed against Advanced Medical Optics arising out of the May 2007 recall of AMO's Complete MoisturePlus Multi-Purpose Contact Lens Solution. The product was recalled due to reports of a link between a rare, but serious eye infection, *Acanthamoeba keratitis*, caused by a

parasite and use of AMO's contact lens solution.  Though AMO promoted Complete MoisturePlus Multi-Purpose as "effective against the introduction of common ocular microorganisms," the complaints charged that AMO's lens solution was ineffective and vastly inferior to other multipurpose solutions on the market.  In many cases, patients were forced to undergo painful corneal transplant surgery to save their vision and some have lost all or part of their vision permanently.  The patients represented by Lieff Cabraser resolved their cases with AMO on favorable, confidential terms.

12.     ***Luisi v. Medtronic,*** No. 07 CV 4250 (D. Minn.).  Lieff Cabraser represented over seven hundred heart patients nationwide who were implanted with recalled Sprint Fidelis defibrillator leads manufactured by Medtronic Inc.  Plaintiffs charge that Medtronic has misrepresented the safety of the Sprint Fidelis leads and a defect in the device triggered their receiving massive, unnecessary electrical shocks.  On October 14, 2010, Medtronic announced that it has entered into an agreement to settle the litigation, subject to certain conditions.  As of January 2013, the majority of claims have been paid through the Settlement Administration Process.

13.     ***Blood Factor VIII And Factor IX Litigation.***  Working with counsel in Asia, Europe, Central and South America and the Middle East, Lieff Cabraser represented over 1,500 hemophiliacs worldwide, or their survivors and estates, who contracted HIV and/or Hepatitis C (HCV), and Americans with hemophilia who contracted HCV, from contaminated and defective blood factor products produced by American pharmaceutical companies.  In 2004, Lieff Cabraser was appointed Plaintiffs' Lead Counsel of the "second generation" Blood Factor MDL litigation presided over by Judge Grady in the Northern District of Illinois.  The case was resolved through a global settlement signed in 2009.

14.     ***In Re Yamaha Motor Corp. Rhino ATV Products Liability Litigation,*** MDL No. 2016 (W.D. Ky.)  Lieff Cabraser served as Plaintiffs' Lead Counsel in the litigation in federal court and Co-Lead Counsel in coordinated California state court litigation arising out of serious injuries and deaths in rollover accidents involving the Yamaha Rhino.  The complaints charged that the Yamaha Rhino contained numerous design flaws, including the failure to equip the vehicles with side doors, which resulted in repeated broken or crushed legs, ankles or feet for riders.  Plaintiffs alleged also that the Yamaha Rhino was unstable due to a narrow track width and high center of gravity leading to rollover accidents that killed and/or injured scores of persons across the nation.  On behalf of victims and families of victims and along with the Center for Auto Safety, and the San Francisco Trauma Foundation, Lieff Cabraser advocated for numerous safety changes  to the Rhino in reports submitted to the U.S. Consumer Product Safety Commission

(CPSC).  On March 31, 2009, the CPSC, in cooperation with Yamaha Motor Corp. U.S.A., announced a free repair program for all Rhino 450, 660, and 700 models to improve safety, including  the addition of spacers and removal of a rear only anti-sway bar.

15. ***In re ReNu With MoistureLoc Contact Lens Solution Products Liability Litigation***, MDL No. 1785 (D. S.C.).  Lieff Cabraser served on the Plaintiffs' Executive Committee in federal court litigation arising out of Bausch & Lomb's 2006 recall of its ReNu with MoistureLoc contact lens solution.  Consumers who developed *Fusarium keratitis*, a rare and dangerous fungal eye infection, as well as other serious eye infections, alleged the lens solution was defective.  Some consumers were forced to undergo painful corneal transplant surgery to save their vision; others lost all or part of their vision permanently.  The litigation was resolved under favorable, confidential settlements with Bausch & Lomb.

16. ***In re Baycol Products Litigation***, MDL No. 1431 (D. Minn.).  Baycol was one of a group of drugs called statins, intended to reduce cholesterol.  In August 2001, Bayer A.G. and Bayer Corporation, the manufacturers of Baycol, withdrew the drug from the worldwide market based upon reports that Baycol was associated with serious side effects and linked to the deaths of over 100 patients worldwide.  In the federal multi-district litigation, Lieff Cabraser served as a member of the Plaintiffs' Steering Committee (PSC) and the Executive Committee of the PSC.  In addition, Lieff Cabraser represented approximately 200 Baycol patients who have suffered injuries or family members of patients who died allegedly as a result of ingesting Baycol.  In these cases, our clients reached confidential favorable settlements with Bayer.

## II.   Securities and Financial Fraud

### A.   Current Cases

1. ***The Charles Schwab Corp. v. Bank of America Corp***., No. 11-cv-07779 PKC (S.D. N.Y.).  Lieff Cabraser represents fourteen mutual funds of The Charles Schwab Corporation in an independent securities action against Bank of America Corporation. The action seeks recovery of losses that these funds incurred as a result of Bank of America's alleged misrepresentations and concealment of material facts in connection with its acquisition of Merrill Lynch & Co., Inc. Specifically, Bank of America failed to inform its shareholders, before the December 5, 2008 vote on the Bank of America-Merrill Lynch merger, of Merrill Lynch's tremendous fourth quarter 2008 losses, as well as its plans to give billions of dollars in performance bonuses to Merrill Lynch employees despite those losses. The complaint was filed in the Northern District of California and transferred to the MDL proceeding in the Southern District of New York.

2.      ***The Charles Schwab Corp. v. BNP Paribas Sec. Corp.***, No. CGC-10-501610 (Cal. Super. Ct.); ***The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.***, No. CGC-10-503206 (Cal. Super. Ct.); ***The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.***, No. CGC-10-503207 (Cal. Super. Ct.); and ***The Charles Schwab Corp. v. Banc of America Sec. LLC***, No. CGC-10-501151 (Cal. Super. Ct.).  Lieff Cabraser represents The Charles Schwab Corporation ("Schwab") in four separate individual securities actions against certain issuers and sellers of mortgage-backed securities for materially misrepresenting the quality of the loans underlying the securities.  Schwab's subsidiary, Charles Schwab Bank, N.A., suffered significant damages by purchasing the securities in reliance on defendants' misstatements.

3.      ***In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litigation***, Case No.  MD-12-2335-LAK (S.D.N.Y.).  Lieff Cabraser is one of three firms serving on the Plaintiffs' Executive Committee in consolidated litigation against The Bank of New York Mellon Corporation ("BNY Mellon") and its predecessors and subsidiaries, in which plaintiffs allege that defendants charged custodial customers fictitious foreign currency exchange ("FX") rates in connection with the purchase and sale of foreign securities. The actions allege that for the past decade, defendants consistently incorporated hidden and excessive mark-ups or mark-downs relative to the actual FX rates applicable at the times of the trades conducted for defendants' custodial FX clients, and that defendants allegedly kept for themselves, as an unlawful profit, the difference between the false and actual price for each FX transaction. In addition to serving on Plaintiffs' Executive Committee, Lieff Cabraser is also co-lead class counsel for a proposed nationwide class of affected custodial customers of BNY Mellon, including public pension funds, ERISA funds, and other public and private institutions. Prior to the cases being transferred and consolidated in the Southern District of New York, Lieff Cabraser defeated, in its entirety, BNY Mellon's motion to dismiss claims brought on behalf of ERISA and other funds under California's and New York's consumer protection laws. Additional clients and proposed class representatives in the consolidated litigation, in which discovery is currently proceeding, include the Ohio Police & Fire Pension Fund and the School Employees Retirement System of Ohio.

4.      ***Arkansas Teacher Retirement System v. State Street Corp.***, No. 11cv10230 (MLW) (D. Mass.).  Lieff Cabraser is co-counsel for a proposed nationwide class of institutional clients of State Street, including public pension funds, who allege that defendants charged class members fictitious FX rates in connection with the purchase and sale of foreign securities.  The complaint charges that for the past decade, defendants consistently incorporated hidden and excessive mark-ups or mark-downs relative to the actual FX rates applicable at the times of the trades

conducted for defendants' custodial FX clients.  Defendants allegedly kept for themselves, as an unlawful profit, the difference between the false and actual price for each FX transaction.  Plaintiffs seek recovery under Massachusetts' Consumer Protection Law and common law tort and contract theories.  Motions to dismiss have been fully briefed.  Lieff Cabraser is also actively involved in counseling other state pension and ERISA funds with respect to their potential exposure to FX manipulation by custodial service providers.

5.      ***Schwab S&P 500 Index Fund. v. Pfizer***, No. 12-cv-8543 (S.D.N.Y.).  Lieff Cabraser represents 14 funds of The Charles Schwab Corporation in an independent securities action against Pfizer Inc. and current and former senior Pfizer executives.  The action seeks recovery of damages sustained in connection with the defendants' alleged fraudulent misrepresentations and omissions regarding the safety of Celebrex and Bextra, two of Pfizer's pain-relieving drugs.  As a result of the alleged fraud, the Schwab funds suffered significant losses in connection with their purchases of Pfizer common stock on the New York Stock Exchange between October 31, 2000 and October 19, 2005.

6.      ***DiNapoli v. Bank of America Corp***., No. 10 CV 5563 (S.D. N.Y.).  Lieff Cabraser, together with co-counsel, represents the New York State Common Retirement Fund, the New York State Teachers' Retirement System, and the Public Employees' Retirement Association of Colorado in an independent securities action against Bank of America Corporation.  The action seeks recovery of losses that these retirement funds incurred as a result of Bank of America's alleged misrepresentations and concealment of material facts in connection with its acquisition of Merrill Lynch & Co., Inc. Specifically, Bank of America failed to inform its shareholders, before the December 5, 2008 vote on the Bank of America-Merrill Lynch merger, of Merrill Lynch's tremendous fourth quarter 2008 losses, as well as its plans to give billions of dollars in performance bonuses to Merrill Lynch employees despite those losses.  Bank of America has answered the complaint and discovery is ongoing.

7.      ***In re A-Power Energy Generation Systems, Ltd. Securities Litigation***, No. 2:11-ml-2302-GW- (CWx) (C.D. Cal.). Lieff Cabraser serves as Court-appointed Lead Counsel for Lead Plaintiff in this securities class action that charges defendants with materially misrepresenting A-Power Energy Generation Systems, Ltd.'s financial results and business prospects in violation of the antifraud provisions of the Securities Exchange Act of 1934.  The Court will hear an unopposed motion for preliminary approval of a settlement for $3.675 million on January 7, 2013.

**B.    Successes**

1.   ***In re First Capital Holdings Corp. Financial Products Securities Litigation***, MDL No. 901 (C.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel in a class action brought to recover damages sustained by policyholders of First Capital Life Insurance Company and Fidelity Bankers Life Insurance Company policyholders resulting from the insurance companies' allegedly fraudulent or reckless investment and financial practices, and the manipulation of the companies' financial statements.  This policyholder settlement generated over $1 billion in restored life insurance policies. The  settlement was approved by both federal and state courts in parallel proceedings and then affirmed by the Ninth Circuit on appeal.

2.   ***In re Broadcom Corporation Derivative Litigation***, No. CV 06-3252-R (C.D. Cal.).  Lieff Cabraser served as Court-appointed Lead Counsel in a shareholders derivative action arising out of stock options backdating in Broadcom securities.  The complaint alleged that defendants intentionally manipulated their stock option grant dates between 1998 and 2003 at the expense of Broadcom and Broadcom shareholders. By making it seem as if stock option grants occurred on dates when Broadcom stock was trading at a comparatively low per share price, stock option grant recipients were able to exercise their stock option grants at exercise prices that were lower than the fair market value of Broadcom stock on the day the options were actually granted.  On December 14, 2009, U.S. District Judge Manuel L. Real granted final approval to a partial settlement in which Broadcom Corporation's insurance carriers paid $118 million to Broadcom.  The settlement released certain individual director and officer defendants covered by Broadcom's directors' and officers' policy.

Plaintiffs' counsel continued to pursue claims against William J. Ruehle, Broadcom's former Chief Financial Officer, Henry T. Nicholas, III, Broadcom's co-founder and former Chief Executive Officer, and Henry Samueli, Broadcom's co-founder and former Chief Technology Officer. On May 23, 2011, the Court granted final approval to a settlement with these defendants.  The settlement provided substantial consideration to Broadcom, consisting of the receipt of cash and cancelled options from Dr. Nicholas and Dr. Samueli totaling $53 million in value, plus the release of a claim by Mr. Ruehle, which sought damages in excess of $26 million, leading to a total settlement valued at $79 million.

Coupled with the earlier $118 million partial settlement, the total recovery in the derivative action is approximately $197.5 million, which constitutes the third-largest settlement ever in a derivative action involving stock options backdating.

3.      ***In re Scorpion Technologies Securities Litigation I***, No. C-93-20333-EAI (N.D. Cal.); ***Dietrich v. Bauer***, No. C-95-7051-RWS (S.D.N.Y.); ***Claghorn v. Edsaco***, No. 98-3039-SI (N.D. Cal.). Lieff Cabraser served as Lead Counsel in class action suits arising out of an alleged fraudulent scheme by Scorpion Technologies, Inc., certain of its officers, accountants, underwriters and business affiliates to inflate the company's earnings through reporting fictitious sales. In Scorpion I, the Court found plaintiffs had presented sufficient evidence of liability under Federal securities acts against the accounting firm Grant Thornton for the case to proceed to trial. In re Scorpion Techs., 1996 U.S. Dist. LEXIS 22294 (N.D. Cal. Mar. 27, 1996). In 1988, the court approved a $5.5 million settlement with Grant Thornton. In 2000, the Court approved a $950,000 settlement with Credit Suisse First Boston Corporation. In April 2002, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd. The jury found that Edsaco aided Scorpion in setting up phony European companies as part of a scheme in which Scorpion reported fictitious sales of its software to these companies, thereby inflating its earnings. Included in the jury verdict, one of the largest verdicts in the U.S. in 2002, was $165 million in punitive damages. Richard M. Heimann conducted the trial for plaintiffs.

On June 14, 2002, U.S. District Court Judge Susan Illston commented on Lieff Cabraser's representation: "[C]ounsel for the plaintiffs did a very good job in a very tough situation of achieving an excellent recovery for the class here. You were opposed by extremely capable lawyers. It was an uphill battle. There were some complicated questions, and then there was the tricky issue of actually collecting anything in the end. I think based on the efforts that were made here that it was an excellent result for the class. . . [T]he recovery that was achieved for the class in this second trial is remarkable, almost a hundred percent."

4.      ***Merrill Lynch Fundamental Growth Fund and Merrill Lynch Global Value Fund  v. McKesson HBOC***, No. 02-405792 (Cal. Supr. Ct.). Lieff Cabraser served as counsel for two Merrill Lynch sponsored mutual funds in a private lawsuit alleging that a massive accounting fraud occurred at HBOC & Company ("HBOC") before and following its 1999 acquisition by McKesson Corporation ("McKesson"). The funds charged that defendants, including the former CFO of McKesson HBOC, the name McKesson adopted after acquiring HBOC, artificially inflated the price of securities in McKesson HBOC, through misrepresentations and omissions concerning the financial condition of HBOC, resulting in approximately $135 million in losses for plaintiffs. In a significant discovery ruling in 2004, the California Court of Appeal held that defendants waived the attorney-client and work product privileges in regard to an audit committee report and interview memoranda prepared in anticipation of shareholder lawsuits by disclosing the information to the U.S. Attorney

and SEC.  *McKesson HBOC, Inc. v. Supr. Court*, 115 Cal. App. 4th 1229 (2004).  Lieff Cabraser's clients recovered approximately $145 million, representing nearly 104% of damages suffered by the funds.  This amount was approximately $115-120 million more than the Merrill Lynch funds would have recovered had they participated in the federal class action settlement.

5.  ***Informix/Illustra Securities Litigation***, No. C-97-1289-CRB (N.D. Cal.).  Lieff Cabraser represented Richard H. Williams, the former Chief Executive Officer and President of Illustra Information Technologies, Inc. ("Illustra"), and a class of Illustra shareholders in a class action suit on behalf of all former Illustra securities holders who tendered their Illustra preferred or common stock, stock warrants or stock options in exchange for securities of Informix Corporation ("Informix") in connection with Informix's 1996 purchase of Illustra.  Pursuant to that acquisition, Illustra stockholders received Informix securities representing approximately 10% of the value of the combined company.  The complaint alleged claims for common law fraud and violations of Federal securities law arising out of the acquisition.  In October 1999, U.S. District Judge Charles E. Breyer approved a global settlement of the litigation for $136 million, constituting one of the largest settlements ever involving a high technology company alleged to have committed securities fraud.  Our clients, the Illustra shareholders, received approximately 30% of the net settlement fund.

6.  ***In re Qwest Communications International Securities and "ERISA" Litigation (No. II)***, No. 06-cv-17880-REB-PAC (MDL No. 1788) (D. Colo.).  Lieff Cabraser represented the New York State Common Retirement Fund, Fire and Police Pension Association of Colorado, Denver Employees' Retirement Plan, San Francisco Employees' Retirement System, and over thirty BlackRock managed mutual funds in individual securities fraud actions ("opt out" cases) against Qwest Communications International, Inc., Philip F. Anschutz, former co-chairman of the Qwest board of directors,  and other senior executives at Qwest.  In each action, the plaintiffs charged defendants with massively overstating Qwest's publicly-reported growth, revenues, earnings, and earnings per share from 1999 through 2002.  The cases were filed in the wake of a $400 million settlement of a securities fraud class action against Qwest  that was announced in  early 2006.  The cases brought by Lieff Cabraser's clients settled in October 2007 for recoveries totaling more than $85 million, or more than 13 times what the clients would have received had they remained in the class.

7.  ***In re AXA Rosenberg Investor Litigation***, No. CV 11-00536 JSW (N.D. Cal)  Lieff Cabraser served as Co-Lead Counsel for a class of institutional investors, ERISA-covered plans, and other investors in

quantitative funds managed by AXA Rosenberg Group, LLC and its affiliates ("AXA"). Plaintiffs alleged that AXA breached its fiduciary duties and violated ERISA by failing to discover a material computer error that existed in its system for years, and then failing to remedy it for months after its eventual discovery in 2009. By the time AXA disclosed the error in 2010, investors had suffered losses and paid substantial investment management fees to AXA. After briefing motions to dismiss and working with experts to analyze data obtained from AXA relating to the impact of the error, we reached a $65 million settlement with AXA that the Court approved in April 2012.

8.    ***In re National Century Financial Enterprises, Inc. Investment Litigation***, MDL No. 1565 (S.D. Ohio). Lieff Cabraser served as outside counsel for the New York City Employees' Retirement System, Teachers' Retirement System for the City of New York, New York City Police Pension Fund, and New York City Fire Department Pension Fund in this multidistrict litigation arising from fraud in connection with NCFE's issuance of notes backed by healthcare receivables. The New York City Pension Funds recovered more than 70% of their $89 million in losses, primarily through settlements achieved in the federal litigation and another NCFE-matter brought on their behalf by Lieff Cabraser.

9.    ***BlackRock Global Allocation Fund v. Tyco International Ltd., et al.***, No. 2:08-cv-519 (D. N.J.); ***Nuveen Balanced Municipal and Stock Fund v. Tyco International Ltd., et al.***, No. 2:08-cv-518 (D. N.J.). Lieff Cabraser represented multiple funds of the investment firms BlackRock Inc. and Nuveen Asset Management in separate, direct securities fraud actions against Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd, Covidien (U.S.), L. Dennis Kozlowski, Mark H. Swartz, and Frank E. Walsh, Jr. Plaintiffs alleged that defendants engaged in a massive criminal enterprise that combined the theft of corporate assets with fraudulent accounting entries that concealed Tyco's financial condition from investors. As a result, plaintiffs purchased Tyco common stock and other Tyco securities at artificially inflated prices and suffered losses upon disclosures revealing Tyco's true financial condition and defendants' misconduct. In 2009, the parties settled the claims against the corporate defendants (Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd., and Covidien (U.S.). The litigation concluded in 2010. The total settlement proceeds paid by all defendants were in excess of $57 million.

10.   ***Kofuku Bank and Namihaya Bank v. Republic New York Securities Corp.***, No. 00 CIV 3298 (S.D.N.Y.); and ***Kita Hyogo Shinyo-Kumiai v. Republic New York Securities Corp.***, No. 00 CIV 4114 (S.D.N.Y.). Lieff Cabraser represented Kofuku Bank, Namihaya Bank and Kita Hyogo Shinyo-Kumiai (a credit union) in individual

lawsuits against, among others, Martin A. Armstrong and HSBC, Inc., the successor-in-interest to Republic New York Corporation, Republic New York Bank and Republic New York Securities Corporation for alleged violations of federal securities and racketeering laws.  Through a group of interconnected companies owned and controlled by Armstrong—the Princeton Companies—Armstrong and the Republic Companies promoted and sold promissory notes, known as the "Princeton Notes," to more than eighty of the largest companies and financial institutions in Japan.  Lieff Cabraser's lawsuits, as well as the lawsuits of dozens of other Princeton Note investors, alleged that the Princeton and Republic Companies made fraudulent misrepresentations and non-disclosures in connection with the promotion and sale of Princeton Notes, and that investors' moneys were commingled and misused to the benefit of Armstrong, the Princeton Companies and the Republic Companies.  In December 2001, the claims of our clients and those of the other Princeton Note investors were settled.  As part of the settlement, our clients recovered more than $50 million, which represented 100% of the value of their principal investments less money they received in interest or other payments.

11. ***Alaska State Department of Revenue v. America Online***, No. 1JU-04-503 (Alaska Supr. Ct.).  In December 2006, a $50 million settlement was reached in a securities fraud action brought by the Alaska State Department of Revenue, Alaska State Pension Investment Board and Alaska Permanent Fund Corporation against defendants America Online, Inc. ("AOL"), Time Warner Inc. (formerly known as AOL Time Warner ("AOLTW")), Historic TW Inc.  When the action was filed, the Alaska Attorney General estimated total losses at $70 million.  The recovery on behalf of Alaska was approximately 50 times what the state would have received as a member of the class in the federal securities class action settlement.  The lawsuit, filed in 2004 in Alaska State Court, alleged that defendants misrepresented advertising revenues and growth of AOL and AOLTW along with the number of AOL subscribers, which artificially inflated the stock price of AOL and AOLTW to the detriment of Alaska State funds.

The Alaska Department of Law retained Lieff Cabraser to lead the litigation efforts under its direction.  "We appreciate the diligence and expertise of our counsel in achieving an outstanding resolution of the case," said Mark Morones, spokesperson for the Department of Law, following announcement of the settlement.

12. ***Allocco v. Gardner***, No. GIC 806450 (Cal. Supr. Ct.).  Lieff Cabraser represents Lawrence L. Garlick, the co-founder and former Chief Executive Officer of Remedy Corporation and 24 other former senior executives and directors of Remedy Corporation in a private (non-class) securities fraud lawsuit against Stephen P. Gardner, the former Chief

Executive Officer of Peregrine Systems, Inc., John J. Moores, Peregrine's former Chairman of the Board, Matthew C. Gless, Peregrine's former Chief Financial Officer, Peregrine's accounting firm Arthur Andersen and certain entities that entered into fraudulent transactions with Peregrine. The lawsuit, filed in California state court, arises out of Peregrine's August 2001 acquisition of Remedy. Plaintiffs charge that they were induced to exchange their Remedy stock for Peregrine stock on the basis of false and misleading representations made by defendants. Within months of the Remedy acquisition, Peregrine began to reveal to the public that it had grossly overstated its revenue during the years 2000-2002, and eventually restated more than $500 million in revenues.

After successfully defeating demurrers brought by defendants, including third parties who were customers of Peregrine who aided and abetted Peregrine's accounting fraud under California common law, plaintiffs reached a series of settlements. The settling defendants included Arthur Andersen, all of the director defendants, three officer defendants and the third party customer defendants KPMG, British Telecom, Fujitsu, Software Spectrum and Bindview. The total amount received in settlements is approximately $45 million.

13. ***In re Cablevision Systems Corp. Shareholder Derivative Litigation***, No. 06-cv-4130-DGT-AKT (E.D.N.Y.). Lieff Cabraser served as Co-Lead Counsel in a shareholders' derivative action against the board of directors and numerous officers of Cablevision. The suit alleged that defendants intentionally manipulated stock option grant dates to Cablevision employees between 1997 and 2002 in order to enrich certain officer and director defendants at the expense of Cablevision and Cablevision shareholders. According to the complaint, Defendants made it appear as if stock options were granted earlier than they actually were in order to maximize the value of the grants. In September 2008, the Court granted final approval to a $34.4 million settlement of the action. Over $24 million of the settlement was contributed directly by individual defendants who either received backdated options or participated in the backdating activity.

14. ***In re Media Vision Technology Securities Litigation***, No. CV-94-1015 (N.D. Cal.). Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit which alleged that certain Media Vision's officers, outside directors, accountants and underwriters engaged in a fraudulent scheme to inflate the company's earnings and issued false and misleading public statements about the company's finances, earnings and profits. By 1998, the Court had approved several partial settlements with many of Media Vision's officers and directors, accountants and underwriters which totaled $31 million. The settlement proceeds have been distributed to eligible class members. The evidence that Lieff Cabraser developed in the

civil case led prosecutors to commence an investigation and ultimately file criminal charges against Media Vision's former Chief Executive Officer and Chief Financial Officer. The civil action against Media Vision's CEO and CFO was stayed pending the criminal proceedings against them. In the criminal proceedings, the CEO pled guilty on several counts, and the CFO was convicted at trial. In October, 2003, the Court granted Plaintiffs' motions for summary judgment and entered a judgment in favor of the class against the two defendants in the amount of $188 million.

15. ***In re California Micro Devices Securities Litigation***, No. C-94-2817-VRW (N.D. Cal.). Lieff Cabraser served as Liaison Counsel for the Colorado Public Employees' Retirement Association and the California State Teachers' Retirement System, and the class they represented. Prior to 2001, the Court approved $19 million in settlements. In May 2001, the Court approved an additional settlement of $12 million, which, combined with the earlier settlements, provided class members an almost complete return on their losses. The settlement with the company included multi-million dollar contributions by the former Chairman of the Board and Chief Executive Officer.

Commenting in 2001 on Lieff Cabraser's work in *Cal Micro Devices*, U.S. District Court Judge Vaughn R. Walker stated, "It is highly unusual for a class action in the securities area to recover anywhere close to the percentage of loss that has been recovered here, and counsel and the lead plaintiffs have done an admirable job in bringing about this most satisfactory conclusion of the litigation." One year later, in a related proceeding and in response to the statement that the class had received nearly a 100% recovery, Judge Walker observed, "That's pretty remarkable. In these cases, 25 cents on the dollar is considered to be a magnificent recovery, and this is [almost] a hundred percent."

16. ***In re Network Associates, Inc. Securities Litigation***, No. C-99-1729-WHA (N.D. Cal.). Following a competitive bidding process, the Court appointed Lieff Cabraser as Lead Counsel for the Lead Plaintiff and the class of investors. The complaint alleged that Network Associates improperly accounted for acquisitions in order to inflate its stock price. In May 2001, the Court granted approval to a $30 million settlement.

In reviewing the *Network Associates* settlement, U.S. District Court Judge William H. Alsup observed, "[T]he class was well served at a good price by excellent counsel . . . We have class counsel who's one of the foremost law firms in the country in both securities law and class actions. And they have a very excellent reputation for the conduct of these kinds of cases . . ."

17. ***In re FPI/Agretech Securities Litigation***, MDL No. 763 (D. Haw., Real, J.).  We served as Lead Class Counsel for investors defrauded in a "Ponzi-like" limited partnership investment scheme. The Court approved $15 million in partial, pretrial settlements. At trial, the jury returned a $24 million verdict, which included $10 million in punitive damages, against non-settling defendant Arthur Young & Co. for its knowing complicity and active and substantial assistance in the marketing and sale of the worthless limited partnership offerings. The appellate court affirmed the compensatory damages award and remanded the case for a retrial on punitive damages. In 1994, the Court approved a $17 million settlement with Ernst & Young, the successor to Arthur Young & Co.

18. ***Nguyen v. FundAmerica***, No. C-90-2090 MHP (N.D. Cal., Patel, J.), 1990 Fed. Sec. L. Rep. (CCH) ¶¶ 95,497, 95,498 (N.D. Cal. 1990).  Lieff Cabraser served as Plaintiffs' Class Counsel in this securities/RICO/tort action seeking an injunction against alleged unfair "pyramid" marketing practices and compensation to participants.  The District Court certified a nationwide class for injunctive relief and damages on a mandatory basis and enjoined fraudulent overseas transfers of assets.  The Bankruptcy Court permitted class proof of claims. Lieff Cabraser obtained dual District Court and Bankruptcy Court approval of settlements distributing over $13 million in FundAmerica assets to class members.

19. ***In re Brooks Automation, Inc. Securities Litigation***, No. 06 CA 11068 (D. Mass.).  Lieff Cabraser served as Court-Appointed Lead Counsel for Lead Plaintiff the Los Angeles County Employees Retirement Association and co-plaintiff Sacramento County Employees' Retirement System in a class action lawsuit on behalf of purchasers of Brooks Automation securities.  Plaintiffs charged that Brooks Automation, its senior corporate officers and directors violated federal securities laws by backdating company stock options over a six-year period, and failed to disclose the scheme in publicly filed financial statements.  Subsequent to Lieff Cabraser's filing of a consolidated amended complaint in this action, both the Securities and Exchange Commission and the United States Department of Justice filed complaints against the Company's former C.E.O., Robert Therrien, related to the same alleged practices.  In October 2008, the Court approved a $7.75 million settlement of the action.

20. ***DiNapoli v. Merrill Lynch & Co.***, No. 10-cv-5562 (S.D. N.Y.).  Lieff Cabraser, together with co-counsel, represented Thomas P. DiNapoli, Comptroller of the State of New York, in his capacity as trustee of the New York State Common Retirement Fund ("NYSCRF") in an individual securities action against Merrill Lynch for allegedly failing to adequately disclose its losses arising from its exposure to subprime mortgages and other securities, in violation of federal securities laws.   The case was successfully resolved in 2011.

21. **Albert v. Alex. Brown Management Services; Baker v. Alex. Brown Management Services** (Del. Ch. Ct.).  In May 2004, on behalf of investors in two investment funds controlled, managed and operated by Deutsche Bank and advised by DC Investment Partners, Lieff Cabraser filed lawsuits for alleged fraudulent conduct that resulted in an aggregate loss of hundreds of millions of dollars.  The suits named as defendants Deutsche Bank and its subsidiaries Alex. Brown Management Services and Deutsche Bank Securities, members of the funds' management committee, as well as DC Investments Partners and two of its principals.  Among the plaintiff-investors were 70 high net worth individuals.  In the fall of 2006, the cases settled by confidential agreement.

## III.  <u>Employment Discrimination and Unfair Employment Practices</u>

### A.  Current Cases

1. **Chen-Oster v. Goldman Sachs**, No. 10-6950 (S.D.N.Y.).  Lieff Cabraser serves as Co-Lead Counsel for plaintiffs in a gender discrimination class action lawsuit against Goldman Sachs.  The complaint alleges that Goldman Sachs has engaged in systemic and pervasive discrimination against its female professional employees in violation of Title VII of the Civil Rights Act of 1964 and the New York City Human Rights Law.  The complaint charges that, among other things, Goldman Sachs pays its female professionals less than similarly situated males, disproportionately promotes men over equally or more qualified women, and offers better business opportunities and professional support to its male professionals.  The Court denied defendant's motion to strike class allegations and discovery  is ongoing.

2. **Calibuso v. Bank of America Corporation, Merrill Lynch & Co.**, No. CV10-1413 (E.D. N.Y.).  Lieff Cabraser serves as Co-Lead Counsel for current and former female Financial Advisors who allege that Bank of America and Merrill Lynch engaged in a pattern and practice of gender discrimination with respect to business opportunities and compensation.  The complaint charges that these violations are systemic, based upon company-wide policies and practices.  The Court denied defendants' motions to dismiss the case and discovery is ongoing.

3. **Vedachalam v. Tata Consultancy Services, LTD.**, C 06-0963 CW (N.D. Cal.).  Lieff Cabraser serves as Co-Lead Counsel for thousands of foreign nationals sent by the Indian conglomerate Tata to work in the U.S. In 2013, the parties reached a $29.75 million settlement after seven years of hard-fought litigation.  The complaint charges that Tata unjustly enriched itself by requiring all of its non-U.S.-citizen employees to endorse and sign over their federal and state tax refund checks to Tata. The suit also alleges other violations of California and federal law, including that Tata did not pay its non-U.S.-citizen employees the amount

promised to those employees before they came to the United States.  In 2007 and again in 2008, the District Court denied Tata's motions to compel arbitration of Plaintiffs' claims in India.  The Court held that no arbitration agreement existed because the documents purportedly requiring arbitration in India applied one set of rules to the Plaintiffs and another set to Tata.  In 2009, the Ninth Circuit Court of Appeals affirmed this decision.  In July 2011, the District Court denied in part Tata's motion for summary judgment, allowing Plaintiffs' legal claims for breach of contract and certain violations of California wage laws to go forward.  In April 2012, the District Court found the plaintiffs satisfied the legal requirements for a class action and certified two classes.

4.   ***Ellis v. Costco Wholesale Corp.***, No. 04-03341-EMC (N.D. Cal.).  Female employees represented by Lieff Cabraser and co-counsel charge that Costco discriminates against women in promotions to management positions.  In January 2007, the Court certified a class consisting of  over 750 current and former female Costco employees nationwide who have been denied promotion to General Manager or Assistant Manager since January 3, 2002.  Costco appealed.  In September 2011, the U.S. Court of Appeals for the Ninth Circuit remanded the case to the district court to make class certification findings consistent with the U.S. Supreme Court's ruling in *Wal-Mart v. Dukes,* 131 S.Ct. 2541 (2011).  In September 2012, U.S. District Court Judge Edward M. Chen granted plaintiffs' motion for class certification and certified two classes of  over 1,250 current and former female Costco employees, one for injunctive relief and the other for monetary relief.  The case is scheduled to proceed to trial in January 2014.

5.   ***Benedict v. Hewlett-Packard Company***, No. C13-0119 (N.D. Cal.).  Lieff Cabraser represents a former Hewlett-Packard ("HP") technical support employee who filed a nationwide class action lawsuit charging that HP failed to pay him and other former and current technical support employees for all overtime hours worked in violation of the federal Fair Labor Standards Act and California law.  HP employs several thousand technical support workers.  The complaint charges that HP has a common practice of misclassifying its technical support workers as exempt and refusing to pay them overtime.

6.   ***Zaborowski v. MHN Government Services***, No. 12-CV-05109-SI (N.D. Cal.)  Lieff Cabraser represents current and former Military and Family Life Consultants ("MFLCs") in a class action lawsuit against MHN Government Services, Inc., ("MHN") and Managed Health Network, Inc., seeking overtime pay under the federal Fair Labor Standards Act and state laws.   The complaint charges that MHN has misclassified the MFLCs as independent contractors and as "exempt" from overtime and failed to pay them overtime pay for hours worked over 40 per week.

7.   ***Tatum v. R.J. Reynolds Tobacco Company***, No. 1:02-cv-00373-NCT (M.D. N.C.).  Lieff Cabraser serves as Co-Lead Trial Counsel in this class action on behalf of over 3,500 employees of R.J. Reynolds Tobacco Company ("RJR") brought under the Employment Retirement Income Security Act (ERISA).  Plaintiffs allege that RJR breached its duty of prudence in administering the employee 401(k) retirement plan.  The 6-week bench trial occurred in January-February 2010 and December 2010, and post-trial briefing concluded in February 2011.  In February 2013, the District Court issued a decision in favor of RJR.  Plaintiffs have appealed the decision.

**B.   Successes**

1.   ***Butler v. Home Depot***, No. C94-4335 SI (N.D. Cal.).  Lieff Cabraser and co-counsel represented a class of approximately 25,000 female employees and applicants for employment with Home Depot's West Coast Division who alleged gender discrimination in connection with hiring, promotions, pay, job assignment, and other terms and conditions of employment.  The class was certified in January 1995.  In January 1998, the court approved a $87.5 million settlement of the action that included comprehensive injunctive relief over the term of a five-year Consent Decree.  Under the terms of the settlement, Home Depot modified its hiring, promotion, and compensation practices to ensure that interested and qualified women were hired for, and promoted to, sales and management positions.

On January 14, 1998, U.S. District Judge Susan Illston commented that the settlement provides "a very significant monetary payment to the class members for which I think they should be grateful to their counsel. . . . Even more significant is the injunctive relief that's provided for . . ."  By 2003, the injunctive relief had created thousands of new job opportunities in sales and management positions at Home Depot, generating the equivalent of over approximately $100 million per year in wages for female employees.

In 2002, Judge Illston stated that the injunctive relief has been a "win/win . . . for everyone, because . . . the way the Decree has been implemented has been very successful and it is good for the company as well as the company's employees."

2.   ***Rosenburg v. IBM,*** No. C 06-0430 PJH (N.D. Cal.).  In July 2007, the Court granted final approval to a $65 million settlement of a class action suit by current and former technical support workers for IBM seeking unpaid overtime.  The settlement constitutes a record amount in litigation seeking overtime compensation for employees in the computer industry.  Plaintiffs alleged that IBM illegally misclassified its employees who install

or maintain computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

3. ***Satchell v. FedEx Express***, No. C 03-2659 SI; C 03-2878 SI (N.D. Cal.). In 2007, the Court granted final approval to a $54.9 million settlement of the race discrimination class action lawsuit by African American and Latino employees of FedEx Express. The settlement requires FedEx to reform its promotion, discipline, and pay practices. Under the settlement, FedEx will implement multiple steps to promote equal employment opportunities, including making its performance evaluation process less discretionary, discarding use of the "Basic Skills Test" as a prerequisite to promotion into certain desirable positions, and changing employment policies to demonstrate that its revised practices do not continue to foster racial discrimination. The settlement, covering 20,000 hourly employees and operations managers who have worked in the western region of FedEx Express since October 1999, was approved by the Court in August 2007.

4. ***Gonzalez v. Abercrombie & Fitch Stores***, No. C03-2817 SI (N.D. Cal.). In April 2005, the Court approved a settlement, valued at approximately $50 million, which requires the retail clothing giant Abercrombie & Fitch to provide monetary benefits of $40 million to the class of Latino, African American, Asian American and female applicants and employees who charged the company with discrimination. The settlement included a six-year period of injunctive relief requiring the company to institute a wide range of policies and programs to promote diversity among its workforce and to prevent discrimination based on race or gender. Lieff Cabraser served as Lead Class Counsel and prosecuted the case with a number of co-counsel firms, including the Mexican American Legal Defense and Education Fund, the Asian Pacific American Legal Center and the NAACP Legal Defense and Educational Fund, Inc.

5. ***Giles v. Allstate***, JCCP Nos. 2984 and 2985. Lieff Cabraser represented a class of Allstate insurance agents seeking reimbursement of out-of-pocket costs. The action settled for approximately $40 million.

6. ***Frank v. United Airlines***, No. C-92-0692 MJJ (N.D. Cal.). Lieff Cabraser and co-counsel obtained a $36.5 million settlement in February 2004 for a class of female flight attendants who were required to weigh less than comparable male flight attendants. Former U.S. District Court Judge Charles B. Renfrew (ret.), who served as a mediator in the case, stated, "As a participant in the settlement negotiations, I am familiar with and know the reputation, experience and skills of lawyers involved. They are dedicated, hardworking and able counsel who have represented their clients very effectively." U.S. District Judge Martin J. Jenkins, in granting final approval to the settlement, found "that the results achieved here

could be nothing less than described as exceptional," and that the settlement "was obtained through the efforts of outstanding counsel."

7.   ***Barnett v. Wal-Mart***, No. 01-2-24553-SNKT (Wash.).  On July 21, 2009, the Court gave final approval to a settlement valued at up to $35 million on behalf of workers in Washington State who alleged they were deprived of meal and rest breaks and forced to work off-the-clock at Wal-Mart stores and Sam's Clubs.  In addition to monetary relief, the settlement provided injunctive relief benefiting all employees.  Wal-Mart was required to undertake measures to prevent wage and hour violations at its 50 stores and clubs in Washington, measures that included the use of new technologies and compliance tools.

Plaintiffs filed their complaint in 2001.  Three years later, the Court certified a class of approximately 40,000 current and former Wal-Mart employees.  The eight years of litigation were intense and adversarial.  Wal-Mart, currently the world's third largest corporation, vigorously denied liability and spared no expense in defending itself.

This lawsuit and similar actions filed against Wal-Mart across America served to reform the pay procedures and employment practices for Wal-Mart's 1.4 million employees nationwide.  In a press release announcing the Court's approval of the settlement, Wal-Mart spokesperson Daphne Moore stated, "This lawsuit was filed years ago and the allegations are not representative of the company we are today."  Lieff Cabraser served as court-appointed Co-Lead Class Counsel.

8.   ***Amochaev. v. Citigroup Global Markets, d/b/a Smith Barney***, No. C 05-1298 PJH (N.D. Cal.).  On August 13, 2008, the Court granted final approval to a settlement of the gender discrimination case against Smith Barney.  Lieff Cabraser represented Female Financial Advisors who charged that Smith Barney, the retail brokerage unit of Citigroup, discriminated against them in account distributions, business leads, referral business, partnership opportunities, and other terms of employment.  The Court approved a four-year settlement agreement that provides for comprehensive injunctive relief and significant monetary relief of $33 million for the 2,411 members of the Settlement Class.  The comprehensive injunctive relief provided under the settlement is designed to increase business opportunities and promote equality in compensation for female brokers.

9.   ***Giannetto v. Computer Sciences Corporation***, No. 03-CV-8201 (C.D. Cal.).  In one of the largest overtime pay dispute settlements ever in the information technology industry, the Court in July 2005 granted final approval to a $24 million settlement with Computer Sciences Corporation.  Plaintiffs charged that the global conglomerate had a

common practice of refusing to pay overtime compensation to its technical support workers involved in the installation and maintenance of computer hardware and software in violation of the Fair Labor Standards Act, California's Unfair Competition Law, and the wage and hour laws of 13 states.

10.     ***Church v. Consolidated Freightways***, No. C90-2290 DLJ (N.D. Cal.).  Lieff Cabraser was the Lead Court-appointed Class Counsel in this class action on behalf of the exempt employees of Emery Air Freight, a freight forwarding company acquired by Consolidated Freightways in 1989.  On behalf of the employee class, Lieff Cabraser prosecuted claims for violation of the Employee Retirement Income Security Act, the securities laws, and the Age Discrimination in Employment Act.  The case settled in 1993 for $13.5 million.

11.     ***Gerlach v. Wells Fargo & Co.,*** No. C 05-0585 CW (N.D. Cal.).  In January 2007, the Court granted final approval to a $12.8 million settlement of a class action suit by current and former business systems employees of Wells Fargo seeking unpaid overtime.  Plaintiffs alleged that Wells Fargo illegally misclassified those employees, who maintained and updated Wells Fargo's business tools according to others' instructions, as "exempt" from the overtime pay requirements of federal and state labor laws.

12.     ***Buccellato v. AT&T Operations***, No. C10-00463-LHK (N.D. Cal.).  Lieff Cabraser represented a group of current and former AT&T technical support workers who alleged that AT&T misclassified them as exempt and failed to pay them for all overtime hours worked, in violation of federal and state overtime pay laws.  In June 2011, the Court approved a $12.5 million collective and class action settlement.

13.     ***Buttram v. UPS***, No. C-97-01590 MJJ (N.D. Cal.).  Lieff Cabraser and several co-counsel represented a class of approximately 14,000 African-American part-time hourly employees of UPS's Pacific and Northwest Regions alleging race discrimination in promotions and job advancement.  In 1999, the Court approved a $12.14 million settlement of the action.  Under the injunctive relief portion of the settlement, among other things, Class Counsel continues to monitor the promotions of African-American part-time hourly employees to part-time supervisor and full-time package car driver.

14.     ***Goddard, et al. v. Longs Drug Stores Corporation, et al.***, No. RG04141291 (Cal. Supr. Ct.).  Store managers and assistant store managers of Longs Drugs charged that the company misclassified them as exempt from overtime wages.  Managers regularly worked in excess of 8 hours per day and 40 hours per week without compensation for their overtime hours.  Following mediation, in 2005, Longs Drugs agreed to

settle the claims for a total of $11 million.  Over 1,000 current and former Longs Drugs managers and assistant managers were eligible for compensation under the settlement, over 98% of the class submitted claims.

15.     ***Trotter v. Perdue Farms***, No. C 99-893-RRM (JJF) (MPT) (D. Del.). Lieff Cabraser represented a class of chicken processing employees of Perdue Farms, Inc., one of the nation's largest poultry processors, for wage and hour violations.  The suit challenged Perdue's failure to compensate its assembly line employees for putting on, taking off, and cleaning protective and sanitary equipment in violation of the Fair Labor Standards Act, various state wage and hour laws, and the Employee Retirement Income Security Act.  Under a settlement approved by the Court in 2002, Perdue paid $10 million for wages lost by its chicken processing employees and attorneys' fees and costs.  The settlement was in addition to a $10 million settlement of a suit brought by the Department of Labor in the wake of Lieff Cabraser's lawsuit.

16.     ***Gottlieb v. SBC Communications***, No. CV-00-04139 AHM (MANx) (C.D. Cal.).  With co-counsel, Lieff Cabraser represented current and former employees of SBC and Pacific Telesis Group ("PTG") who participated in AirTouch Stock Funds, which were at one time part of PTG's salaried and non-salaried savings plans.  After acquiring  PTG, SBC sold AirTouch, which PTG had owned, and caused the AirTouch Stock Funds that were included in the PTG employees' savings plans to be liquidated.  Plaintiffs alleged that in eliminating the AirTouch Stock Funds, and in allegedly failing to adequately communicate with employees about the liquidation, SBC breached its duties to 401k plan participants under the Employee Retirement Income Security Act.  In 2002, the Court granted final approval to a $10 million settlement.

17.     ***In Re Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation***, MDL No. 1439 (D. Ore.).  Lieff Cabraser and co-counsel represented claims representatives of Farmers' Insurance Exchange seeking unpaid overtime.  Lieff Cabraser won a liability phase trial on a classwide basis, and then litigated damages on an individual basis before a special master.  The judgment was partially upheld on appeal.  In August 2010, the Court approved an $8 million settlement.

18.     ***Zuckman v. Allied Group***, No. 02-5800 SI (N.D. Cal.).  In September 2004, the Court approved a settlement with Allied Group and Nationwide Mutual Insurance Company of $8 million plus Allied/Nationwide's share of payroll taxes on amounts treated as wages, providing plaintiffs a 100% recovery on their claims. Plaintiffs, claims representatives of Allied / Nationwide, alleged that the company misclassified them as exempt employees and failed to pay them and other claims representatives in

California overtime wages for hours they worked in excess of eight hours or forty hours per week.  In approving the settlement, U.S. District Court Judge Susan Illston commended counsel for their "really good lawyering" and stated that they did "a splendid job on this" case.

19. ***Thomas v. California State Automobile Association***, No. CH217752 (Cal. Supr. Ct.).  With co-counsel, Lieff Cabraser represented 1,200 current and former field claims adjusters who worked for the California State Automobile Association ("CSAA").  Plaintiffs alleged that CSAA improperly classified their employees as exempt, therefore denying them overtime pay for overtime worked.  In May 2002, the Court approved an $8 million settlement of the case.

20. ***Higazi v. Cadence Design Systems***, No. C 07-2813 JW (N.D. Cal.).  In July 2008, the Court granted final approval to a $7.664 million settlement of a class action suit by current and former technical support workers for Cadence seeking unpaid overtime.  Plaintiffs alleged that Cadence illegally misclassified its employees who install, maintain, or support computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

21. ***Sandoval v. Mountain Center, Inc., et al.,***  No. 03CC00280 (Cal. Supr. Ct.).  Cable installers in California charged that defendants owed them overtime wages, as well as damages for missed meal and rest breaks and reimbursement for expenses incurred on the job.  In 2005, the Court approved a $7.2 million settlement of the litigation, which was distributed to the cable installers who submitted claims.

22. ***Lewis v. Wells Fargo***, No. 08-cv-2670 CW (N.D. Cal.).  Lieff Cabraser served as Lead Counsel on behalf of approximately 330 I/T workers who alleged that Wells Fargo had a common practice of misclassifying them as exempt and failing to pay them for all overtime hours worked in violation of federal and state overtime pay laws.  In April 2011, the Court granted collective action certification of the FLSA claims and approved a $6.72 million settlement of the action.

23. ***Kahn v. Denny's***, No. BC177254 (Cal. Supr. Ct.).  Lieff Cabraser brought a lawsuit alleging that Denny's failed to pay overtime wages to its General Managers and Managers who worked at company-owned restaurants in California.  The Court approved a $4 million settlement of the case in 2000.

24. ***Wynne v. McCormick & Schmick's Seafood Restaurants***, No. C 06-3153 CW (N.D. Cal.).  In August 2008, the Court granted final approval to a settlement valued at $2.1 million, including substantial injunctive relief, for a class of African American restaurant-level hourly employees.  The consent decree created hiring benchmarks to increase the

number of African Americans employed in front of the house jobs (*e.g.*, server, bartender, waiter/waitress, and cocktail server), a registration of interest program to minimize discrimination in promotions, improved complaint procedures, and monitoring and enforcement mechanisms.

25.     ***Sherrill v. Premera Blue Cross***, No. 2:10-cv-00590-TSZ (W.D. Wash.). In April 2010, a technical worker at Premera Blue Cross filed a lawsuit against Premera seeking overtime pay from its misclassification of technical support workers as exempt.  In June 2011, the Court approved a collective and class action settlement of $1.45 million.

26.     ***Holloway v. Best Buy***, No. C05-5056 PJH (N.D. Cal.).  Lieff Cabraser, with co-counsel, represented a class of current employees of Best Buy that alleged Best Buy stores nationwide discriminated against women, African Americans, and Latinos.  The complaint charged that these employees were assigned to less desirable positions and denied promotions, and that class members who attained managerial positions were paid less than white males. In November 2011, the Court approved a settlement of the class action in which Best Buy agreed to changes to its personnel policies and procedures that will enhance the equal employment opportunities of the tens of thousands of women, African Americans, and Latinos employed by Best Buy nationwide.

27.     ***Lyon v. TMP Worldwide***, No. 993096 (Cal. Supr. Ct.).  Lieff Cabraser served as Class Counsel for a class of certain non-supervisory employees in an advertising firm.  The settlement, approved in 2000, provided almost a 100% recovery to class members.  The suit alleged that TMP failed to pay overtime wages to these employees.

Lieff Cabraser attorneys have also had experience working on several other employment cases, including cases involving race, gender, and age discrimination, ERISA, breach of contract claims, and wage/hour claims.  Lieff Cabraser attorneys frequently write amici briefs on cutting-edge legal issues involving employment law.  Lieff Cabraser is currently investigating charges of race, gender and/or age discrimination, and wage/hour violations against several companies.

For 2013, *U.S. News* and *Best Lawyers* have selected Lieff Cabraser as a national "Law Firm of the Year" in the category of Employment Law – Individuals.  *U.S. News* and *Best Lawyers* ranked firms nationally in 80 different practice areas based on extensive client feedback and evaluations from 70,000 lawyers nationwide.  Only one law firm in each practice area receives the "Law Firm of the Year" designation.

*Benchmark Plaintiff*, a guide to the nation's leading plaintiffs' firms, has ranked our employment practice group a Tier 1 national ranking, its highest ranking.  The *Legal 500* guide to the U.S. legal profession has also recognized Lieff Cabraser as having one of the leading plaintiffs' employment practices in the nation for the past three years.  The legal weekly *The*

*Recorder* selected our employment group as one of the top plaintiffs' employment practice groups in the San Francisco Bay Area in 2011 and 2012.

Kelly M. Dermody chairs the firm's employment practice group and leads the firm's employment cases. The *Daily Journal* has recognized Ms. Dermody, in multiple years, as both one of the top labor and employment lawyers in California and one of the "Top Women Litigators in California." In 2012, the *Daily Journal* also selected her as one of the "Top 100 Lawyers in California." *Best Lawyers* and *Super Lawyers* have repeatedly recognized Ms. Dermody as one of top lawyers in San Francisco and Northern California. In 2007, *California Lawyer* magazine awarded Ms. Dermody its prestigious California Lawyer Attorney of the Year (CLAY) Award.

### IV.   Consumer Protection

#### A.   Current Cases

1.   ***Gutierrez v. Wells Fargo Bank***, No. C 07-05923 WHA (N.D. Cal.). Following a two week bench class action trial, on August 10, 2010, U.S. District Court Judge William Alsup held in a 90-page opinion that Wells Fargo violated California law by improperly and illegally assessing overdraft fees on its California customers and ordered $203 million in restitution to the certified class. Instead of posting each transaction chronologically, the evidence presented at trial showed that Wells Fargo deducted the largest charges first, drawing down available balances more rapidly and triggering a higher volume of overdraft fees. Wells Fargo filed an appeal. On December 26, 2012, the appellate court issued an opinion upholding and reversing portions of Judge Alsup's order, and remanded the case to the district court for further proceedings.

For his outstanding work as Lead Trial Counsel and the significance of the case, *California Lawyer* magazine recognized Richard M. Heimann with a California Lawyer of the Year (CLAY) Award. In addition, the Consumer Attorneys of California named Mr. Heimann and Michael W. Sobol as Finalists for the Consumer Attorney of the Year Award for their success in the case.

2.   ***In re Checking Account Overdraft Litigation***, MDL No. 2036 (S.D. Fl.). Lieff Cabraser serves on the plaintiffs' executive committee and is the lead plaintiffs' law firm prosecuting the case against Bank of America in Multi-District Litigation against the nation's major banks for the collection of excessive overdraft fees. The lawsuits charge that the banks entered charges debiting customer's accounts from the "largest to the smallest" for the purpose of maximizing the number of times they could assess their customers overdraft fees. In March 2010, the Court denied defendants' motions to dismiss the complaints.

In November 2011, the Court granted final approval to a $410 million settlement of the case against Bank of America.  In approving the settlement, U.S. District Court Judge James Lawrence King stated, "This is a marvelous result for the members of the class."  Judge King added, "[B]ut for the high level of dedication, ability and massive and incredible hard work by the Class attorneys . . . I do not believe the Class would have ever seen . . . a penny."

In September 2012, the Court granted final approval to a $35 million of the case against Union Bank.  In approving the settlement, Judge King complimented plaintiffs' counsel for their outstanding work and effort in resolving the case:  "The description of plaintiffs' counsel, which is a necessary part of the settlement, is, if anything, understated.  In my observation of the diligence and professional activity, it's superb.  I know of no other class action case anywhere in the country in the last couple of decades that's been handled as efficiently as this one has, which is a tribute to the lawyers."

3.     ***Payment Protection Credit Card Litigation.***  Lieff Cabraser, with co-counsel, represents consumers in a series of federal court cases against some of the nation's largest credit card issuers, challenging the imposition of charges for so-called "payment protection" or "credit protection" programs.  Plaintiffs allege that the credit card companies make promises that under these "payment protection programs," payment of credit card debt will be suspended or canceled if borrowers experience major life events such as unemployment or disability.  However, plaintiffs allege that the credit card issuers impose "payment protection" on consumers without consent or deceptively market it to them, and exacerbate the misconduct through unfair benefits administration practices. Lieff Cabraser has reached settlements with a number of banks including Discover (final approval granted), HSBC (final approval granted; on appeal), and Bank of America (final approval granted), with settlements totaling more than $50 million plus certain practice changes.

4.     ***Dover v. British Airways, PLC***, No. 1:12-cv-05567 (E.D. NY).  Lieff Cabraser represents participants in British Airways' ("BA") frequent flyer program, known as Executive Club, in a breach of contract class action lawsuit.  BA imposes a "fuel surcharge," sometimes in excess of $500, on Executive Club reward tickets.  Plaintiffs allege that the contract governing the Executive Club program permits BA to impose charges only when based on a fee or charge imposed by a regulatory authority, and no jurisdiction to which BA flies imposes a fuel surcharge on commercial airlines or on commercial airline passengers.  Plaintiffs also allege that the "fuel surcharge" is in no way based upon the price of fuel.

5. ***Moore v. Verizon Communications***, No. 09-cv-01823-SBA (N.D. Cal.); ***Nwabueze v. AT&T***, No. 09-cv-1529 SI (N.D. Cal.); ***Terry v. Pacific Bell Telephone Co.***, No. RG 09 488326 (Alameda County Sup. Ct.). Lieff Cabraser, with co-counsel, represents nationwide classes of landline telephone customers subjected to the deceptive business practice known as "cramming." In this practice, a telephone company bills customers for unauthorized third-party charges assessed by billing aggregators on behalf of third-party providers. A U.S. Senate committee has estimated that Verizon, AT&T, and Qwest place 300 million such charges on customer bills each year (amounting to $2 billion in charges), many of which are unauthorized. Various sources estimate that 90-99% of third-party charges are unauthorized. Both Courts have granted preliminary approval of settlements that allow customers to receive 100% refunds for all unauthorized charges from 2005 to the present, plus extensive injunctive relief to prevent cramming in the future. The *Nwabueze* and *Terry* cases are ongoing.

6. ***James v. UMG Recordings, Inc.***, No. CV-11-1613 (N.D. CAL); ***Zombie v. UMG Recordings, Inc.***, No. CV-11-2431 (N.D. CAL). Lieff Cabraser and its co-counsel represent music recording artists in a proposed class action against Universal Music Group. Plaintiffs allege that Universal failed to pay the recording artists full royalty income earned from customers' purchases of digitally downloaded music from vendors such as Apple iTunes. The complaint alleges that Universal licenses plaintiffs' music to digital download providers, but in its accounting of the royalties plaintiffs have earned, treats such licenses as "records sold" because royalty rate for "records sold" is lower than the royalty rate for licenses. Plaintiffs legal claims include breach of contract and violation of California unfair competition laws. In November 2011 the court denied defendant's motion to dismiss plaintiffs' unfair competition law claims.

7. ***In re Neurontin Marketing and Sales Practices Litigation***, No. 04-CV-10739-PBS (D. Mass.). Lieff Cabraser serves on the Plaintiffs' Steering Committee in multidistrict litigation arising out of the sale and marketing of the prescription drug Neurontin, manufactured by Parke-Davis, a division of Warner-Lambert Company, which was later acquired by Pfizer, Inc. Lieff Cabraser served as co-counsel to Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals ("Kaiser") in Kaiser's trial against Pfizer in the litigation. On March 25, 2010, a federal court jury determined that Pfizer Inc. violated a federal antiracketeering law by promoting its drug Neurontin for unapproved uses and found Pfizer must pay Kaiser damages up to $142 million. At trial, Kaiser presented evidence that Pfizer knowingly marketed Neurontin for unapproved uses without proof that it was effective. Kaiser said it was misled into believing neuropathic pain**,** migraines, and bipolar disorder were among the

conditions that could be treated effectively with Neurontin, which was approved by the FDA as an adjunctive therapy to treat epilepsy and later for post-herpetic neuralgia, a specific type of neuropathic pain. On November 3, 2010, the Court issued Findings of Fact and Conclusions of Law on Kaiser's claims arising under the California Unfair Competition Law, finding Pfizer liable and ordering that it pay restitution to Kaiser of approximately $95 million. On April 3, 2013, the First Circuit Court of Appeals affirmed both the jury's and the district court's verdicts.

8. ***Healy v. Chesapeake Appalachia***, No. 1:10cv00023 (W.D. Va.); ***Hale v. CNX Gas***, No. 1:10cv00059 (W.D. Va.); ***Estate of Holman v. Noble Energy***, No. 03 CV 9 (Dist. Ct., Co.); ***Droegemueller v. Petroleum Development Corporation***, No. 07 CV 2508 JLK (D. Co.); ***Anderson v. Merit Energy Co.***, No. 07 CV 00916 LTB (D. Co.); ***Holman v. Petro-Canada Resources*** (USA), No. 07 CV 416 (Dist. Ct., Co.). Lieff Cabraser serves as Co-Lead Counsel in several cases pending in federal court in Virginia, in which plaintiffs allege that certain natural gas companies improperly underpaid gas royalties to the owners of the gas. In one case that recently settled, the plaintiffs recovered approximately 95% of the damages they suffered. Lieff Cabraser also achieved settlements on behalf of natural gas royalty owners in five other class actions outside Virginia. Those settlements -- in which class members recovered between 70% and 100% of their damages, excluding interest -- were valued at more than $160 million.

9. ***Adkins v. Morgan Stanley, No. 12 CV 7667 (S.D.N.Y.).*** Five African-American residents from Detroit, Michigan, joined by Michigan Legal Services, have brought a class action lawsuit against Morgan Stanley for discrimination in violation of the Fair Housing Act and other civil rights laws. The plaintiffs charge that Morgan Stanley actively ensured the proliferation of high-cost mortgage loans with specific risk factors in order to bundle and sell mortgage-backed securities to investors. The lawsuit is the first to seek to hold a bank in the secondary market accountable for the adverse racial impact of such policies and conduct. Plaintiffs seek certification of the case as a class action for as many as 6,000 African-Americans homeowners in the Detroit area who may have suffered similar discrimination. Lieff Cabraser serves as plaintiffs' counsel with the American Civil Liberties Union, the ACLU of Michigan, and the National Consumer Law Center.

## B.   Successes

1. ***Kline v. The Progressive Corporation***, Circuit No. 02-L-6 (Circuit Court of the First Judicial Circuit, Johnson County, Illinois). Lieff Cabraser served as settlement class counsel in a nationwide consumer

class action challenging Progressive Corporation's private passenger automobile insurance sales practices.  Plaintiffs alleged that the Progressive Corporation wrongfully concealed from class members the availability of lower priced insurance for which they qualified.  In 2002, the Court approved a settlement valued at approximately $450 million, which included both cash and equitable relief.  The claims program, implemented upon a nationwide mail and publication notice program, was completed in 2003.

2.      ***Catholic Healthcare West Cases***, JCCP No. 4453 (Cal. Supr. Ct.).  Plaintiff alleged that Catholic Healthcare West ("CHW") charged uninsured patients excessive fees for treatment and services, at rates far higher than the rates charged to patients with private insurance or on Medicare.  In January 2007, the Court approved a settlement that provides discounts, refunds and other benefits for CHW patients valued at $423 million.  The settlement requires that CHW lower its charges and end price discrimination against all uninsured patients, maintain generous charity case policies allowing low-income and uninsured patients to receive free or heavily discounted care, and protect uninsured patients from unfair collections practices.  Lieff Cabraser served as Lead Counsel in the coordinated action.

3.      ***Sutter Health Uninsured Pricing Cases***, JCCP No. 4388 (Cal. Supr. Ct.).  Plaintiffs alleged that they and a Class of uninsured patients treated at Sutter hospitals were charged substantially more than patients with private or public insurance, and many times above the cost of providing their treatment.  In December 2006, the Court granted final approval to a comprehensive and groundbreaking settlement of the action.  As part of the settlement, Class members will be entitled to make a claim for refunds or deductions of between 25% to 45% from their prior hospital bills, at an estimated total value of $276 million.  For the next three years, Sutter will maintain discounted pricing policies for uninsureds that will make Sutter's pricing for uninsureds comparable to or better than the pricing for patients with private insurance.  In addition, Sutter agreed to maintain more compassionate collections policies that will protect uninsureds who fall behind in their payments.  Lieff Cabraser served as Lead Counsel in the coordinated action.

4.      ***Citigroup Loan Cases***, JCCP No. 4197 (San Francisco Supr. Ct., Cal.).  In 2003, the Court approved a settlement that provided approximately $240 million in relief to former Associates' customers across America.  Prior to its acquisition in November 2000, Associates First Financial, referred to as The Associates, was one of the nation's largest "subprime" lenders.  Lieff Cabraser represented former customers of The Associates charging that the company added unwanted and unnecessary insurance products onto mortgage loans and engaged in improper loan refinancing

practices.  Lieff Cabraser served as nationwide Plaintiffs' Co-Liaison Counsel.

5.  ***Thompson v. WFS Financial.***, No. 3-02-0570 (M.D. Tenn.); ***Pakeman v. American Honda Finance Corporation***, No. 3-02-0490 (M.D. Tenn.); ***Herra v. Toyota Motor Credit Corporation***, No. CGC 03-419 230 (San Francisco Supr. Ct.).  Lieff Cabraser with co-counsel litigated against several of the largest automobile finance companies in the country to compensate victims of—and stop future instances of—racial discrimination in the setting of interest rates in automobile finance contracts.  The litigation led to substantial changes in the way Toyota Motor Credit Corporation ("TMCC"), American Honda Finance Corporation ("American Honda") and WFS Financial, Inc. sell automobile finance contracts, limiting the discrimination that can occur.

In approving the settlement in *Thompson v. WFS Financial*, the Court recognized the "innovative" and "remarkable settlement" achieved on behalf of the nationwide class.  In 2006 in *Herra v. Toyota Motor Credit Corporation*, the Court granted final approval to a nationwide class action settlement on behalf of all African-American and Hispanic customers of TMCC who entered into retail installment contracts that were assigned to TMCC from 1999 to 2006.  The monetary benefit to the class was estimated to be between $159-$174 million.

6.  ***In re John Muir Uninsured Healthcare Cases***, JCCP No. 4494 (Cal. Supr. Ct.).  Lieff Cabraser represented nearly 53,000 uninsured patients who received care at John Muir hospitals and outpatient centers and were charged inflated prices and then subject to overly aggressive collection practices when they failed to pay.  On November 19, 2008, the Court approved a final settlement of the *John Muir* litigation.  John Muir agreed to provide refunds or bill adjustments of 40-50% to uninsured patients that received medical care at John Muir over a six year period, bringing their charges to the level of patients with private insurance, at a value of $115 million.  No claims were required, so every class member received a refund or bill adjustment.  Furthermore, John Muir was required to (1) maintain charity care policies to give substantial discounts—up to 100%—to low income, uninsured patients who meet certain income requirements; (2) maintain an Uninsured Patient Discount Policy to give discounts to all uninsured patients, regardless of income, so that they pay rates no greater than those paid by patients with private insurance; (3) enhance communications to uninsured patients so they are better advised about John Muir's pricing discounts, financial assistance, and financial counseling services; and (4) limit the practices for collecting payments from uninsured patients.

7. ***Providian Credit Card Cases***, JCCP No. 4085 (San Francisco Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a certified national Settlement Class of Providian credit cardholders who alleged that Providian had engaged in widespread misconduct by charging cardholders unlawful, excessive interest and late charges, and by promoting and selling to cardholders "add-on products" promising illusory benefits and services.  In November 2001, the Court granted final approval to a $105 million settlement of the case, which also required Providian to implement substantial changes in its business practices.  The $105 million settlement, combined with an earlier settlement by Providian with Federal and state agencies, represents the largest settlement ever by a U.S. credit card company in a consumer protection case.

8. ***In re Chase Bank USA, N.A. "Check Loan" Contract Litigation***, MDL No. 2032 (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Liaison Counsel and on the Plaintiffs' Executive Committee in Multi-District Litigation ("MDL") charging that Chase Bank violated the implied covenant of good faith and fair dealing by unilaterally modifying the terms of fixed rate loans.  The MDL was established in 2009 to coordinate more than two dozen cases that were filed in the wake of the conduct at issue.  The nationwide, certified class consisted of more than 1 million Chase cardholders who, in 2008 and 2009, had their monthly minimum payment requirements unilaterally increased by Chase by more than 150%.  Plaintiffs alleged that Chase made this change, in part, to induce cardholders to give up their promised fixed APRs in order to avoid the unprecedented minimum payment hike.  In November 2012, the Court approved a $100 million settlement of the case.

9. ***In re Synthroid Marketing Litigation***, MDL No. 1182 (N.D. Ill.).  Lieff Cabraser served as Co-Lead Counsel for the purchasers of the thyroid medication Synthroid in litigation against Knoll Pharmaceutical, the manufacturer of Synthroid.  The lawsuits charged that Knoll misled physicians and patients into keeping patients on Synthroid despite knowing that less costly, but equally effective drugs, were available.  In 2000, the District Court gave final approval to a $87.4 million settlement with Knoll and its parent company, BASF Corporation, on behalf of a class of all consumers who purchased Synthroid at any time from 1990 to 1999.  In 2001, the Court of Appeals upheld the order approving the settlement and remanded the case for further proceedings.  264 F.3d 712 (7th Cir. 2001).  The settlement proceeds were distributed in 2003.

10. ***R.M. Galicia v. Franklin; Franklin v. Scripps Health***, No. IC 859468 (San Diego Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel in a certified class action lawsuit on behalf of 60,750 uninsured patients who alleged that the Scripps Health hospital system imposed

excessive fees and charges for medical treatment.  The class action originated in July 2006, when uninsured patient Phillip Franklin filed a class action cross-complaint against Scripps Health after Scripps sued Mr. Franklin through a collection agency.  Mr. Franklin alleged that he, like all other uninsured patients of Scripps Health, was charged unreasonable and unconscionable rates for his medical treatment.  In June 2008, the Court granted final approval to a settlement of the action which includes refunds or discounts of 35% off of medical bills, collectively worth $73 million.  The settlement also requires Scripps Health to modify its pricing and collections practices by (1) following an Uninsured Patient Discount Policy, which includes automatic discounts from billed charges for Hospital Services; (2) following a Charity Care Policy, which provides uninsured patients who meet certain income tests with discounts on Health Services up to 100% free care, and provides for charity discounts under other special circumstances; (3) informing uninsured patients about the availability and terms of the above financial assistance policies; and (4) restricting certain collections practices and actively monitoring outside collection agents.  The prospective future discounts are worth many millions more in savings to uninsureds over the next four years.

11.     ***In re Lawn Mower Engine Horsepower Marketing and Sales Practices Litigation***, MDL No. 1999 (E.D. Wi.). Lieff Cabraser served as co-counsel for consumers that alleged manufacturers of certain gasoline-powered lawn mowers misrepresented, and significantly overstated, the horsepower of the product. As the price for lawn mowers is linked to the horsepower of the engine -- the higher the horsepower, the more expensive the lawn mower -- defendants' alleged misconduct caused consumers to purchase expensive lawn mowers that provided lower horsepower than advertised. In August 2010, the Court approved a $65 million settlement of the action.

12.     ***Strugano v. Nextel Communications***, No. BC 288359 (Los Angeles Supr. Crt).  In May 2006, the Los Angeles Superior Court granted final approval to a class action settlement on behalf of all California customers of Nextel from January 1, 1999 through December 31, 2002, for compensation for the harm caused by Nextel's alleged unilateral (1) addition of a $1.15 monthly service fee and/or (2) change from second-by-second billing to minute-by-minute billing, which caused "overage" charges (*i.e.*, for exceeding their allotted cellular plan minutes).  The total benefit conferred by the Settlement directly to Class Members was between approximately $13.5 million and $55.5 million, depending on which benefit Class Members selected.

13.     ***Curry v. Fairbanks Capital Corporation***, No. 03-10895-DPW (D. Mass.).  In 2004, the Court approved a $55 million settlement of a class

action lawsuit against Fairbanks Capital Corporation arising out of charges against Fairbanks of misconduct in servicing its customers' mortgage loans.  The settlement also required substantial changes in Fairbanks' business practices and established a default resolution program to limit the imposition of fees and foreclosure proceedings against Fairbanks' customers.  Lieff Cabraser served as nationwide Co-Lead Counsel for the homeowners.

14. ***California Title Insurance Industry Litigation.***  Lieff Cabraser, in coordination with parallel litigation brought by the Attorney General, reached settlements in 2003 and 2004 with the leading title insurance companies in California, resulting in historic industry-wide changes to the practice of providing escrow services in real estate closings.  The settlements brought a total of $50 million in restitution to California consumers, including cash payments.  In the lawsuits, plaintiffs alleged, among other things, that the title companies received interest payments on customer escrow funds that were never reimbursed to their customers. The defendant companies include Lawyers' Title, Commonwealth Land Title, Stewart Title of California, First American Title, Fidelity National Title, and Chicago Title.

15. ***White v. Experian Information Solutions***, No. 05-CV-1070 DOC (C.D. Cal.).   In September 2011, the Court approved a $45 million settlement on behalf of 750,000 claimants against the nation's three largest repositories of consumer credit information, Experian Information Solutions, Inc., Trans Union, LLC, and Equifax Information Services, LLC.  Plaintiffs charged that defendants violated the Fair Credit Reporting Act ("FCRA") by recklessly failing to follow reasonable procedures to ensure the accurate reporting of debts discharged in bankruptcy and by refusing to adequately investigate consumer disputes regarding the status of discharged accounts. The $45 million settlement constitutes the second largest settlement ever in a lawsuit alleging violations of the FCRA. Earlier in the litigation, plaintiffs obtained approval of a historic settlement for injunctive relief.  The injunction required the retroactive correction and updating of consumers' credit file information concerning discharged debt (affecting one million consumers who had filed for bankruptcy dating back to 2003), as well as new procedures to ensure that debts subject to future discharge orders will be similarly treated. Demonstrating the significance of the case, U.S. District Court Judge David O. Carter observed that "Plaintiffs' claims largely presented questions of first impression . .  Prior to the injunctive relief order entered in the instant case, however, no verdict or reported decision had ever required Defendants to implement procedures to cross-check data between their furnishers and their public record providers."  Lieff Cabraser served as Co-Lead Counsel in the nationwide class action lawsuit.

16.  **Vytorin/Zetia Marketing, Sales Practices & Products Liability Litigation**, MDL No. 1938 (D. N.J.).  Lieff Cabraser served on the Executive Committee of the Plaintiffs' Steering Committee representing plaintiffs alleging that Merck/Schering-Plough Pharmaceuticals falsely marketed anti-cholesterol drugs Vytorin and Zetia as being more effective than other anti-cholesterol drugs. Plaintiffs further alleged that Merck/Schering-Plough Pharmaceuticals sold Vytorin and Zetia at higher prices than other anti-cholesterol medication when they were no more effective than other drugs. In 2010, the Court approved a $41.5 million settlement for consumers who bought Vytorin or Zetia between November 2002 and February 2010.

17.  ***Morris v. AT&T Wireless Services***, No. C-04-1997-MJP (W.D. Wash.).  Lieff Cabraser served as class counsel for a nationwide settlement class of cell phone customers subjected to an end-of-billing cycle cancellation policy implemented by AT&T Wireless in 2003 and alleged to have breached customers' service agreements.  In May 2006, the New Jersey Superior Court granted final approval to a class settlement that guarantees delivery to the class of $40 million in benefits.  Class members received cash-equivalent calling cards automatically, and had the option of redeeming them for cash.  Lieff Cabraser had been prosecuting the class claims in the Western District of Washington when a settlement in New Jersey state court was announced.  Lieff Cabraser objected to that settlement as inadequate because it would have only provided $1.5 million in benefits without a cash option, and the court agreed, declining to approve it.  Thereafter, Lieff Cabraser negotiated the new settlement providing $40 million to the class, and the settlement was approved.

18.  ***Berger v. Property I.D. Corporation***, No.  CV 05-5373-GHK (C.D. Cal.).  In January 2009, the Court granted final approval to a $39.4 million settlement with several of the nation's largest real estate brokerages, including companies doing business as Coldwell Banker, Century 21, and ERA Real Estate, and California franchisors for RE/MAX and Prudential California Realty, in an action under the Real Estate Settlement Procedures Act on behalf of California home sellers. Plaintiffs charged that the brokers and Property I.D. Corporation set up straw companies as a way to disguise kickbacks for referring their California clients' natural hazard disclosure report business to Property I.D. (the report is required to sell a home in California). Under the settlement, hundreds of thousands of California home sellers were eligible to receive a full refund of the cost of their report, typically about $100.

19.  ***In re Tri-State Crematory Litigation***, MDL No. 1467 (N.D. Ga.).  In March 2004, Lieff Cabraser delivered opening statements and began testimony in a class action by families whose loved ones were improperly

cremated and desecrated by Tri-State Crematory in Noble, Georgia. The families also asserted claims against the funeral homes that delivered the decedents to Tri-State Crematory for failing to ensure that the crematory performed cremations in the manner required under the law and by human decency. One week into trial, settlements with the remaining funeral home defendants were reached and brought the settlement total to approximately $37 million. Trial on the class members' claims against the operators of crematory began in August 2004. Soon thereafter, these defendants entered into a $80 million settlement with plaintiffs. As part of the settlement, all buildings on the Tri-State property were razed. The property will remain in a trust so that it will be preserved in peace and dignity as a secluded memorial to those whose remains were mistreated, and to prevent crematory operations or other inappropriate activities from ever taking place there. Earlier in the litigation, the Court granted plaintiffs' motion for class certification in a published order. 215 F.R.D. 660 (2003).

20. ***In re American Family Enterprises***, MDL No. 1235 (D. N.J.). Lieff Cabraser served as Co-Lead Counsel for a nationwide class of persons who received any sweepstakes materials sent under the name "American Family Publishers." The class action lawsuit alleged that defendants deceived consumers into purchasing magazine subscriptions and merchandise in the belief that such purchases were necessary to win an American Family Publishers' sweepstakes prize or enhanced their chances of winning a sweepstakes prize. In September 2000, the Court granted final approval of a $33 million settlement of the class action. In April 2001, over 63,000 class members received refunds averaging over $500 each, representing 92% of their eligible purchases. In addition, American Family Publishers agreed to make significant changes to the way it conducts the sweepstakes.

21. ***Cincotta v. California Emergency Physicians Medical Group,*** No. 07359096 (Cal. Supr. Ct.). Lieff Cabraser served as class counsel for nearly 100,000 uninsured patients that alleged they were charged excessive and unfair rates for emergency room service across 55 hospitals throughout California. The settlement, approved on October 31, 2008, provided complete debt elimination, 100% cancellation of the bill, to uninsured patients treated by California Emergency Physicians Medical Group during the 4-year class period. These benefits were valued at $27 million. No claims were required, so all of these bills were cancelled. In addition, the settlement required California Emergency Physicians Medical Group prospectively to (1) maintain certain discount policies for all charity care patients; (2) inform patients of the available discounts by enhanced communications; and (3) limit significantly the type of collections practices available for collecting from charity care patients.

22.     **In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation**, MDL No. 1715.  Lieff Cabraser served as Co-Lead Counsel for borrowers who alleged that Ameriquest engaged in a predatory lending scheme based on the sale of loans with illegal and undisclosed fees and terms.  In August 2010, the Court approved a $22 million settlement.

23.     *Yarrington v. Solvay Pharmaceuticals*, No. 09-CV-2261 (D. Minn.).  In March 2010, the Court granted final approval to a $16.5 million settlement with Solvay Pharmaceuticals, one of the country's leading pharmaceutical companies.  Lieff Cabraser served as Co-Lead Counsel, representing a class of persons who purchased Estratest—a hormone replacement drug.  The class action lawsuit alleged that Solvay deceptively marketed and advertised Estratest as an FDA-approved drug when in fact Estratest was not FDA-approved for any use.  Under the settlement, consumers obtained partial refunds for up to 30% of the purchase price paid of Estratest.  In addition, $8.9 million of the settlement was allocated to fund programs and activities devoted to promoting women's health and well-being at health organizations, medical schools, and charities throughout the nation.

24.     *Reverse Mortgage Cases*, JCCP No. 4061 (San Mateo County Supr. Ct., Cal.).  Transamerica Corporation, through its subsidiary Transamerica Homefirst, Inc., sold "reverse mortgages" marketed under the trade name "Lifetime."  The Lifetime reverse mortgages were sold exclusively to seniors, *i.e.*, persons 65 years or older.  Lieff Cabraser, with co-counsel, filed suit on behalf of seniors alleging that the terms of the reverse mortgages were unfair, and that borrowers were misled as to the loan terms, including the existence and amount of certain charges and fees.  In 2003, the Court granted final approval to an $8 million settlement of the action.

25.     *Brazil v. Dell*, No. C-07-01700 RMW (N.D. Cal.).  Lieff Cabraser served as Class Counsel representing a certified class of online consumers in California who purchased certain Dell computers based on the advertisement of an instant-off (or "slash-through") discount.  The complaint challenged Dell's pervasive use of "slash-through" reference prices in its online marketing.  Plaintiffs alleged that these "slash-through" reference prices were interpreted by consumers as representing Dell's former or regular sales prices, and that such reference prices (and corresponding representations of "savings") were false because Dell rarely, if ever, sold its products at such prices.  In October 2011, the Court approved a settlement that provided a $50 payment to each class member who submitted a timely and valid claim.  In addition, in response to the lawsuit, Dell changed its methodology for consumer online advertising, eliminating the use of "slash-through" references prices.

26. ***In re Ocwen Federal Bank FSB Mortgage Servicing Litigation***, MDL No. 1604 (N.D. Ill.). Lieff Cabraser serves as Co-Lead Plaintiffs' Counsel in a nationwide class action against Ocwen Financial Corporation, Ocwen Federal Bank FSB, and their affiliates ("Ocwen"). This lawsuit arises out of charges against Ocwen of misconduct in servicing its customers' mortgage loans and in its provision of certain related services, including debt collection and foreclosure services. On January 10, 2011, the Court granted preliminary approval of a nationwide settlement that provides monetary relief, cash-equivalent benefits, and injunctive relief. Final approval was granted to the settlement on July 6, 2011.

## V. Antitrust/Trade Regulation/Intellectual Property

### A. Current Cases

1. ***In re High-Tech Employee Antitrust Litigation***, No. 11 CV 2509 (N.D. Cal.). Lieff Cabraser serves as plaintiffs' Interim Co-Lead Counsel in a consolidated class action charging that Adobe Systems Inc., Apple Inc., Google Inc., Intel Corporation, Intuit Inc., Lucasfilm Ltd., and Pixar violated antitrust laws by conspiring to suppress the pay of technical, creative, and other salaried employees. The complaint alleges that the conspiracy among defendants consisted of (1) agreements not to actively recruit each other's employees; (2) agreements to provide notification when making an offer to another's employee (without the knowledge or consent of that employee); and (3) agreements to cap pay packages offered to prospective employees at the initial offer. Plaintiffs have moved for class certification.

2. ***Charles Schwab Bank, N.A. v. Bank of America Corp.***, No. 11 CV 4187 (N.D. Cal.). Lieff Cabraser represents The Charles Schwab Corporation and its affiliates Charles Schwab Bank, N.A., and Charles Schwab & Co., Inc., which manages the investments of the Charles Schwab Bank, N.A., (collectively "Schwab") in a lawsuit against Bank of America Corporation, Credit Suisse Group AG, J.P. Morgan Chase & Co., Citibank, Inc., and additional banks for allegedly manipulating the London Interbank Offered Rate ("LIBOR"). The complaint alleges that beginning in 2007, the defendants conspired to understate their true costs of borrowing, causing the calculation of LIBOR to be set artificially low. As a result, Schwab received less than its rightful rates of return on its investments. The complaint asserts claims under federal antitrust and securities laws, the federal Racketeer Influenced and Corrupt Organizations Act, and the statutory and common law of California.

3. ***In re Lithium Ion Batteries Antitrust Litigation,*** MDL No. 2420. Lieff Cabraser serves as Interim Co-Lead Indirect Purchaser Counsel representings consumers in a class action filed against Sony, Panasonic,

Hitachi, LG Chem, Samsung, and Sanyo for allegedly conspiring to fix and raise the prices of lithium-ion rechargeable batteries in violation of U.S. antitrust law from 2002 to 2011. The defendants are the world's leading manufacturers of lithium-ion rechargeable batteries, which provide power for a wide variety of consumer electronic products. As a result of the defendants' alleged anticompetitive and unlawful conduct, consumers across America paid artificially inflated prices for lithium-ion rechargeable batteries.

4.   ***In re Municipal Derivatives Litigation***, MDL No. 1950 (S.D.N.Y.). Lieff Cabraser represents the City of Oakland, the County of Alameda, City of Fresno, Fresno County Financing Authority, and East Bay Delta Housing and Finance Agency in a class action lawsuit brought on behalf of themselves and California entities that purchased guaranteed investment contracts, swaps, and other municipal derivatives products from Bank of America, N.A., JP Morgan Chase & Co., Piper Jaffray & Co., Societe Generale SA, UBS AG, and other banks, brokers and financial institutions. The complaint charges that defendants conspired to give cities, counties, school districts, and other governmental agencies artificially low bids for guaranteed investment contracts, swaps, and other municipal derivatives products, which are used by public entities use to earn interest on bond proceeds. The complaint charges that defendants met secretly to discuss prices, customers, and markets of municipal derivatives sold in the U.S. and elsewhere; intentionally created the false appearance of competition by engaging in sham auctions in which the results were pre-determined or agreed not to bid on contracts; and covertly shared their unjust profits with losing bidders to maintain the conspiracy. In April 2010, the Court denied defendants' motions to dismiss.

5.   ***Haley Paint Co. v. E.I. Dupont De Nemours and Co. et al.***, No. 10-cv-00318-RDB (N.D. Md.). Lieff Cabraser represents direct purchasers of titanium dioxide in a nationwide class action lawsuit. Plaintiffs charge that defendants conspired to fix, raise, and maintain the price of titanium dioxide in the United States. The complaint alleges defendants coordinated increases in the prices for titanium dioxide despite declining demand, decreasing raw material costs, and industry overcapacity. In March 2011, the Court denied defendants' motions to dismiss the action.

6.   ***Marchbanks Truck Service v. Comdata Network***, No. 07-cv-01078 (E.D. Pa.). Lieff Cabraser is co-lead counsel for this consolidated class action. The lawsuit charges that Comdata, and its parent company Ceridian, colluded with major truck stop chains to undermine the ability of rival fleet card issuers to challenge Comdata's monopoly in the fleet card market. Plaintiffs allege that this illegal conduct harmed

the proposed class of independent truck stops by forcing them to pay millions of dollars in excessive fees to Comdata.  Plaintiffs seek treble damages for the overcharges they and the proposed class paid, and an injunction to prevent ongoing anticompetitive conduct.

**B.    Successes**

1.    ***Natural Gas Antitrust Cases***, JCCP Nos. 4221, 4224, 4226 & 4228 (Cal. Supr. Ct.).  In 2003, the Court approved a landmark of $1.1 billion settlement in class action litigation against El Paso Natural Gas Co. for manipulating the market for natural gas pipeline transmission capacity into California.  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel and Co-Liaison Counsel in the *Natural Gas Antitrust Cases I-IV.*

In June 2007, the Court granted final approval to a $67.39 million settlement of a series of class action lawsuits brought by California business and residential consumers of natural gas against a group of natural gas suppliers, Reliant Energy Services, Inc., Duke Energy Trading and Marketing LLC, CMS Energy Resources Management Company, and Aquila Merchant Services, Inc.

Plaintiffs charged defendants with manipulating the price of natural gas in California during the California energy crisis of 2000-2001 by a variety of means, including falsely reporting the prices and quantities of natural gas transactions to trade publications, which compiled daily and monthly natural gas price indices; prearranged wash trading; and, in the case of Reliant, "churning" on the Enron Online electronic trading platform, which was facilitated by a secret netting agreement between Reliant and Enron.

The 2007 settlement followed a settlement reached in 2006 for $92 million partial settlement with Coral Energy Resources, L.P.; Dynegy Inc. and affiliates; EnCana Corporation; WD Energy Services, Inc.; and The Williams Companies, Inc. and affiliates.

2.    ***Wholesale Electricity Antitrust Cases I & II***, JCCP Nos. 4204 & 4205 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel in the private class action litigation against Duke Energy Trading & Marketing, Reliant Energy, and The Williams Companies for claims that the companies manipulated California's wholesale electricity markets during the California energy crisis of 2000-2001.  Extending the landmark victories for California residential and business consumers of electricity, in September 2004, plaintiffs reached a $206 million settlement with Duke Energy Trading & Marketing, and in August 2005, plaintiffs reached a $460 million settlement with Reliant Energy, settling claims that the companies manipulated California's wholesale electricity markets during

the California energy crisis of 2000-01.  Lieff Cabraser earlier entered into a settlement for over $400 million with The Williams Companies.

3.   ***In re Brand Name Prescription Drugs***, MDL No. 997 (N.D. Ill.). Lieff Cabraser served as Class Counsel for a class of tens of thousands of retail pharmacies against the leading pharmaceutical manufacturers and wholesalers of brand name prescription drugs for alleged price-fixing from 1989 to 1995 in violation of the federal antitrust laws.  Plaintiffs charged that defendants engaged in price discrimination against retail pharmacies by denying them discounts provided to hospitals, health maintenance organizations, and nursing homes.  In 1996 and 1998, the Court approved settlements with certain manufacturers totaling $723 million.

4.   ***Microsoft Private Antitrust Litigation.***  Representing businesses and consumers, Lieff Cabraser prosecuted multiple private antitrust cases against Microsoft Corporation in state courts across the country, including Florida, New York, North Carolina, and Tennessee.  Plaintiffs alleged that Microsoft had engaged in anticompetitive conduct, violated state deceptive and unfair business practices statutes, and overcharged businesses and consumers for Windows operating system software and for certain software applications, including Microsoft Word and Microsoft Office.  In August 2006, the New York Supreme Court granted final approval to a settlement that made available up to $350 million in benefits for New York businesses and consumers.  In August 2004, the Court in the North Carolina action granted final approval to a settlement valued at over $89 million.  In June 2004, the Court in the Tennessee action granted final approval to a $64 million settlement.  In November 2003, in the Florida Microsoft litigation, the Court granted final approval to a $202 million settlement, one of the largest antitrust settlements in Florida history.  Lieff Cabraser served as Co-Lead Counsel in the New York, North Carolina and Tennessee cases, and held leadership roles in the Florida case.

5.   ***In re TFT-LCD (Flat Panel) Antitrust Litigation***, MDL No. 1827 (N.D. Cal.).  Lieff Cabraser served as court-appointed Co-Lead Counsel for direct purchasers in litigation against the world's leading manufacturers of Thin Film Transistor Liquid Crystal Displays.  TFT-LCDs are used in flat-panel televisions as well as computer monitors, laptop computers, mobile phones, personal digital assistants, and other devices.  Plaintiffs charged that defendants conspired to raise and fix the prices of TFT-LCD panels and certain products containing those panels for over a decade, resulting in overcharges to purchasers of those panels and products.  In March 2010, the Court certified two nationwide classes of persons and entities that directly purchased TFT-LCDs from January 1, 1999 through December 31, 2006, one class of panel purchasers, and one class of class

of buyers of laptop computers, computer monitors, and televisions that contained TFT-LCDs.  Over the course of the litigation, the classes reached settlements with all defendants except Toshiba.  The case against Toshiba proceeded to trial.  In July 2012, the jury found that Toshiba participated in the price-fixing conspiracy.  The case was subsequently settled, bringing the total settlements in the litigation to over $470 million.  For his outstanding work in the precedent-setting litigation, *California Lawyer* recognized Richard M. Heimann with a 2013 California Lawyer of the Year award.

6.  ***Sullivan v. DB Investments***, No. 04-02819 (D. N.J.).  Lieff Cabraser served as Class Counsel for consumers who purchased diamonds from 1994 through March 31, 2006, in a class action lawsuit against the De Beers group of companies.  Plaintiffs charged that De Beers conspired to monopolize the sale of rough diamonds in the U.S.  In May 2008, the District Court approved a $295 million settlement for purchasers of diamonds and diamond jewelry, including $130 million to consumers.  The settlement also barred De Beers from continuing its illegal business practices and required De Beers to submit to the jurisdiction of the Court to enforce the settlement.   In December 2011, the Third Circuit Court of Appeals affirmed the district court's order approving the settlement.  667 F.3d 273 (3rd Cir. 2011).

For sixty years, De Beers has flaunted U.S. antitrust laws.  In 1999, De Beers' Chairman Nicholas Oppenheimer stated that De Beers "likes to think of itself as the world's . . . longest-running monopoly.  [We seek] to manage the diamond market, to control supply, to manage prices and to act collusively with our partners in the business."  The hard-fought litigation spanned several years and nations.  Despite the tremendous resources available to the U.S. Department of Justice and state attorney generals, it was only through the determination of plaintiffs' counsel that De Beers was finally brought to justice and the rights of consumers were vindicated.  Lieff Cabraser attorneys played key roles in negotiating the settlement and defending it on appeal.  Discussing the DeBeers case, *The National Law Journal* noted that Lieff Cabraser was "among the plaintiffs' firms that weren't afraid to take on one of the business world's great white whales."

7.  ***In re Linerboard Antitrust Litigation***, MDL No. 1261 (E.D. Pa.).  Lieff Cabraser served as Class Counsel on behalf of a class of direct purchasers of linerboard.  The Court approved a settlement totaling $202 million.

8.  ***Azizian v. Federated Department Stores,*** No. 3:03 CV 03359 SBA (N.D. Cal.).  In March 2005, the Court granted final approval to a settlement that Lieff Cabraser and co-counsel reached with numerous department store cosmetics manufacturers and retailers.  The settlement is valued at $175 million and includes significant injunctive relief, for the benefit of a nationwide class of consumers of department store cosmetics.

The complaint alleged the manufacturers and retailers violated antitrust law by engaging in anticompetitive practices to prevent discounting of department store cosmetics.

9.      ***Pharmaceutical Cases I, II, and III***, JCCP Nos. 2969, 2971 & 2972 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel and Co-Liaison Counsel representing a certified class of indirect purchasers (consumers) on claims against the major pharmaceutical manufacturers for violations of the Cartwright Act and the Unfair Competition Act.  The class alleged that defendants unlawfully fixed discriminatory prices on prescription drugs to retail pharmacists in comparison with the prices charged to certain favored purchasers, including HMOs and mail order houses.  In April 1999, the Court approved a settlement providing $148 million in free, brand-name prescription drugs to health agencies that served California's poor and uninsured.  In October 2001, the Court approved a settlement with the remaining defendants in the case, which provided an additional $23 million in free, brand-name prescription drugs to these agencies.

10.     ***In re Lupron Marketing and Sales Practices Litigation***, MDL No. 1430 (D. Mass.).  In May 2005, the Court granted final approval to a settlement of a class action lawsuit by patients, insurance companies and health and welfare benefit plans that paid for Lupron, a prescription drug used to treat prostate cancer, endometriosis and precocious puberty.  The settlement requires the defendants, Abbott Laboratories, Takeda Pharmaceutical Company Limited, and TAP Pharmaceuticals, to pay $150 million, inclusive of costs and fees, to persons or entities who paid for Lupron from January 1, 1985 through March 31, 2005.  Plaintiffs charged that the defendants conspired to overstate the drug's average wholesale price ("AWP"), which resulted in plaintiffs paying more for Lupron than they should have paid.  Lieff Cabraser served as Co-Lead Plaintiffs' Counsel.

11.     ***California Vitamins Cases***, JCCP No. 4076 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel and Co-Chairman of the Plaintiffs' Executive Committee on behalf of a class of California indirect vitamin purchasers in every level of the chain of distribution.  In January 2002, the Court granted final approval of a $96 million settlement with certain vitamin manufacturers in a class action alleging that these and other manufacturers engaged in price fixing of particular vitamins.  In December 2006, the Court granted final approval to over $8.8 million in additional settlements.

12.     ***In re Buspirone Antitrust Litigation***, MDL No. 1413 (S.D. N.Y.).  In November 2003, Lieff Cabraser obtained a $90 million cash settlement for individual consumers, consumer organizations, and third party payers

that purchased BuSpar, a drug prescribed to alleviate symptoms of anxiety.  Plaintiffs alleged that Bristol-Myers Squibb Co. (BMS), Danbury Pharmacal, Inc., Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. entered into an unlawful agreement in restraint of trade under which BMS paid a potential generic manufacturer of BuSpar to drop its challenge to BMS' patent and refrain from entering the market.  Lieff Cabraser served as Plaintiffs' Co-Lead Counsel.

13. ***In re Travel Agency Commission Antitrust Litigation***, MDL No. 1058 (D. Minn.).  Lieff Cabraser served as Co-Lead Counsel for a certified class of U.S. travel agents on claims against the major U.S. air carriers, who allegedly violated the federal antitrust laws by fixing the commissions paid to travel agents.  In 1997, the Court approved an $82 million settlement.

14. ***In re Commercial Explosives Antitrust Litigation***, MDL No. 1093 (D. Utah).  Lieff Cabraser served as Class Counsel on behalf of direct purchasers of explosives used in mining operations.  In 1998, the Court approved a $77 million settlement of the litigation.

15. ***In re Toys 'R' Us Antitrust Litigation***, MDL No. 1211 (E.D. N.Y.).  Lieff Cabraser served as Co-Lead Counsel representing a class of direct purchasers (consumers) who alleged that Toys 'R' Us conspired with the major toy manufacturers to boycott certain discount retailers in order to restrict competition and inflate toy prices.  In February 2000, the Court approved a settlement of cash and product of over $56 million.

16. ***Meijer v. Abbott Laboratories***, Case No. C 07-5985 CW (N.D. Cal.).  Lieff Cabraser served as co-counsel for the group of retailers charging that Abbott Laboratories monopolized the market for AIDS medicines used in conjunction with Abbott's prescription drug Norvir.  These drugs, known as Protease Inhibitors, have enabled patients with HIV to fight off the disease and live longer.  In January 2011, the Court denied Abbott's motion for summary judgment on plaintiffs' monopolization claim. Trial commenced in February 2011.  After opening statements and the presentation of four witnesses and evidence to the jury, plaintiffs and Abbott Laboratories entered into a $52 million settlement.  The Court granted final approval to the settlement in August 2011.

17. ***In re Carpet Antitrust Litigation***, MDL No. 1075 (N.D. Ga.).  Lieff Cabraser served as Class Counsel and a member of the trial team for a class of direct purchasers of twenty-ounce level loop polypropylene carpet.  Plaintiffs, distributors of polypropylene carpet, alleged that Defendants, seven manufacturers of polypropylene carpet, conspired to fix the prices of polypropylene carpet by agreeing to eliminate discounts and charge inflated prices on the carpet.  In 2001, the Court approved a $50 million settlement of the case.

18.   ***In re High Pressure Laminates Antitrust Litigation***, MDL
No. 1368 (S.D. N.Y.).  Lieff Cabraser served as Trial Counsel on behalf of a
class of direct purchasers of high pressure laminates.  The case in 2006
was tried to a jury verdict.  The case settled for over $40 million.

19.   ***Schwartz v. National Football League***, No. 97-CV-5184 (E.D. Pa.).
Lieff Cabraser served as counsel for individuals who purchased the "NFL
Sunday Ticket" package of private satellite transmissions in litigation
against the National Football League for allegedly violating the Sherman
Act by limiting the distribution of television broadcasts of NFL games by
satellite transmission to one package.  In August 2001, the Court
approved of a class action settlement that included: (1) the requirement
that defendants provide an additional weekly satellite television package
known as Single Sunday Ticket for the 2001 NFL football season, under
certain circumstances for one more season, and at the defendants'
discretion thereafter; (2) a $7.5 million settlement fund to be distributed
to class members; (3) merchandise coupons entitling class members to
discounts at the NFL's Internet store which the parties value at
approximately $3 million; and (4) $2.3 million to pay for administering
the settlement fund and notifying class members.

20.   ***In re Lasik/PRK Antitrust Litigation***, No. CV 772894 (Cal. Supr.
Ct.).  Lieff Cabraser served as a member of Plaintiffs' Executive
Committee in class actions brought on behalf of persons who underwent
Lasik/PRK eye surgery.  Plaintiffs alleged that defendants, the
manufacturers of the laser system used for the laser vision correction
surgery, manipulated fees charged to ophthalmologists and others who
performed the surgery, and that the overcharges were passed onto
consumers who paid for laser vision correction surgery.  In December
2001, the Court approved a $12.5 million settlement of the litigation.

21.   ***Quantegy Recording Solutions, LLC, et al. v. Toda Kogyo
Corp., et al.***, No. C-02-1611 (PJH).  In August 2006 and January 2009,
the Court approved the final settlements in antitrust litigation against
manufacturers, producers, and distributors of magnetic iron oxide
("MIO").  MIO is used in the manufacture of audiotape, videotape, and
data storage tape.  Plaintiffs alleged that defendants violated federal
antitrust laws by conspiring to fix, maintain, and stabilize the prices and
to allocate the worldwide markets for MIO from 1991 to October 12, 2005.
The value of all settlements reached in the litigation was $6.35 million.
Lieff Cabraser served as Plaintiffs' Co-Lead Counsel.

22.   ***In re Static Random Access Memory (SRAM) Antitrust
Litigation***, MDL No. 1819 (N.D. Cal.).  Plaintiffs allege that from
November 1, 1996 through December 31, 2006, the defendant
manufacturers conspired to fix and maintain artificially high prices for

SRAM, a type of memory used in many products, including smartphones and computers.  Lieff Cabraser served as one of three members of the Steering Committee for consumers and other indirect purchasers of SRAM. In February 2008, U.S. District Court Judge Claudia Wilken denied most aspects of defendants' motions to dismiss plaintiffs' complaints.  In November 2009, the Court certified a nationwide class seeking injunctive relief and twenty-seven state classes seeking damages.  In  2010, the Court granted final approval of a first set of settlements.   In October 2011, the Court granted final approval of settlements with the remaining defendants.

23.     ***Carbon Fiber Cases I, II, III***, JCCP Nos. 4212, 4216 & 4222 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel on behalf of indirect purchasers of carbon fiber.  Plaintiffs alleged that defendants illegally conspired to raise prices of carbon fiber.  Settlements have been reached with all of the defendants.

24.     ***Methionine Cases I and II***, JCCP Nos. 4090 & 4096 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of methionine, an amino acid used primarily as a poultry and swine feed additive to enhance growth and production.  Plaintiffs alleged that the companies illegally conspired to raise methionine prices to super-competitive levels.  The case settled.

25.     ***McIntosh v. Monsanto***, No. 4:01CV65RSW (E.D. Mo.).  Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit against Monsanto Company and others alleging that a conspiracy to fix prices on genetically modified Roundup Ready soybean seeds and Yieldgard corn seeds.  The case settled.

26.     ***Tortola Restaurants v. Minnesota Mining and Manufacturing***, No. 314281 (Cal. Supr. Ct).  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of Scotch-brand invisible and transparent tape.  Plaintiffs alleged that defendant 3M conspired with certain retailers to monopolize the sale of Scotch-brand tape in California.  The case was resolved as part of a nationwide settlement that Lieff Cabraser negotiated, along with co-counsel.

27.     ***In re Compact Disc Antitrust Litigation***, MDL No. 1216 (C.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel for the direct purchasers of compact discs on claims that the producers fixed the price of CDs in violation of the federal antitrust laws.

28.     ***In re Electrical Carbon Products Antitrust Litigation***, MDL No. 1514 (D.N.J.).  Lieff Cabraser represented the City and County of San Francisco and a class of direct purchasers of carbon brushes and carbon

collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Sherman Act.

## VI.   Economic Injury Product Defects

### A.   Current Cases

1.   ***Front-Loading Washer Products Liability Litigation***.  Lieff Cabraser represents consumers in multiple states who have filed separate class action lawsuits against Whirlpool, Sears and LG Corporations.  The complaints charge that certain front-loading automatic washers manufactured by these companies are defectively designed and that the design defects create foul odors from mold and mildew that permeate washing machines and customers' homes.  Many class members have spent money for repairs and on other purported remedies. As the complaints allege, none of these remedies eliminates the problem.

2.   ***Honda Window Defective Window Litigation.*** Case No. 2:21-cv-01142-SVW-PLA (C.D. CA).  Lieff Cabraser represents consumers who have filed lawsuits against Honda Motor Company, Inc. for manufacturing and selling vehicles with allegedly defective window regulator mechanisms. Windows in these vehicles allegedly can, without warning, drop into the door frame and break or become permanently stuck in the fully-open position.

The experience of one Honda Element owner, as set forth in the complaint, exemplifies the problem: The driver's side window in his vehicle slid down suddenly while he was driving on a smooth road. A few months later, the window on the passenger side of the vehicle also slid down into the door and would not move back up. The owner incurred more than $300 in repair costs, which Honda refused to pay for.

### B.   Successes

1.   ***In re Mercedes-Benz Tele-Aid Contract Litigation***, MDL No. 1914 (D. N.J.).  Lieff Cabraser represented owners and lessees of Mercedes-Benz cars and SUVs equipped with the Tele-Aid system, an emergency response system which links subscribers to road-side assistance operators by using a combination of global positioning and cellular technology.  In 2002, the Federal Communications Commission issued a rule, effective 2008, eliminating the requirement that wireless phone carriers provide analog-based networks.  The Tele-Aid system offered by Mercedes-Benz relied on analog signals.  Plaintiffs charged that Mercedes-Benz committed fraud in promoting and selling the Tele-Aid system without disclosing to buyers of certain model years that the Tele-Aid system as installed would become obsolete in 2008.

In an April 2009 published order, the Court certified a nationwide class of all persons or entities in the U.S. who purchased or leased a Mercedes-Benz vehicle equipped with an analog-only Tele Aid system after August 8, 2002, and (1) subscribed to Tele Aid service until being informed that such service would be discontinued at the end of 2007, or (2) purchased an upgrade to digital equipment.   In September 2011, the Court approved a settlement that provided class members between a $650 check or a $750 to $1,300 certificate toward the purchase or lease of new Mercedes-Benz vehicle, depending upon whether or not they paid for an upgrade of the analog Tele Aid system and whether they still owned their vehicle.   In approving the settlement, U.S. District Court Judge Dickinson R. Debevoise stated,  "I want to thank counsel for the . . . very effective and good work . . . .   It was carried out with vigor, integrity and aggressiveness with never going beyond the maxims of the Court."

2.   ***McLennan v. LG Electronics USA***, No. 2:10-cv-03604 (D. N.J.).  Lieff Cabraser represented consumers that alleged several LG refrigerator models had a faulty design that caused the interior lights to remain on even when the refrigerator doors were closed (identified as the "light issue"), resulting in overheating and food spoilage. In March 2012, the Court granted final approval to a settlement of the nationwide class action lawsuit.  The settlement provides that LG reimburse class members for all out-of-pocket costs (parts and labor) to repair the light issue prior to the mailing of the class notice and extends the warranty with respect to the light issue for 10 years from the date of the original retail purchase of the refrigerator.  The extended warranty covers in-home refrigerator repair performed by LG and, in some cases, the cost of a replacement refrigerator.  In approving the settlement, U.S. District Court Judge William J. Martini stated, "The Settlement in this case provides for both the complete reimbursement of out-of-pocket expenses for repairs fixing the Light Issue, as well as a warranty for ten years from the date of refrigerator purchase. It would be hard to imagine a better recovery for the Class had the litigation gone to trial. Because Class members will essentially receive all of the relief to which they would have been entitled after a successful trial, this factor weighs heavily in favor of settlement."

3.   ***Grays Harbor Adventist Christian School v. Carrier Corporation***, No. 05-05437 (W.D. Wash.).  In April 2008, the Court approved a nationwide settlement for current and past owners of high-efficiency furnaces manufactured and sold by Carrier Corporation and equipped with polypropylene-laminated condensing heat exchangers ("CHXs").  Carrier sold the furnaces under the Carrier, Bryant, Day & Night and Payne brand-names.  Plaintiffs alleged that starting in 1989 Carrier began manufacturing and selling high efficiency condensing furnaces manufactured with a secondary CHX made of inferior materials. Plaintiffs alleged that as a result, the CHXs, which Carrier warranted and

consumers expected to last for 20 years, failed prematurely.  The settlement provides an enhanced 20-year warranty of free service and free parts for consumers whose furnaces have not yet failed.  The settlement also offers a cash reimbursement for consumers who already paid to repair or replace the CHX in their high-efficiency Carrier furnaces.

An estimated three million or more consumers in the U.S. and Canada purchased the furnaces covered under the settlement.  Plaintiffs valued the settlement to consumers at over $300 million based upon the combined value of the cash reimbursement and the estimated cost of an enhanced warranty of this nature.

4.  ***Carideo v. Dell***, No. C06-1772 JLR (W.D. Wash.).  Lieff Cabraser represented consumers who owned Dell Inspiron notebook computer model numbers 1150, 5100, or 5160.  The class action lawsuit complaint charged that the notebooks suffered premature failure of their cooling system, power supply system, and/or motherboards.  In December 2010, the Court approved a settlement which provided class members that paid Dell for certain repairs to their Inspiron notebook computer a reimbursement of all or a portion of the cost of the repairs.

5.  ***Cartwright v. Viking Industries***, No. 2:07-cv-2159 FCD (E.D. Cal.)  Lieff Cabraser represented California homeowners in a class action lawsuit which alleged that over one million Series 3000 windows produced and distributed by Viking between 1989 and 1999 were defective.  The plaintiffs charged that the windows were not watertight and allowed for water to penetrate the surrounding sheetrock, drywall, paint or wallpaper.  Under the terms of a settlement approved by the Court in August 2010, all class members who submitted valid claims were entitled to receive as much as $500 per affected property.

6.  ***Pelletz v. Advanced Environmental Recycling Technologies*** (W.D. Wash.).  Lieff Cabraser served as Co-Lead Counsel in a case alleging that ChoiceDek decking materials, manufactured by AERT, developed persistent and untreatable mold spotting throughout their surface.  In a published opinion in January 2009, the Court approved a settlement that provided affected consumers with free and discounted deck treatments, mold inhibitor applications, and product replacement and reimbursement.

7.  ***Create-A-Card v. Intuit***, No. C07-6452 WHA (N.D. Cal.).  Lieff Cabraser, with co-counsel, represented business users of QuickBooks Pro for accounting that lost their QuickBooks data and other files due to faulty software code sent by Intuit, the producer of QuickBooks.  In September 2009, the Court granted final approval to a settlement that provided all class members who filed a valid claim with a free software upgrade and

compensation for certain data-recovery costs.  Commenting on the settlement and the work of Lieff Cabraser on September 17, 2009, U.S. District Court Judge William H. Alsup stated, "I want to come back to something that I observed in this case firsthand for a long time now.  I think you've done an excellent job in the case as class counsel and the class has been well represented having you and your firm in the case."

8.    ***Weekend Warrior Trailer Cases***, JCCP No. 4455 (Cal. Supr. Ct.). Lieff Cabraser, with co-counsel, represented owners of Weekend Warrior trailers manufactured between 1998 and 2006 that were equipped with frames manufactured, assembled, or supplied by Zieman Manufacturing Company.  The trailers, commonly referred to as "toy haulers," were used to transport outdoor recreational equipment such as motorcycles and all-terrain vehicles.  Plaintiffs charged that Weekend Warrior and Zieman knew of design and performance problems, including bent frames, detached siding, and warped forward cargo areas, with the trailers, and concealed the defects from consumers.  In February 2008, the Court approved a $5.5 million settlement of the action that provided for the repair and/or reimbursement of the trailers.  In approving the settlement, California Superior Court Judge Thierry P. Colaw stated that class counsel were "some of the best" and "there was an overwhelming positive reaction to the settlement" among class members.

9.    ***Lundell v. Dell***, No. C05-03970 (N.D. Cal.).  Lieff Cabraser served as Lead Class Counsel for consumers who experienced power problems with the Dell Inspiron 5150 notebook.  In December 2006, the Court granted final approval to a settlement of the class action which extended the one-year limited warranty on the notebook for a set of repairs related to the power system.  In addition, class members that paid Dell or a third party for repair of the power system of their notebook were entitled to a 100% cash refund from Dell.

10.   ***Kan v. Toshiba American Information Systems***, No. BC327273 (Los Angeles Super. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a class of all end-user persons or entities who purchased or otherwise acquired in the United States, for their own use and not for resale, a new Toshiba Satellite Pro 6100 Series notebook.  Consumers alleged a series of defects were present in the notebook.  In 2006, the Court approved a settlement that extended the warranty for all Satellite Pro 6100 notebooks, provided cash compensation for certain repairs, and reimbursed class members for certain out-of-warranty repair expenses.

11.   ***Foothill/DeAnza Community College District v. Northwest Pipe Company***, No. C-00-20749 (N.D. Cal.).  In June 2004, the court approved the creation of a settlement fund of up to $14.5 million for property owners nationwide with Poz-Lok fire sprinkler piping that fails.

Since 1990, Poz-Lok pipes and pipe fittings were sold in the U.S. as part of fire suppression systems for use in residential and commercial buildings. After leaks in Poz-Lok pipes caused damage to its DeAnza Campus Center building, Foothill/DeAnza Community College District in California retained Lieff Cabraser to file a class action lawsuit against the manufacturers of Poz-Lok.  The college district charged that Poz-Lok pipe had manufacturing and design defects that resulted in the premature corrosion and failure of the product.  Under the settlement, owners whose Poz-Lok pipes are leaking today, or over the next 15 years, may file a claim for compensation.

12.   ***Toshiba Laptop Screen Flicker Settlement.***  Lieff Cabraser negotiated a settlement with Toshiba America Information Systems, Inc. ("TAIS") to provide relief for owners of certain Toshiba Satellite 1800 Series, Satellite Pro 4600 and Tecra 8100 personal notebook computers whose screens flickered, dimmed or went blank due to an issue with the FL Inverter Board component.  In 2004 under the terms of the Settlement, owners of affected computers who paid to have the FL Inverter issue repaired by either TAIS or an authorized TAIS service provider recovered the cost of that repair, up to $300 for the Satellite 1800 Series and the Satellite Pro 4600 personal computers, or $400 for the Tecra 8100 personal computers.  TAIS also agreed to extend the affected computers' warranties for the FL Inverter issue by 18 months.

13.   ***McManus v. Fleetwood Enterprises, Inc.***, No. SA-99-CA-464-FB (W.D. Tex.).  Lieff Cabraser served as Class Counsel on behalf of original owners of 1994-2000 model year Fleetwood Class A and Class C motor homes.  In 2003, the Court approved a settlement that resolved lawsuits pending in Texas and California about braking while towing with 1994 Fleetwood Class A and Class C motor homes.  The lawsuits alleged that Fleetwood misrepresented the towing capabilities of new motor homes it sold, and claimed that Fleetwood should have told buyers that a supplemental braking system is needed to stop safely while towing heavy items, such as a vehicle or trailer.  The settlement paid $250 to people who bought a supplemental braking system for Fleetwood motor homes that they bought new.

14.   ***Richison v. American Cemwood Corp.***, No. 005532 (San Joaquin Supr. Ct., Cal.).  Lieff Cabraser served as Co-Lead Class Counsel for an estimated nationwide class of 30,000 owners of homes and other structures on which defective Cemwood Shakes were installed.  In November 2003, the Court granted final approval to a $75 million Phase 2 settlement in the American Cemwood roofing shakes national class action litigation.  This amount was in addition to a $65 million partial settlement approved by the Court in May 2000, and brought the litigation to a conclusion.

15.     ***ABS Pipe Litigation***, JCCP No. 3126 (Contra Costa County Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel on behalf of property owners whose ABS plumbing pipe was allegedly defective and caused property damage by leaking.  Six separate class actions were filed in California against five different ABS pipe manufacturers, numerous developers of homes containing the ABS pipe, as well as the resin supplier and the entity charged with ensuring the integrity of the product.  Between 1998 and 2001, we achieved 12 separate settlements in the class actions and related individual lawsuits for approximately $78 million.

Commenting on the work of Lieff Cabraser and co-counsel in the case, California Superior Court (now appellate) Judge Mark B. Simons stated on May 14, 1998: "The attorneys who were involved in the resolution of the case certainly entered the case with impressive reputations and did nothing in the course of their work on this case to diminish these reputations, but underlined, in my opinion, how well deserved those reputations are."

16.     ***Williams v. Weyerhaeuser***, No. 995787 (San Francisco Supr. Ct.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of hundreds of thousands or millions of owners of homes and other structures with defective Weyerhaeuser hardboard siding.  A California-wide class was certified for all purposes in February 1999, and withstood writ review by both the California Court of Appeal and Supreme Court of California.  In 2000, the Court granted final approval to a nationwide settlement of the case which provides class members with compensation for their damaged siding, based on the cost of replacing or, in some instances, repairing, damaged siding.  The settlement has no cap, and requires Weyerhaeuser to pay all timely, qualified claims over a nine year period.  The claims program is underway and paying claims.

17.     ***Naef v. Masonite***, No. CV-94-4033 (Mobile County Circuit Ct., Ala.).  Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide Class of an estimated 4 million homeowners with allegedly defective hardboard siding manufactured and sold by Masonite Corporation, a subsidiary of International Paper, installed on their homes. The Court certified the class in November 1995, and the Alabama Supreme Court twice denied extraordinary writs seeking to decertify the Class, including in *Ex Parte Masonite*, 681 So. 2d 1068 (Ala. 1996).  A month-long jury trial in 1996 established the factual predicate that Masonite hardboard siding was defective under the laws of most states.  The case settled on the eve of a second class-wide trial, and in 1998, the Court approved a settlement.  Under a claims program established by the settlement that ran through 2008, class members with failing Masonite hardboard siding installed and incorporated in their property between January 1, 1980 and January 15, 1998 were entitled to make claims, have their homes

evaluated by independent inspectors, and receive cash payments for damaged siding.  Combined with settlements involving other alleged defective home building products sold by Masonite, the total cash paid to homeowners exceeded $1 billion.

18.  ***In re General Motors Corp. Pick-Up Fuel Tank Products Liability Litigation***, MDL No. 961 (E.D. Pa.).  Lieff Cabraser served as court-appointed Co-Lead Counsel representing a class of 4.7 million plaintiffs who owned 1973-1987 GM C/K pickup trucks with allegedly defective gas tanks.  The Consolidated Complaint asserted claims under the Lanham Act, the Magnuson-Moss Act, state consumer protection statutes, and common law.  In 1995, the Third Circuit vacated the District Court settlement approval order and remanded the matter to the District Court for further proceedings.  In July 1996, a new nationwide class action was certified for purposes of an enhanced settlement program valued at a minimum of $600 million, plus funding for independent fuel system safety research projects.  The Court granted final approval of the settlement in November 1996.

19.  ***In re Louisiana-Pacific Inner-Seal Siding Litigation***, No. C-95-879-JO (D. Ore.).  Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide class of homeowners with defective exterior siding on their homes.  Plaintiffs asserted claims for breach of warranty, fraud, negligence, and violation of consumer protection statutes.  In 1996, U.S. District Judge Robert E. Jones entered an Order, Final Judgment and Decree granting final approval to a nationwide settlement requiring Louisiana-Pacific to provide funding up to $475 million to pay for inspection of homes and repair and replacement of failing siding over the next seven years.

20.  ***In re Intel Pentium Processor Litigation***, No. CV 745729 (Santa Clara Supr. Ct., Cal.).  Lieff Cabraser served as one of two court appointed Co-Lead Class Counsel, and negotiated a settlement, approved by the Court in June 1995, involving both injunctive relief and damages having an economic value of approximately $1 billion.  The chip replacement program has been implemented, and is ongoing.

21.  ***Cox v. Shell***, No. 18,844 (Obion County Chancery Ct., Tenn.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of approximately 6 million owners of property equipped with defective polybutylene plumbing systems and yard service lines.  In November 1995, the Court approved a settlement involving an initial commitment by Defendants of $950 million in compensation for past and future expenses incurred as a result of pipe leaks, and to provide replacement pipes to eligible claimants.  The deadline for filing claims expired in 2009.

22.     ***Hanlon v. Chrysler Corp.***, No. C-95-2010-CAL (N.D. Cal.).  In 1995, the district court approved a $200+ million settlement enforcing Chrysler's comprehensive minivan rear latch replacement program, and to correct alleged safety problems with Chrysler's pre-1995 designs.  As part of the settlement, Chrysler agreed to replace the rear latches with redesigned latches.  The settlement was affirmed on appeal by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (1998).

23.     ***Gross v. Mobil***, No. C 95-1237-SI (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Class Counsel in this nationwide action involving an estimated 2,500 aircraft engine owners whose engines were affected by Mobil AV-1, an aircraft engine oil.  Plaintiffs alleged claims for strict liability, negligence, misrepresentation, violation of consumer protection statutes, and for injunctive relief.  Plaintiffs obtained a preliminary injunction requiring Defendant Mobil Corporation to provide notice to all potential class members of the risks associated with past use of Defendants' aircraft engine oil.  In addition, Plaintiffs negotiated a proposed Settlement, granted final approval by the Court in November 1995, valued at over $12.5 million, under which all Class Members were eligible to participate in an engine inspection and repair program, and receive compensation for past repairs and for the loss of use of their aircraft associated with damage caused by Mobil AV-1.

## VII.   Environmental and Toxic Exposures

### A.   Current Cases

1.      ***In Re Oil Spill  by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico***, MDL No. 2179 (E.D. La.).  Lieff Cabraser serves on the Court-appointed Plaintiffs' Steering Committee ("PSC") and with co-counsel represents fishermen, property owners, business owners, wage earners, and other harmed parties in class action litigation against BP, Transocean, Halliburton, Cameron, and other defendants involved in the Deepwater Horizon oil rig blowout and resulting oil spill in the Gulf of Mexico on April 20, 2010.  The Master Complaints allege that the defendants were insouciant in addressing the operations of the well and the oil rig, ignored warning signs of the impending disaster, and failed to employ and/or follow  proper safety measures, worker safety laws, and environmental protection laws in favor of cost-cutting measures.

On March 3, 2012, the PSC announced a settlement in principle with BP that will fully compensate hundreds of thousands of victims of the tragedy, with no cap on the amount BP will pay.  BP is obligated to fully satisfy all eligible claims under the terms of the Court supervised settlement, irrespective of the funds previously set aside.

2.   ***Kingston, Tennessee TVA Coal Ash Spill Litigation***, No. 3:09-cv-09 (E.D. Tenn.).  On December 22, 2008, more than a billion gallons of coal ash spilled when a dike burst on a retention pond at the Kingston Fossil Plant operated by the Tennessee Valley Authority (TVA) in Roane County, Tennessee.  Coal ash is the toxic byproduct of burning coal.  The catastrophic failure is the largest environmental disaster involving a spill of coal ash in United States history.   Lieff Cabraser represents impacted property owners and businesses.  In March 2010, the Court denied in major part TVA's motion to dismiss the litigation.  In the Fall of 2011, the Court conducted a three week bench trial limited to the question of whether TVA was liable for releasing the coal ash into the river system.  The issues of individual causation and damages were reserved for later proceedings.  On August 23, 2012, U.S. District Court Judge Thomas Varlan found in favor of plaintiffs on their claims of negligence, trespass, and private nuisance.

3.   ***In re Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation***, MDL No. 2284 (E.D. Pa.).  We served as Interim Co-Lead Counsel for homeowners, golf course companies and other property owners in a nationwide class action lawsuit against E.I. du Pont de Nemours & Company ("DuPont"), charging that its herbicide Imprelis caused widespread death among trees and other non-targeted vegetation across the country.  The complaint charges that DuPont failed to disclose the risks Imprelis posed to trees, even when applied as directed, and failed to provide instructions for the safe application of Imprelis.

## B.   Successes

1.   ***In re Exxon Valdez Oil Spill Litigation***, No. 3:89-cv-0095 HRH (D. Al.).  The *Exxon Valdez* ran aground on March 24, 1989, spilling 11 million gallons of oil into Prince William Sound.  Lieff Cabraser served as one of the court-appointed Plaintiffs' Class Counsel.  The class consisted of fisherman and others whose livelihoods were gravely affected by the disaster.  In addition, Lieff Cabraser served on the Class Trial Team that tried the case before a jury in federal court in 1994.  The jury returned an award of $5 billion in punitive damages.

In 2001, the Ninth Circuit Court of Appeals ruled that the original $5 billion punitive damages verdict was excessive.  In 2002, U.S. District Court Judge H. Russell Holland reinstated the award at $4 billion.  Judge Holland stated that, "Exxon officials knew that carrying huge volumes of crude oil through Prince William sound was a dangerous business, yet they knowingly permitted a relapsed alcoholic to direct the operation of the *Exxon Valdez* through Prince William Sound."  In 2003, the Ninth Circuit again directed Judge Holland to reconsider the punitive damages

award under United States Supreme Court punitive damages guidelines. In January 2004, Judge Holland issued his order finding that Supreme Court authority did not change the Court's earlier analysis.

In December 2006, the Ninth Circuit Court of Appeals issued its ruling, setting the punitive damages award at $2.5 billion. Subsequently, the U.S. Supreme Court further reduced the punitive damages award to $507.5 million, an amount equal to the compensatory damages. With interest, the total award to the plaintiff class was $1.515 billion.

2.    ***In re GCC Richmond Works Cases***, JCCP No. 2906 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Liaison Counsel and Lead Class Counsel in coordinated litigation arising out of the release on July 26, 1993, of a massive toxic sulfuric acid cloud which injured an estimated 50,000 residents of Richmond, California. The Coordination Trial Court granted final approval to a $180 million class settlement for exposed residents.

3.    ***In re Unocal Refinery Litigation***, No. C 94-04141 (Cal. Supr. Ct.). Lieff Cabraser served as one of two Co-Lead Class Counsel and on the Plaintiffs' Steering Committee in this action against Union Oil Company of California ("Unocal") arising from a series of toxic releases from Unocal's San Francisco refinery in Rodeo, California. The action was settled in 1997 on behalf of approximately 10,000 individuals for $80 million.

4.    ***West v. G&H Seed Co., Aventis CropSciences USA, LLP***, No. 99-C-4984-A (La. State Ct.). With co-counsel, Lieff Cabraser represented a class of 1,500 Louisiana crawfish farmers. The farmers sued Bayer CropScience LP claiming the pesticide ICON killed their crawfish and caused economic ruin. In 2004, the Court approved a $45 million settlement. The settlement was reached after the parties had presented nearly a month's worth of evidence at trial and were on the verge of making closing arguments to the jury.

5.    ***In re Sacramento River Spill Cases I and II***, JCCP Nos. 2617 & 2620 (Cal. Supr. Ct.). On July 14, 1991, a Southern Pacific train tanker car derailed in northern California, spilling 19,000 gallons of a toxic pesticide, metam sodium, into the Sacramento River near the town of Dunsmir. The metam sodium mixed thoroughly with the river water and had a devastating effect on the river and surrounding ecosystem. In addition, many residents living along the river became ill with symptoms that included headaches, shortness of breath, and vomiting. Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Lead Class Counsel, and chaired the Plaintiffs' Litigation Committee in coordinated proceedings that included all of the lawsuits arising out of this toxic spill. Settlement proceeds of approximately $16 million were

distributed pursuant to Court approval of a plan of allocation to four certified plaintiff classes: personal injury, business loss, property damage/diminution, and evacuation.

6.     ***Craft v. Vanderbilt University***, Civ. No. 3-94-0090 (M.D. Tenn.). Lieff Cabraser served as Lead Counsel of a certified class of over 800 pregnant women and their children who were intentionally fed radioactive iron without their consent while receiving prenatal care at defendant Vanderbilt's hospital in the 1940s. The facts surrounding the administration of radioactive iron to the pregnant women and their children *in utero* came to light as a result of Energy Secretary Hazel O'Leary's 1993 disclosures of government-sponsored human radiation experimentation during the Cold War. Defendants' attempts to dismiss the claims and decertify the class were unsuccessful. The case was settled in July 1998 for a total of $10.3 million and a formal apology from Vanderbilt.

7.     ***Kentucky Coal Sludge Litigation***, No. 00-CI-00245 (Cmmw. Ky.). On October 11, 2000, near Inez, Kentucky, a coal waste storage facility ruptured, spilling 300 million gallons of coal sludge (a wet mixture produced by the treatment and cleaning of coal) into waterways in the region and contaminating hundreds of properties. This was one of the worst environmental disasters in the Southeastern United States. With co-counsel, Lieff Cabraser represented over 400 clients in property damage claims, including claims for diminution in the value of their homes and properties. In April 2003, the parties reached a confidential settlement agreement on favorable terms to the plaintiffs.

8.     ***Toms River Childhood Cancer Incidents***, No. L-10445-01 MT (Sup. Ct. NJ). With co-counsel, Lieff Cabraser represented 69 families in Toms River, New Jersey, each with a child having cancer, that claimed the cancers were caused by environmental contamination in the Toms River area. Commencing in 1998, the parties—the 69 families, Ciba Specialty Chemicals, Union Carbide and United Water Resources, Inc., a water distributor in the area—participated in an unique alternative dispute resolution process, which lead to a fair and efficient consideration of the factual and scientific issues in the matter. In December 2001, under the supervision of a mediator, a confidential settlement favorable to the families was reached.

## VIII.   <u>False Claims Act</u>

### A.   <u>Current Cases</u>

1.     ***State of California ex rel. Associates Against FX Insider Trading v. State Street Corp.***, No. 34-2008-00008457 (Sacramento Supr. Ct., Cal.) ("***State Street I***"). Lieff Cabraser serves as co-counsel for

the whistleblowers in this action against State Street Corporation which serves as the contractual custodian for over 40% of public pension funds in the United States.  As the contractual custodian, State Street is responsible for undertaking the foreign currency exchange (FX) transactions necessary to facilitate a customer's purchases or sales of foreign securities.  The complaint charges that State Street violated the California False Claims Act by systematically manipulating the timing of its execution and reporting of FX trades in order to enrich itself, at the expense of California custodial public pension fund clients, including the California Public Employees' Retirement System and the California State Teachers' Retirement System.  The California Attorney General intervened in the case in October 2009. The case is in the discovery stage after the trial court denied State Street's demurrer.

2.   ***State of California ex rel. Rockville Recovery Associates v. Multiplan***, No. 34-2010-00079432 (Sacramento Supr. Ct., Cal.).  Lieff Cabraser represents whistleblower Rockville Recovery Associates in a *qui tam* suit for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Insurance Code § 1871.7.  The Act is designed to prevent fraud against insurers and, by extension, their policyholders.  The complaint alleges that Sutter hospitals throughout California submit fraudulent bills for anesthesia services to insurers and other payors.

In May 2011, the Court permitted the California Insurance Commissioner to join the litigation against Sutter.  Having survived no less than three demurrers and two motions to strike, the case is now in discovery with a trial date in July 2013.

3.   ***In re Bank of New York Mellon Corporation False Claims Act Foreign Exchange Litigation***, No. C-11-05683 (N.D. Cal.).  Lieff Cabraser serves as co-counsel for plaintiff and relator FX Analytics in a *qui tam* suit filed on behalf of the Los Angeles County Employees' Retirement Association Fund ("LACERA") and nine other California municipal and county pension funds against The Bank of New York Mellon Corporation ("BNY Mellon") and its predecessors and subsidiaries, for alleged violations of the California False Claims Act and breach of contract and fiduciary duty.  The complaint charges that defendants created and carried out a fraudulent scheme, for over a decade, in which they charged plaintiffs fictitious foreign currency exchange ("FX") rates in connection with the purchase and sale of foreign securities.  The complaint further alleges that defendants consistently incorporated hidden and excessive mark-ups or mark-downs relative to the actual FX rates applicable at the times of the trades conducted for defendants' custodial FX clients.  Defendants allegedly kept for themselves, as an unlawful profit, the difference between the false and actual price for each FX transaction. LACERA and several other funds

intervened in the case in late 2011. The case is now pending in MDL 2335
in the Southern District of New York.

## B.     Successes

1.     ***United States of America ex rel. Mary Hendow and Julie
Albertson v. University of Phoenix***, No. 2:03-cv-00457-GEB-DAD
(E.D. Cal.).  Lieff Cabraser obtained a record whistleblower settlement
against the University of Phoenix that charged the university had violated
the incentive compensation ban of the Higher Education Act (HEA) by
providing improper incentive pay to its recruiters.  The HEA prohibits
colleges and universities whose students receive federal financial aid from
paying their recruiters based on the number of students enrolled, which
creates a risk of encouraging recruitment of unqualified students who,
Congress has determined, are more likely to default on their loans.  High
student loan default rates not only result in wasted federal funds, but the
students who receive these loans and default are burdened for years with
tremendous debt without the benefit of a college degree.

The complaint alleged that the University of Phoenix defrauded the U.S.
Department of Education by obtaining federal student loan and Pell Grant
monies from the federal government based on false statements of
compliance with HEA.  In December 2009, the parties announced a
$78.5 million settlement.  The settlement constitutes the second-largest
settlement ever in a False Claims Act case in which the federal
government declined to intervene in the action and largest settlement
ever involving the Department of Education.   The University of Phoenix
case led to the Obama Administration passing new regulations that took
away the so-called "safe harbor" provisions that for-profit universities
relied on to justify their alleged recruitment misconduct.  For his
outstanding work as Lead Counsel and the significance of the case,
*California Lawyer* magazine recognized Lieff Cabraser attorney Robert J.
Nelson with a California Lawyer of the Year (CLAY) Award.

2.     ***United States ex rel. Dye v. ATK Launch Systems***,
No. 1:06CV39TS (D. Utah).  Lieff Cabraser served as co-counsel for a
whistleblower who alleged that ATK Launch Systems knowingly sold
defective and potentially dangerous illumination flares to the United
States military in violation of the federal False Claims Act.  The
specialized flares were used in nighttime combat, covert missions, and
search and rescue operations.  A key design specification set by the
Defense Department was that these highly flammable and dangerous
items ignite only under certain conditions.  The complaint alleged that the
ATK flares at issue could ignite when dropped from a height of less than
10 feet – and, according to ATK's own analysis, from as little as 11.6
inches – notwithstanding contractual specifications that they be capable

of withstanding such a drop.  In April 2012, the parties reached a settlement valued at $37 million.

3. ***United States of America ex rel. Mauro Vosilla and Steven Rossow v. Avaya, Inc.***, Case No. Case No.  CV04-8763 PA JTLx (C.D. Cal.).  Lieff Cabraser represented whistleblower in litigation alleging that defendants Avaya, Lucent Technologies, and AT&T violated the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended, and the False Claims Acts of California and several other states.  The complaint alleged that defendants charged governmental agencies for the lease, rental, and post-warranty maintenance of telephone communications systems and services that the governmental agencies no longer possessed and/or were no longer maintained by defendants.  In November 2010, the parties entered into a $21.75 million settlement of the litigation.

## IX.   International and Human Rights Litigation

### A.   Successes

1. ***Holocaust Cases***.  Lieff Cabraser was one of the leading firms that prosecuted claims by Holocaust survivors and the heirs of Holocaust survivors and victims against banks and private manufacturers and other corporations who enslaved and/or looted the assets of Jews and other minority groups persecuted by the Nazi Regime during the Second World War era.  We serve as Settlement Class Counsel in the case against the Swiss banks that the Court approved a U.S. $1.25 billion settlement in July 2000.  Lieff Cabraser donated its attorneys' fees in the Swiss Banks case, in the amount of $1.5 million, to endow a Human Rights clinical chair at Columbia University Law School.  We were also active in slave labor and property litigation against German and Austrian defendants, and Nazi-era banking litigation against French banks.  In connection therewith, Lieff Cabraser participated in multi-national negotiations that led to Executive Agreements establishing an additional approximately U.S. $5 billion in funds for survivors and victims of Nazi persecution.  Our website provides links to the websites of settlement and claims administrators in these cases.

Commenting on the work of Lieff Cabraser and co-counsel in the litigation against private German corporations, entitled *In re Holocaust Era German Industry, Bank & Insurance Litigation* (MDL No. 1337), U.S. District Court Judge William G. Bassler stated on November 13, 2002:

> Up until this litigation, as far as I can tell, perhaps with some minor exceptions, the claims of slave and forced labor fell on deaf ears.  You can say what you want to say about class actions and about attorneys, but the fact of the matter is, there was no

attention to this very, very large group of people by Germany, or by German industry until these cases were filed. . . .  What has been accomplished here with the efforts of the plaintiffs' attorneys and defense counsel is quite incredible. . . .  I want to thank counsel for the assistance in bringing us to where we are today.  Cases don't get settled just by litigants.  It can only be settled by competent, patient attorneys.

2. ***Cruz v. U.S., Estados Unidos Mexicanos, Wells Fargo Bank, et al.***, No. 01-0892-CRB (N.D. Cal.).  Working with co-counsel, Lieff Cabraser succeeded in correcting an injustice that dated back 60 years. The case was brought on behalf of Mexican workers and laborers, known as Braceros ("strong arms"), who came from Mexico to the United States pursuant to bilateral agreements from 1942 through 1946 to aid American farms and industries hurt by employee shortages during World War II in the agricultural, railroad, and other industries.  As part of the Braceros program, employers held back 10% of the workers' wages, which were to be transferred via United States and Mexican banks to savings accounts for each Bracero.  The Braceros were never reimbursed for the portion of their wages placed in the forced savings accounts.

Despite significant obstacles including the aging and passing away of many Braceros, statutes of limitation hurdles, and strong defenses to claims under contract and international law, plaintiffs prevailed in a settlement in February 2009.  Under the settlement, the Mexican government provided a payment to Braceros, or their surviving spouses or children, in the amount of approximately $3,500 (USD).  In approving the settlement on February 23, 2009, U.S. District Court Judge Charles Breyer stated:

I've never seen such litigation in eleven years on the bench that was more difficult than this one.  It was enormously challenging. . . .  It had all sorts of issues . . . that complicated it:  foreign law, constitutional law, contract law, [and] statute of limitations. . . .  Notwithstanding all of these issues that kept surfacing . . . over the years, the plaintiffs persisted.  I actually expected, to tell you the truth, at some point that the plaintiffs would just give up because it was so hard, but they never did.  They never did.  And, in fact, they achieved a settlement of the case, which I find remarkable under all of these circumstances.

**FIRM BIOGRAPHY:**

## PARTNERS

*ELIZABETH J. CABRASER*, Admitted to practice in California, 1978; U.S. Supreme Court, 1996; U.S. Tax Court, 1979; California Supreme Court, 1978; U.S. District Court, Northern District of California, 1978; Eastern District of California, 1979; Central District of California and Southern District of California, 1992; U.S. District Court, Eastern District of Michigan (2005); U.S. Court of Appeals, First Circuit, 2011; U.S. Court of Appeals, Second Circuit, 2009; Third Circuit, 1994; Fifth Circuit, 1992; Sixth Circuit, 1992; Seventh Circuit, 2001; Ninth Circuit, 1979; Tenth Circuit, 1992; Eleventh Circuit, 1992; U.S. District Court, District of Hawaii, 1986. *Education*: Boalt Hall School of Law, University of California (J.D., 1978); University of California at Berkeley (A.B., 1975). *Awards and Honors*: AV Preeminent Peer Review Rated, *Martindale-Hubbell*; "Outstanding Achievement Award," *Chambers USA*, 2012; "Litigation Star," *Benchmark Plaintiff* (ranked as one of the nation's top litigators for civil rights/human rights, mass torts/product liability, and securities); "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in antitrust, employment/labor law, environmental litigation, False Claims Act, and personal injury); *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2005-2012; "Lawdragon 500 Leading Lawyers in America," *Lawdragon*, 2005-2011; "Margaret Brent Women Lawyers of Achievement Award," American Bar Association Commission on Women in the Profession, 2010; "Top 100 Attorneys in California," *Daily Journal*, 2002-2007, 2010-2011; "Top California Women Litigators," *Daily Journal*, 2007, 2010, 2012-2013; "Top 10 Northern California Super Lawyer," *Super Lawyers*, 2011; "Northern California Super Lawyer," *Super Lawyers*, 2004-2012; "Top 100 Northern California Super Lawyers," *Super Lawyers*, 2005-2011; "Top 50 Female Northern California Super Lawyers," *Super Lawyers*, 2005-2011; "Edward Pollock Award," Consumer Attorneys of California, 2008; "Top Women Litigators in California," *Daily Journal*, 2007, 2010; "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, Winter 2007; "50 Most Influential Women Lawyers in America," *The National Law Journal*, 1998 & 2007; "Award For Public Interest Excellence," University of San Francisco School of Law Public Interest Law Foundation, 2007; "Top 75 Women Litigators," *Daily Journal*, 2005-2006; "Lawdragon 500 Leading Litigators in America," *Lawdragon*, 2006; "Distinguished Leadership Award," Legal Community Against Violence, 2006; "Women of Achievement Award," Legal Momentum (formerly the NOW Legal Defense & Education Fund), 2006; "100 Most Influential Lawyers in America," *The National Law Journal*, 1997, 2000 & 2006; "Top 30 Securities Litigator," *Daily Journal*, 2005; "Top 50 Women Litigators," *Daily Journal*, 2004; "Citation Award," University of California, Berkeley Boalt Hall, 2003; "Distinguished Jurisprudence Award," Anti-Defamation League, 2002; "Top 30 Women Litigators," *California Daily Journal*, 2002; "Top Ten Women Litigators," *The National Law Journal*, 2001; "Matthew O. Tobriner Public Service Award," Legal Aid Society, 2000; "California Law Business Top 100 Lawyers," *California Daily Journal*, 1998-2000; "California Lawyer of the Year (CLAY)," *California Lawyer*, 1998; "Presidential Award of Merit," Consumer Attorneys of California, 1998; "Public Justice Achievement Award," Public Justice, 1997. *Publications & Presentations*: "Due Process Pre-Empted: Stealth Preemption As a Consequence of Agency Capture" (2009); "Just Choose: The Jurisprudential Necessity to Select a Single Governing Law for Mass Claims Arising from Nationally Marketed Consumer Goods and Services," *Roger Williams University Law Review* (Winter 2009); "California Class Action Classics," Consumer Attorneys of California (January/February Forum 2009); Co-Author with Joy A. Kruse, Bruce Leppla, "Selective

Waiver: Recent Developments in the Ninth Circuit and California," (pts. 1 & 2), *Securities Litigation Report* (West Legalworks May & June 2005); "The Manageable Nationwide Class: A Choice-of-Law Legacy of Phillips Petroleum Co. v. Shutts," *University of Missouri- Kansas City Law Review*, Volume 74, Number 3, Spring 2006; Co-Author with Fabrice N. Vincent, "Class Actions Fairness Act of 2005," *California Litigation*, Vol. 18, No. 3 (2005); Editor-in-Chief, *California Class Actions Practice and Procedures* (2003); "A Plaintiffs' Perspective On The Effect of State Farm v. Campbell On Punitive Damages in Mass Torts" (May 2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law*, updated and re-published in *5 Newberg on Class Actions* (ABA 2001-2004); Co-Author, "Mass But Not (Necessarily) Class: Emerging Aggregation Alternatives Under the Federal Rules," *ABA 8th Annual National Institute on Class Actions*, New York (Oct. 15, 2004), New Orleans (Oct. 29, 2004); Co-Author, "2004 ABA Toxicology Monograph-California State Law," (January 2004); "Human Rights Violations as Mass Torts: Compensation as a Proxy for Justice in the United States Civil Litigation System"; Co-Author with Fabrice N. Vincent, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-Author with Fabrice N. Vincent, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002); Coordinating Editor and Co-Author of California section of the *ABA State Class Action Survey* (2001-2002); "Unfinished Business: Reaching the Due Process Limits of Punitive Damages in Tobacco Litigation Through Unitary Classwide Adjudication," *36 Wake Forest Law Review 979* (Winter 2001); "Symposium: Enforcing the Social Contract through Representative Litigation," *33 Connecticut Law Review 1239* (Summer 2001); "Equity for the Victims, Equity for the Transgressor: The Classwide Treatment of Punitive Damages Claims," *74 Tulane Law Review 2005* (June 2000); "Class Action Trends and Developments After Amchem and Ortiz," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study 1999); Contributor/Editor, *Moore's Federal Practice* (1999); Co-Author, "Preliminary Issues Regarding Forum Selection, Jurisdiction, and Choice of Law in Class Actions," (December 1999); "Life After Amchem: The Class Struggle Continues," *31 Loyola Law Review 373* (1998); "Recent Developments in Nationwide Products Liability Litigation: The Phenomenon of Non-Injury Products Cases, the Impact of Amchem and the Trend Toward State Court Adjudication," *Products Liability* (ABA February 1998); Contributor/Editor, *California Causes of Action* (1998); "Beyond Bifurcation: Multi-Phase Structure in Mass Tort Class Actions," *Class Actions & Derivative Suits* (Spring 1997); "The Road Not Taken: Thoughts on the Fifth Circuit's Decertification of the Castano Class," *SB24 ALI-ABA 433* (1996); "Getting the Word Out: Pre-Certification Notice to Class Members Under Rule 23(d)(2)," *Class Actions & Derivative Suits Newsletter* (October 1995); "Mass Tort Class Action Settlements," *24 CTLA Forum 11* (January-February 1994); "Do You Know the Way from San Jose? The Evolution of Environmental and Toxic Nuisance Class Actions," *Class Actions & Derivative Suits* (Spring 1994); "An Oracle of Change? Realizing the Potential of Emerging Fee Award Methodologies for Enhancing The Role and Control of Investors in Derivative and Class Action Suits," *Principles of Corporate Governance* (ALI October 1994); "How To Streamline Complex Litigation: Tailor a Case Management Order to Your Controversy," *21 The Brief 12* (ABA/TIPS Summer 1992); "The Applicability of the Fraud-On-The-Market Theory to Undeveloped Markets: When Fraud Creates the Market," *12 Class Action Reports 402* (1989); "Mandatory

Certification of Settlement Classes," *10 Class Action Reports 151* (1987). *Member*: American Academy of Arts and Sciences (Fellow); American Association for Justice (Fight for Justice Campaign; Women Trial Lawyers Caucus; California State Liaison); American Bar Association (Committee on Mass Torts, Past Co-Chair; Committee on Class Actions and Derivative Suits; Tort and Insurance Practice Section (TIPS); Rules & Procedures Committee, Past Vice-Chair; Civil Procedure & Evidence News Letter, Contributor; Business Law Section); American Law Institute (Council; International Jurisdiction and Judgments and Aggregate Litigation Projects, Advisor); Association of Business Trial Lawyers; Bar Association of San Francisco (Past President, Securities Litigation Section; Board of Directors, 1997-1998; Judiciary Committee); Bar Association of the Fifth Federal Circuit; Bay Area Lawyers for Individual Freedom; California Constitution Revision Commission (1993-1996); California Women Lawyers; Consumer Attorneys of California; Federal Bar Association (Northern District of California Chapter); Federal Civil Rules Advisory Committee (Appointed by Supreme Court, 2011); National Center for State Courts Mass Tort Conference Planning Committee; Ninth Circuit Judicial Conference; Northern District of California Civil Justice Reform Act (Advisory Committee; Advisory Committee on Professional Conduct); Public Justice Foundation; Queen's Bench; State Bar of California.

**RICHARD M. HEIMANN**, Admitted to practice in Pennsylvania, 1972; District of Columbia, 1974; California, U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1975; U.S. Supreme Court, 1980; U.S. Court of Appeals, Second Circuit, 1980; U.S. District Court, District of Hawaii, 1986; New York, 2000. *Education*: Georgetown University (J.D., 1972); *Georgetown Law Journal*, 1971-72; University of Florida (B.S.B.A., with honors, 1969). *Employment*: Mr. Heimann served as Deputy District Attorney and Acting Assistant District Attorney for Tulare County, California, and as an Assistant Public Defender in Philadelphia, Pennsylvania, 1972-74. As a private civil law attorney, Mr. Heimann has tried over 30 civil jury cases, including complex cases such as the successful *FPI/Agretech* and *Edsaco* securities class action trials. In April 2002 in the *Edsaco* case, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd., which included $165 million in punitive damages. *Awards & Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell; "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in antitrust, personal injury and securities law); *The Best Lawyers in America*, based on peer and blue ribbon panel review; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2011; selected for list of "*San Francisco's Best Lawyers*," 2007-2012; California Lawyer of the Year (CLAY) Award, California Lawyer, 2011; "Lawdragon Finalist," Lawdragon, 2009-2011; "Top 100 Attorneys in California," Daily Journal, 2010-2011; "Top Attorneys In Securities Law," Super Lawyers Corporate Counsel Edition, 2010; "Northern California Super Lawyer," Super Lawyers, 2004-2011. *Publications & Presentations:* Securities Law Roundtable, *California Lawyer* (September 2010); Securities Law Roundtable, *California Lawyer* (March 2009); Securities Law Roundtable, *California Lawyer* (April 2008); Securities Law Roundtable, *California Lawyer* (April 2007); Co-Author, "Preliminary Issues Regarding Forum Selection, Jurisdiction, and Choice of Law in Class Actions" (December 1999). *Member*: State Bar of California; Bar Association of San Francisco.

**WILLIAM BERNSTEIN**, Admitted to practice in California, 1975; U.S. Court of Appeals, Ninth Circuit, 1987; U.S. District Court, Northern District of California, 1975; New York and U.S. Supreme Court, 1985; U.S. District Court, Central and Eastern Districts of

California, 1991; U.S. District Court, Southern District of California, 1992; U.S. Court of Appeals, Third Circuit, 2008. *Education*: University of San Francisco (J.D., 1975); *San Francisco Law Review*, 1974-75; University of Pennsylvania (B.A., general honors, 1972). *Community Service*: Adjunct Professor of Law, University of San Francisco, Settlement Law, 2006-present; Judge Pro Tem for San Francisco Superior Court, 2000-present; Marin Municipal Court, 1984; Discovery Referee for the Marin Superior Court, 1984-89; Arbitrator for the Superior Court of Marin, 1984-1990. *Awards & Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell; "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in antitrust law); "Lawdragon Finalist," *Lawdragon*, 2009-2011; Northern California Super Lawyer," *Super Lawyers*, 2004-2011; "Top Attorneys In Antitrust Law," *Super Lawyers Corporate Counsel Edition*, 2010; Princeton Premier Registry, Business Leaders and Professionals, 2008-2009; "Top 100 Trial Lawyers in California," American Trial Lawyers Association, 2008; *Who's Who Legal*, 2007; Unsung Hero Award, Appleseed, 2006. *Publications & Presentations*: "The Rise and Fall of Enron's One-To-Many Trading Platform," American Bar Association Antitrust Law Section, Annual Spring Meeting (2005); Co-Author with Donald C. Arbitblit, "Effective Use of Class Action Procedures in California Toxic Tort Litigation," *Hastings West-Northwest Journal of Environmental and Toxic Torts Law and Policy*, No. 3 (Spring 1996). *Member*: Bar Association of San Francisco; Marin County Bar Association (Admin. of Justice Committee, 1988); State Bar of California.

**DONALD C. ARBITBLIT**, Admitted to practice in Vermont, 1979; California and U.S. District Court, Northern District of California, 1986. *Education*: Boalt Hall School of Law, University of California (J.D., 1979); Order of the Coif; Tufts University (B.S., *magna cum laude*, 1974). *Awards and Honors: The Best Lawyers in America,* based on peer and blue ribbon panel review, selected for list of *"San Francisco's Best Lawyers,"* 2012; AV Preeminent Peer Review Rated, Martindale-Hubbell; "*Lawdragon* Finalist," *Lawdragon*, 2009-2011; "Northern California Super Lawyers," *Super Lawyers*, 2004, 2006-2008. *Publications & Presentations*: Co-Author with Wendy Fleishman, "The Risky Business of Off-Label Use," *Trial* (March 2005);"Comment on Joiner: Decision on the Daubert Test of Admissibility of Expert Testimony," *6 Mealey's Emerging Toxic Torts*, No. 18 (December 1997); Co-author with William Bernstein, "Effective Use of Class Action Procedures in California Toxic Tort Litigation," *3 Hastings West-Northwest Journal of Environmental Law and Policy*, No. 3 (Spring 1996); "The Plight of American Citizens Injured by Transboundary River Pollution," *8 Ecology Law Quarterly*, No. 2 (1979). *Appointments*: Member of the Federal Court-appointed Science Executive Committee, and Chair of the Epidemiology/Clinical Trials Subcommittee, *In re Vioxx Products Liability Litigation*, MDL No. 1657 (E.D. La.); Member of the Federal Court-appointed Science and Expert Witness Committees in *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.), *In re Baycol Products Litigation,* MDL No. 1431 (D. Minn.) and *Rezulin Products Liability Litigation*, MDL No. 1348 (S.D.N.Y.). *Member*: State Bar of California; Bar Association of San Francisco.

**STEVEN E. FINEMAN,** Managing Partner. Admitted to practice in California, 1989; U.S. District Court, Northern, Eastern and Central Districts of California and U.S. Court of Appeals, Ninth Circuit, 1995; U.S. Court of Appeals, Fifth Circuit, 1996; New York, U.S. District Court, Eastern and Southern Districts of New York, U.S. District Court, District of

Colorado, 2006; U.S. Court of Appeals, Second Circuit and U.S. Supreme Court, 1997; U.S. District Court for the District of Columbia, 1997.  *Education*:  University of California, Hastings College of the Law (J.D., 1988); University of California, San Diego (B.A., 1985); Stirling University, Scotland (English Literature and Political Science, 1983-84).  *Awards & Honors*: *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*The New York Area's Best Lawyers*," 2005-2012; Member, *Best Lawyers* Advisory Board, a select group of U.S. and international law firm leaders and general counsel, 2011-2012; "Lawdragon Finalist," *Lawdragon*, 2009-present; "New York Super Lawyers," *Super Lawyers*, 2006-present; "Top Attorneys In Securities Law," *Super Lawyers Business Edition*, 2008-present; Consultant to the Office of Attorney General, State of New York, in connection with an industry-wide investigation and settlement concerning health insurers' use of the "Ingenix database" to determine usual and customary rates for out-of-network services, April 2008-February 2009; "100 Managing Partners You Need to Know," *Lawdragon*, 2008; "40 under 40," selected as one of the country's most successful litigators under the age of 40, *The National Law Journal*, 2002. *Publications & Presentations*: Co-Author with Michael J. Miarmi, "The *Basics* of Obtaining Class Certification in Securities Fraud Cases: U.S. Supreme Court Clarifies Standard, Rejecting Fifth Circuit's 'Loss Causation' Requirement," *Bloomberg Law Reports* (July 5, 2011); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Representing Plaintiffs in Large-Scale Litigation (March 2, 2011, Stanford, California); Stanford University Law School — Panel Member, Symposium on the Future of the Legal Profession, (March 1, 2011, Stanford, California); 4th Annual International Conference on the Globalization of Collective Litigation — Panel Member, Funding Issues: Public versus Private Financing (December 10, 2010, Florida International University College of Law, Miami, Florida); "Bill of Particulars, A Review of Developments in New York State Trial Law," Column, *The Supreme Court's Decisions in Iqbal and Twombly Threaten Access to Federal Courts* (Winter 2010); American Constitution Society for Law and Policy, Access to Justice in Federal Courts — Panel Member, The Iqbal and Twombly Cases (January 21, 2010, New York, New York); American Bar Association, Section of Litigation, The 13th Annual National Institute on Class Actions — Panel Member, Hydrogen Peroxide Will Clear It Up Right Away: Developments in the Law of Class Certification (November 20, 2009, Washington, D.C.); Global Justice Forum, Presented by Robert L. Lieff and Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Co-Host and Moderator of Mediation/Arbitration Panel (October 16, 2009, Columbia Law School, New York, New York); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts/U.S. Lawyers in Foreign Courts (April 6, 2009, Stanford, California); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts/U.S. Lawyers in Foreign Courts (April 16, 2008, Stanford, California); Benjamin N. Cardozo Law School, The American Constitution Society for Law & Policy, and Public Justice, Co-Organizer of conference and Master of Ceremonies for conference, Justice and the Role of Class Actions (March 28, 2008, New York, New York); Stanford University Law School and The Centre for Socio-Legal Studies, Oxford University, Conference on The Globalization of Class Actions, Panel Member, Resolution of Class and Mass Actions (December 13 and 14, 2007, Oxford, England); Editorial Board and Columnist, "Federal Practice for the State Court Practitioner," New York State Trial Lawyers Association's "Bill of Particulars," (2005-present); "Bill of Particulars, A Review of Developments in New York State Trial Law," *Federal Multidistrict Litigation Practice* (Fall 2007); "Bill of Particulars, A Review

of Developments in New York State Trial Law," *Pleading a Federal Court Complaint* (Summer 2007); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts (April 17, 2007, Palo Alto, California); "Bill of Particulars, A Review of Developments in New York State Law," *Initiating Litigation and Electronic Filing in Federal Court* (Spring 2007); "Bill of Particulars, A Review of Developments in New York State Trial Law," Column, *Federal Court Jurisdiction: Getting to Federal Court By Choice or Removal* (Winter 2007); American Constitution Society for Law and Policy, 2006 National Convention, Panel Member, Finding the Balance: Federal Preemption of State Law (June 16, 2006, Washington, D.C.); Global Justice Forum, Presented by Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Moderator and Panel Member on Securities Litigation (May 19, 2006, Paris, France); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Court (April 25, 2006, Stanford, California); Global Justice Forum, Presented by Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Moderator and Speaker and Papers, The Basics of Federal Multidistrict Litigation: How Disbursed Claims are Centralized in U.S. Practice and Basic Principles of Securities Actions for Institutional Investors (May 20, 2005, London, England); New York State Trial Lawyers Institute, Federal Practice for State Practitioners, Speaker and Paper, *Federal Multidistrict Litigation Practice*, (March 30, 2005, New York, New York), published in "Bill of Particulars, A Review of Developments in New York State Trial Law" (Spring 2005); Stanford University Law School, The Stanford Center on Conflict and Negotiation, Interdisciplinary Seminar on Conflict and Dispute Resolution, Guest Lecturer, In Search of "Global Settlements": Resolving Class Actions and Mass Torts with Finality (March 16, 2004, Stanford, California); Lexis/Nexis, Mealey's Publications and Conferences Group, Wall Street Forum: Mass Tort Litigation, Co-Chair of Event (July 15, 2003, New York, New York); Northstar Conferences, The Class Action Litigation Summit, Panel Member on Class Actions in the Securities Industry, and Paper, Practical Considerations for Investors' Counsel - Getting the Case (June 27, 2003, Washington, D.C.); The Manhattan Institute, Center for Legal Policy, Forum Commentator on Presentation by John H. Beisner, Magnet Courts: If You Build Them, Claims Will Come (April 22, 2003, New York, New York); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's Courses on Complex Litigation, Selecting The Forum For a Complex Case — Strategic Choices Between Federal And State Jurisdictions, and Alternative Dispute Resolution ADR In Mass Tort Litigation, (March 4, 2003, Stanford, California); American Bar Association, Tort and Insurance Practice Section, Emerging Issues Committee, Member of Focus Group on Emerging Issues in Tort and Insurance Practice (coordinated event with New York University Law School and University of Connecticut Law School, August 27, 2002, New York, New York); Duke University and University of Geneva, "Debates Over Group Litigation in Comparative Perspective," Panel Member on Mass Torts and Products Liability (July 21-22, 2000, Geneva, Switzerland); *New York Law Journal*, Article, Consumer Protection Class Actions Have Important Position, Applying New York's Statutory Scheme (November 23, 1998); Leader Publications, Litigation Strategist, "Fen-Phen," Articles, *The Admissibility of Scientific Evidence in Fen-Phen Litigation and Daubert Developments: Something For Plaintiffs*, Defense Counsel (June 1998, New York, New York); "Consumer Protection Class Actions Have Important Position, Applying New York's Statutory Scheme," New York Law Journal (November 23, 1998); The Defense Research Institute and Trial Lawyer Association, Toxic Torts and Environmental Law Seminar, Article and Lecture, A Plaintiffs' Counsels' Perspective: What's the Next Horizon? (April 30, 1998, New York, New York);

Lexis/Nexis, Mealey's Publications and Conference Group, Mealey's Tobacco Conference: Settlement and Beyond 1998, Article and Lecture, The Expanding Litigation (February 21, 1998, Washington, D.C.); New York State Bar Association, Expert Testimony in Federal Court After Daubert and New Federal Rule 26, Article and Lecture, Breast Implant Litigation: Plaintiffs' Perspective on the Daubert Principles (May 23, 1997, New York, New York); Plaintiff Toxic Tort Advisory Council, Lexis/Nexis, Mealey's Publications and Conferences Group (January 2002-2005). *Member*: American Association for Justice; American Bar Association; American Constitution Society; Association of the Bar of the City of New York; Bar Association of the District of Columbia; Civil Justice Foundation (Board of Trustees, 2004-present); Fight for Justice Campaign; Human Rights First; National Association of Shareholder and Consumer Attorneys (Executive Committee, 2009-present); New York State Bar Association; New York State Trial Lawyers Association (Board of Directors, 2001-2004); New York State Trial Lawyers Association's "Bill of Particulars" (Editorial Board and Columnist, "Federal Practice for the State Court Practitioner," 2005-present); Plaintiff Toxic Tort Advisory Council (Lexis/Nexis, Mealey's Publications and Conferences Group, 2002-2005); Public Justice Foundation (President, July 2011-present; Executive Committee, July 2006-present; Board of Directors, July 2002-present; Co-Chair, Major Donors/Special Gifts Committee, July 2009-present; Class Action Preservation Project Committee, July 2005-present); State Bar of California; Supreme Court Historical Society.

   ***ROBERT J. NELSON***, Admitted to practice in California, 1987; U.S. District Court, Central District of California, 1987; U.S. District Court, Northern District of California, 1988; U.S. Court of Appeals, Ninth Circuit, 1988; U.S. Court of Appeals, Sixth Circuit, 1995; District of Columbia, 1998; New York, 1999; U.S. District Court, Eastern District of New York, Southern District of New York, 2001; U.S. District Court, Eastern District of California, 2006. *Education*:  New York University School of Law (J.D., 1987): Order of the Coif, Articles Editor, *New York University Law Review*; Root-Tilden-Kern Scholarship Program. Cornell University (A.B., *cum laude* 1982): Member, Phi Beta Kappa; College Scholar Honors Program. London School of Economics (General Course, 1980-81): Graded First.  *Employment:*  Judicial Clerk to Judge Stephen Reinhardt, U.S. Court of Appeals, Ninth Circuit, 1987-88; Assistant Federal Public Defender, Northern District of California, 1988-93; Legal Research and Writing Instructor, University of California-Hastings College of the Law, 1989-91 (Part-time position). *Awards & Honors*: "Litigation Star," *Benchmark Plaintiff* (ranked as one of the nation's top litigators for mass torts/product liability); "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in environmental litigation, False Claims Act, personal injury, and securities); *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2012; "Lawdragon Finalist," *Lawdragon*, 2009-2011; "California Lawyer Attorney of the Year (CLAY)" Award, *California Lawyer*, 2008, 2010; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2007, 2010; "Northern California Super Lawyer," *Super Lawyers*, 2004-2011; "San Francisco Trial Lawyer of the Year Finalist," San Francisco Trial Lawyers' Association, 2007. *Publications:* False Claims Roundtable, *California Lawyer* (June 2010); Product Liability Roundtable, *California Lawyer* (March 2010); Product Liability Roundtable, *California Lawyer* (July 2009); "Class Action Treatment of Punitive Damages after *Philip Morris v. Williams*:  We Can Get There from Here," 2 Charleston Law Review 2 (Spring 2008) (with Elizabeth J. Cabraser); Product Liability Roundtable, California Lawyer (December 2007); Contributing Author, California Class Actions Practice and Procedures (Elizabeth J. Cabraser

editor in chief, 2003); "The Importance of Privilege Logs," The Practical Litigator, Vol. II, No. 2 (March 2000) (ALI-ABA Publication); "To Infer or Not to Infer a Discriminatory Purpose: Rethinking Equal Protection Doctrine," 61 New York University Law Review 334 (1986). *Member*:  State Bar of California; District of Columbia Bar Association; New York Bar Association; American Bar Association; Fight for Justice Campaign; Bar Association of San Francisco; Consumer Attorneys of California; American Association for Justice; San Francisco Trial Lawyers Association.

**KELLY M. DERMODY**, Admitted to practice in California (1994); U.S. Supreme Court (2013); U.S. District Court, Northern District of California (1995); U.S. District Court, Central District of California; U.S. District Court, Eastern District of California (2012); U.S. Court of Appeals for the First Circuit (2012); U.S. Court of Appeals for the Second Circuit (2010); U.S. Court of Appeals for the Third Circuit (2001); U.S. Court of Appeals for the Fourth Circuit (2008); U.S. Court of Appeals for the Sixth Circuit (2008); U.S. Court of Appeals for the Seventh Circuit (2006); U.S. Court of Appeals for the Ninth Circuit (2007); U.S. District Court of Colorado (2007).  *Education*:  Boalt Hall School of Law, University of California, Berkeley (J.D. 1993); Moot Court Executive Board (1992-1993); Articles Editor, *Industrial Relations Law Journal/Berkeley Journal of Employment and Labor Law* (1991-1992); Harvard University (A.B. *magna cum laude*, 1990), Senior Class Ames Memorial Public Service Award.  *Employment*: Law Clerk to Chief Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, 1993-1994; Adjunct Professor of Law, Golden Gate University School of Law, Employment Law (Spring 2001).  *Awards & Honors:* "Leading Labor and Employment Attorneys in California," Daily Journal, 2011-2012; "Top California Women Litigators," *Daily Journal*, 2007, 2010, 2012-2013; AV Preeminent Peer Review Rated, Martindale-Hubbell; "Litigation Star," *Benchmark Plaintiff* (ranked as one of the nation's top litigators for plaintiffs' employment/labor law); "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in consumer protection and employment/labor law); *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2010-2012 "Northern California Super Lawyer," *Super Lawyers*, 2004-2012; "Women of Achievement Award," Legal Momentum (formerly the NOW Legal Defense & Education Fund), 2011; "Top 50 Female Northern California Super Lawyers," *Super Lawyers*, 2007-2012; "Top 100 Northern California Super Lawyers," *Super Lawyers*, 2007, 2009, 2011, 2012; "Lawdragon 500 Leading Lawyers in America," *Lawdragon*, 2010-2011; "Florence K. Murray Award," National Association of Women Judges, 2010 (for influencing women to pursue legal careers, opening doors for women attorneys, and advancing opportunities for women within the legal profession); "Irish Legal 100" Finalist, *The Irish Voice*, 2010; "Lawdragon Finalist," *Lawdragon*, 2007-2009; "Community Service Award," Bay Area Lawyers for Individual Freedom, 2008; "Community Justice Award," Centro Legal de la Raza, 2008; "Award of Merit," Bar Association of San Francisco, 2007; "California Lawyer Attorney of the Year (CLAY) Award," *California Lawyer*, 2007; "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, Winter 2007; "Trial Lawyer of the Year Finalist," Public Justice Foundation, 2007; California's "Top 20 Lawyers Under 40," *Daily Journal*, 2006; "Consumer Attorney of the Year" Finalist, Consumer Attorneys of California, 2006; "Living the Dream Partner," Lawyers' Committee for Civil Rights of the San Francisco Bay Area, 2005; "Top Bay Area Employment Attorney*," The Recorder*, 2004.  *Publications & Presentations*:  "Class Actions: Latest Developments in Litigating and Settling Employment Discrimination Class Actions" American Bar Association Labor and Employment Section Equal Employment Opportunity Committee (Mid-Year Meeting

2001); "A Road Map to Discovery in Employment Discrimination and Wage/Hour Class Actions," with James M. Finberg, Glasser Legal Works Seminar (2000); "Employment Discrimination Class Actions in the Wake of *Allison v. Citgo Petroleum Corp.* and Fed.R.Civ.P. 23(f)," Federal Bar Association Convention (1999); Co-Author with James Finberg, "Discovery in Employment Discrimination Class Actions," *Litigation and Settlement of Complex Class Actions* (Glasser Legal Works 1998). *Member*: American Bar Association; Labor and Employment Law Section (Governing Council, 2009-present; Co-Chair, Section Conference, 2008-2009; Vice-Chair, Section Conference, 2007-2008; Co-Chair, Committee on Equal Opportunity in the Legal Profession, 2006-2007; Co-Chair Committee on Equal Employment Opportunity); Bar Association of San Francisco (President, 2012; Board of Directors, 2005-present; President-Elect, 2010-2011; Treasurer, 2009-2010; Secretary, 2008-2009; Litigation Section; Executive Committee, 2002-2005); Northern District of California Lawyer Representative to the Ninth Circuit Judicial Conference (2007-2010); Lawyers' Committee for Civil Rights of the San Francisco Bay Area (Board of Directors, 1998-2005; Secretary, 1999-2003; Co-Chair, 2003-2005); National Center for Lesbian Rights (Board of Directors, 2002-2008; Co-Chair, 2005-2006); National Association of Women Judges (Independence of the Judiciary Co-Chair, 2011-present; Resource Board, 2005-present; Co-Chair, 2009-2011); Carver Healthy Environments and Response to Trauma in Schools ("HEARTS") Project (Steering Committee, 2007-present); Pride Law Fund (Board of Directors, 1995-2002; Secretary, 1995-1997; Chairperson, 1997-2002); Equal Rights Advocates (Litigation Committee, 2000-2002); National Employment Lawyers Association; Consumer Attorneys of California; Bay Area Lawyers for Individual Freedom; Public Justice Foundation; State Bar of California.

**JONATHAN D. SELBIN**, Admitted to practice in California; District of Columbia; New York; U.S. Court of Appeals, Third Circuit; U.S. Court of Appeals, Fifth Circuit; U.S. Court of Appeals, Sixth Circuit; U.S. Court of Appeals, Seventh Circuit; U.S. Court of Appeals, Ninth Circuit; U.S. Court of Appeals, Eleventh Circuit; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. District Court, Northern District of Illinois; U.S. District Court, Southern District of New York; U.S. District Court, Eastern District of New York; U.S. District Court, Eastern District of Michigan; U.S. District Court, Northern District of Florida; U.S. Supreme Court. *Education*: Harvard Law School (J.D., *magna cum laude*, 1993); University of Michigan (B.A., *summa cum laude*, 1989). *Employment*: Law Clerk to Judge Marilyn Hall Patel, U.S. District Court, Northern District of California, 1993-95. *Awards & Honors*: "New York Super Lawyers," *Super Lawyers*, 2006-present; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Publications & Presentations*: Contributing Author, "Ninth Circuit Reshapes California Consumer-Protection Law," American Bar Association (July 2012); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor-in-chief, 2003); "Bashers Beware:  The Continuing Constitutionality of Hate Crimes Statutes After R.A.V.," 72 *Oregon Law Review* 157 (Spring, 1993). *Member*: American Association for Justice; American Bar Association; District of Columbia Bar Association; New York Advisory Board, Alliance for Justice; New York State Bar Association; New York State Trial Lawyers Association; State Bar of California.

**MICHAEL W. SOBOL**, Admitted to practice in Massachusetts, 1989; California, 1998; United States District Court, District of Massachusetts, 1990; U.S. District Court, Northern District of California, 2001; U.S. District Court, Central District of California, 2005; U.S. Court of Appeals for the Ninth Circuit (2009); U.S. Court of Appeals for the Eleventh Circuit (2012).

*Education*: Boston University (J.D., 1989); Hobart College (B.A., *cum laude*, 1983).  *Prior Employment*: Lecturer in Law, Boston University School of Law, 1995-1997.  *Awards & Honors:* "California Litigation Star," *Benchmark Plaintiff* (ranked as one of California's leading litigators in consumer law), 2012; "Trial Lawyer of the Year Finalist," Public Justice, 2012; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2011; "*Lawdragon* Finalist," *Lawdragon*, 2009.  *Publications & Presentations*: Panelist, National Consumer Law Center's 15th Annual Consumer Rights Litigation Conference, Class Action Symposium; Panelist, Continuing Education of the Bar (C.E.B.) Seminar on Unfair Business Practices—California's Business and Professions Code Section 17200 and Beyond; Columnist, *On Class Actions*, Association of Business Trial Lawyers, 2005 to present; *The Fall of Class Action Waivers* (2005); *The Rise of Issue Class Certification* (2006); *Proposition 64's Unintended Consequences* (2007); *The Reach of Statutory Damages* (2008).  *Member*:  State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California, Board of Governors, (2007-2008, 2009-2010); National Association of Consumer Advocates.

**FABRICE N. VINCENT**, Admitted to practice in California, 1992; U.S. District Court, Northern District of California, Central District of California, Eastern District of California, Ninth Circuit Court of Appeals, 1992.  *Education*: Cornell Law School (J.D., *cum laude*, 1992); University of California at Berkeley (B.A., 1989).  *Awards & Honors: The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*San Francisco's Best Lawyers*," 2012; "Northern California Super Lawyer," *Super Lawyers*, 2006–2011.  *Publications & Presentations*: Co-Author with Elizabeth J. Cabraser, "Class Actions Fairness Act of 2005," *California Litigation*, Vol. 18, No. 3 (2005); Co-Editor, *California Class Actions Practice and Procedures* (2003-06); Co-Author, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-author, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law* (ABA 2000-09), updated and re-published in 5 *Newberg on Class Actions* (2001-09); Coordinating Editor and Co-Author of California section of the ABA State Class Action Survey (2001-06); Co-Editor-In-Chief, *Fen-Phen Litigation Strategist* (Leader Publications 1998-2000) and author of "Off-Label Drug Promotion Permitted" (Oct. 1999); Co-Author, "The Future of Prescription Drug Products Liability Litigation in a Changing Marketplace," and "Six Courts Certify Medical Monitoring Claims for Class Treatment," 29 *Forum* 4 (Consumer Attorneys of California 1999); Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study 1999); Co-Author, "How Class Proofs of Claim in Bankruptcy Can Help in Medical Monitoring Cases," (Leader Publications 1999); Co-Author, Introduction, "Sanctioning Discovery Abuses in the Federal Court," (LRP Publications 2000); "With Final Approval, Diet Drug Class Action Settlement Avoids Problems That Doomed Asbestos Pact," (Leader Publications 2000).  *Member*:  State Bar of California; Bar Association of San Francisco; American Bar Association; Fight for Justice Campaign; Association of Business Trial Lawyers, Society of Automotive Engineers.

**DAVID S. STELLINGS**, Admitted to practice in New York, 1994; New Jersey; 1994; U.S. District Court, Southern District of New York, 1994.  *Education*: New York University

School of Law (J.D., 1993); Editor, *Journal of International Law and Politics;* Cornell University (B.A., *cum laude,* 1990).  *Awards & Honors*: "Trial Lawyer of the Year Finalist," Public Justice, 2012; "New York Metro Super Lawyer," *Super Lawyers*, 2012; "*Lawdragon* Finalist, *Lawdragon*, 2009.  *Member*:  State Bar of New York; State Bar of New Jersey; Bar Association of the City of New York; New York State Bar Association; American Bar Association.

     **ERIC B. FASTIFF,** Admitted to practice in California, 1996; District of Columbia, 1997; U.S. Courts of Appeals for the Third, Ninth and Federal Circuit; U.S. District Courts for the Northern, Southern, Eastern, and Central Districts of California, District of Columbia; U.S. District Court, Eastern District of Wisconsin.  *Education*: Cornell Law School (J.D., 1995); Editor-in-Chief, *Cornell International Law Journal;* London School of Economics (M.Sc.(Econ.), 1991); Tufts University (B.A., *cum laude, magno cum honore in thesi,* 1990).  *Employment*: Law Clerk to Hon. James T. Turner, U.S. Court of Federal Claims, 1995-1996.  *Awards & Honors*: "Northern California Super Lawyer," *Super Lawyers*, 2010-2011; "*Lawdragon* Finalist," *Lawdragon*, 2009.  *Publications & Presentations*:  General Editor, *California Class Actions Practice and Procedures*, (2003-2009); Coordinating Editor and Co-Author of California section of the *ABA State Class Action Survey* (2003-2008); Author, "US Generic Drug Litigation Update," 1 *Journal of Generic Medicines* 212 (2004); Author, "The Proposed Hague Convention on the Recognition and Enforcement of Civil and Commercial Judgments:  A Solution to Butch Reynolds's Jurisdiction and Enforcement Problems," 28 *Cornell International Law Journal* 469 (1995).  *Member*: American Antitrust Institute (Advisory Board); State Bar of California; District of Columbia Bar Association; Bar Association of San Francisco; Bar of the U.S. Court of Federal Claims; Children's Day School (Board of Trustees); Editorial Board Member, *Journal of Generic Medicines*, 2003-present; Jewish Home for the Aged (Board of Trustees); Menorah Park (Board of Trustees); SF Works (Board of Trustees); Children's Day School (Board of Trustees).

     **WENDY R. FLEISHMAN**, Admitted to practice in Pennsylvania, 1977; New York, 1992.  *Education*: University of Pennsylvania (Post-Baccalaureate Pre-Med, 1982); Temple University (J.D., 1977); Sarah Lawrence College (B.A., 1974).  *Employment*: Skadden, Arps, Slate, Meagher & Flom LLP in New York (Counsel in the Mass Torts and Complex Litigation Department), 1993-2001; Fox, Rothschild O'Brien & Frankel (partner), 1988-93 (tried more than thirty civil, criminal, employment and jury trials, and AAA arbitrations, including toxic tort, medical malpractice and serious injury and wrongful death cases); Ballard Spahr Andrews & Ingersoll (associate), 1984-88 (tried more than thirty jury trials on behalf of the defense and the plaintiffs in civil personal injury and tort actions as well as employment—and construction—related matters); Assistant District Attorney in Philadelphia, 1977-84 (in charge of and tried major homicide and sex crime cases).  *Awards and Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell; "New York Super Lawyers," *Super Lawyers*, 2006-present; Officer of New York State Trial Lawyers Association, 2010-present; New York State Academy of Trial Lawyers, 2011; "*Lawdragon* Finalist," *Lawdragon*, 2009.  *Publications & Presentations*: Editor, Brown & Fleishman, "Proving and Defending Damage Claims: A Fifty-State Guide" (2007-2010); Co-Author with Donald Arbitblit, "The Risky Business of Off-Label Use," *Trial* (March 2005); Co-Author, "From the Defense Perspective," *Scientific Evidence, Chapter 6, Aspen Law Pub* (1999); Editor, *Trial Techniques Newsletter,* Tort and Insurance Practices Section, American Bar Association (1995-1996; 1993-1994); "How to Find, Understand, and Litigate Mass Torts,"

NYSTLA Mass Torts Seminar (April 2009); "Ethics of Fee Agreements in Mass Torts," AAJ Education Programs (July 2009). *Appointments:* Lead Counsel, Joint Coordinated California Litigation, *Amo Lens Solution Litigation*; Co-Liaison, *In re Zimmer Durom Cup Hip Implant Litigation*; Plaintiffs' Steering Committee, Depuy ASR Hip Implant Litigation; Liaison, NJ Ortho Evra Patch Product Liability Litigation; Co-Liaison, NJ Reglan Mass Tort Litigation; Co-Chair, Mealey's Drug & Medical Device Litigation Conference (2007); Executive Committee, *In re ReNu MoistureLoc Product Liability Litigation*, MDL; Discovery Chair, *In re Guidant Products Liability Litigation*; Co Chair Science Committee, *In re Baycol MDL Litigation*; Pricing Committee, *In re Vioxx MDL Litigation*. *Member*: New York State Trial Lawyers Association (Treasurer, 2010-present; Board of Directors, 2004-Present); Association of the Bar of the City of New York (Judiciary Committee, 2004-Present); American Bar Association (2000, Affair Chair, ABA Annual Meeting, Torts & Insurance Practices Section, NYC; 1997, Chair, Trial Techniques Committee, Tort & Insurance Practices; 1996, Chair Elect, Trial Techniques Committee, Tort & Insurance Practices); American Association for Justice (Section Officer); Pennsylvania Bar Association (Committee on Legal Ethics and Professionalism, 1993-Present; Committee on Attorney Advertising, 1993-Present; Vice-Chair, Task Force on Attorney Advertising, 1991-92); State Bar of New York, Federal Bar Association; Member, Gender and Race Bias Task Force of the Second Circuit, 1994-present; Deputy Counsel, Governor Cuomo's Screening Committee for New York State Judicial Candidates, 1993-94; New York State Trial Lawyers Association; New York Women's Bar Association; Association of the Bar of the City of New York (Product Liability Committee, 2007-present); New York County Lawyers; Fight for Justice Campaign; NYTLA; PATLA; Philadelphia Bar Association (Member of Committee on Professionalism 1991-92).

**PAULINA do AMARAL**, Admitted to practice in New York, 1997; California, 1998; U.S. Court of Appeals, Ninth Circuit, 1999; U.S. District Court, Southern District of New York, 2004; U.S. District Court, Western District of Michigan, 2004; U.S. District Court, Eastern District of Michigan, 2007. *Education*: University of California Hastings College of Law (J.D., 1996); Executive Editor, *Hastings Constitutional Law Quarterly*; National Moot Court Competition Team, 1995; Moot Court Executive Board; University of Rochester (B.A., 1988). *Employment*: Law Clerk to Chief Judge Richard Alan Enslen, U.S. District Court, Western District of Michigan, 1996-98. *Member*: Association of the Bar of the City of New York, (2007-2010, Committee on the Judiciary); American Bar Association; State Bar of New York; State Bar of California; Bar Association of San Francisco; American Trial Lawyers Association; New York State Trial Lawyers Association.

**KATHRYN E. BARNETT**, Admitted to practice in Tennessee, 1992; Sixth Circuit Court of Appeals, 2000; Eleventh Circuit Court of Appeals, 2003; United States District Court, Eastern District Tennessee, 2005; United States District Court, Middle District of Tennessee, 1997; United States District Court, Western District of Tennessee, 2001. *Education*: Vanderbilt University School of Law (J.D., 1992); American Jurisprudence Awards: Torts I and Jurisprudence; Davidson College (B.A., with Honors in Philosophy, 1989), Dean Rusk Grant for International Studies. *Litigation Experience*: Ms. Barnett has tried over 20 civil and criminal trials, including complex and class action cases, as well as catastrophic personal injury cases. In 2013, Ms. Barnett represented a family at trial against two multi-billion dollar corporations in a wrongful death case, winning a $26 million jury verdict. In 2010, Ms. Barnett represented a business wronged by its former partner, winning an $8 million arbitration award against the

wrongdoer.  In March 2004 and in August 2004, Ms. Barnett served as Co-Lead trial counsel in the class action lawsuit of *In re Tri-State Crematory Litigation*, MDL No. 1467.  The case was settled during the second week of trial.  The settlements in the *Tri-State* litigation exceed $40 million.  Ms. Barnett also served as lead counsel in a class action against the Georgia Farm Bureau regarding insurance coverage, which resulted in an $18 million settlement. In 2000, Ms. Barnett obtained a verdict of nearly $6 million on behalf of parents whose unborn fetus died tragically due to medical malpractice.  *Employment*:  Judicial Intern to Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, Fall 1990; Assistant Public Defender, Davidson County, Tennessee, Sept. 1992-1995.  *Awards & Honors*: *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*Nashville's Best Lawyers*," 2010-2012; "Mid-South Super Lawyer," *Super Lawyers*, 2006-2012; "Top 100 Tennessee Mid-South Super Lawyer," *Super Lawyers*, 2011; "Top 50 Women Mid-South Super Lawyer," *Super Lawyers*, 2011; "Nashville Lawyers In Charge," *Nashville Post*, 2010; "Best of the Bar," *Nashville Business Journal,* 2003, 2005-2010; "150 Best Lawyers in Tennessee," *Business Tennessee,* 2006-2009; "*Lawdragon* Finalist," *Lawdragon*, 2009-2011.  *Publications & Presentations*: "Introducing Evidence," Tennessee Bar Association (November 2012) "Legal Writing," Vanderbilt Law School (October 2012) "How Cultural Values Impact Contested Issues – Research and Findings," panelist, Nashville Bar Association (August 2011) "Products Liability Cases and the Tenn. Civil Justice Act of 2011," Tennessee Bar Association (June 2011) "Trial Practice – Experts," Tennessee Bar Association (March 2011) "The Basics of Class Action and MDL Litigation," Tennessee Bar Association (July 2009); "Advanced Federal Court Practice," Nashville Bar Association (March 2009); Guest speaker, "Medicine, Law and Society," Vanderbilt University (March 2009) "Annual Review: Medical Malpractice Update" Tennessee Association for Justice (Oct, Dec. 2008); "Civil Procedure and Evidence Update," Tennessee Trial Lawyers (Oct. and Nov. 2006); "Pre-Trial Skills: Thinking on Your Feet," National Business Institute (Nov. 2006), "Trial Practice Institute," Nashville Bar Association (Sept. 2005); "State Law Class Actions," American Bar Association, Business Law Section (April 2005); "Power Windows Can Kill," *Trial* (April 2005); "Auto Defect Cases," Tennessee Trial Lawyers (Feb. 2005);  "Limiting the Harmful Testimony of Experts on the Law," *Trial* (Jan. 2001); "Letting Focus Groups Work for You," *Trial* (April 1999); "Knocking Out Opposing Experts," Tennessee Trial Lawyers (October and November, 2004), Nashville Bar Association (July, 2004); "Trial Practice Tips: Powerful Trial Strategies for the Absolute Litigator," Nashville Bar Association (April, 2004); "Damages," Tennessee Trial Lawyers (Oct. and Nov. 2003); "Trying the Wrongful Death Case in Tennessee," National Business Institute (Aug. 2003); "Advanced Personal Injury," National Business Institute (July 2003); "Mass Torts," Tennessee Bar Association (July 2002); "Superior Depositions Strategies in Civil Trial Practice," National Business Institute (Jan. 2002, Dec.  1999); "Lawsuits Against the Nursing Home Industry," Tennessee Trial Lawyers (Feb. 2000); "How to Prepare for Mediation and other Practice Tips," Nashville Bar Association (Oct. 2000); "Tennessee Expert Witness," Lorman Education Services (July 2000); "Using Focus Groups to Get the Settlement or Verdict Your Client Deserves," Tennessee Trial Lawyers (Feb. 1999).  *Member*: Tennessee Bar Foundation; Tennessee Judicial Conference, Bench/Bar Committee (Chair, 2009-2010); Tennessee Association for Justice (Vice-President for the Middle Section, 2011; Treasurer, 2010; Executive Committee, 2008-2009, Secretary, 2007-2009, Chair, Continuing Education Committee, 2004-2006, Board of Governors, 2002-2009); Nashville Bar Association, First Vice President (2007) (Board, 2005-2008); Harry Phillips American Inn of Courts, (Executive Committee, 2004-09,

Member, 2004-2009, 1997-99); Nashville Bar Foundation (Fellow); Tennessee Justice Center, Inc. (Board of Directors, 2002-05, Secretary-Treasurer, 2003-04); Nashville Lawyer's Association for Women (President, 2004-2005; President-elect, 2003-2004; Director, 2002-03; Treasurer, 2000-02; Nominating Committee, 2007; Board, 1998-2005) Davidson County, Tennessee Metropolitan Board of Equalization, 2000-04; Tennessee Bar Association; American Association of Trial Lawyers.

*JOY A. KRUSE*, Admitted to practice in Washington, D.C., 1984; California; U.S. Supreme Court; U.S. Courts of Appeals for the Ninth and Federal Circuits; U.S. District Courts for the Northern, and Eastern Districts of California; U.S. District Court for the Central District of California, 2006; U.S. District Court, District of Colorado, 2006; U.S. District Court, District of Wisconsin, 2001. *Education*: Harvard Law School (J.D., 1984); Wellesley College (B.A., 1977). *Employment*: Assistant Federal Public Defender, Northern District of California, 1992-96; Public Defender Service, Washington D.C., 1984-89. *Awards & Honors:* AV Preeminent Peer Review Rated, Martindale-Hubbell; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Presentations & Publications*: Co-Author with Elizabeth J. Cabraser, Bruce Leppla, "Selective Waiver: Recent Developments in the Ninth Circuit and California," (pts. 1 & 2), *Securities Litigation Report* (West Legalworks May and June 2005). *Member*: Phi Beta Kappa; State Bar of California; Bar Association of San Francisco.

*RACHEL GEMAN*, Admitted to practice in New York, 1998; Southern and Eastern Districts of New York, 1999; U.S. District Court, Eastern District of Michigan, 2005; U.S. District Court of Colorado, 2007. *Education*: Columbia University School of Law (J.D. 1997); Stone Scholar; Equal Justice America Fellow; Human Rights Fellow; Editor, *Columbia Journal of Law and Social Problems*; Harvard University (A.B. *cum laude* 1993). *Employment*: Adjunct Professor, New York Law School; Special Advisor, United States Mission to the United Nations, 2000; Law Clerk to Judge Constance Baker Motley, U.S. District Court, Southern District of New York, 1997-98. *Awards & Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell; *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*The New York Area's Best Lawyers*," 2011; "Rising Star for New York," *Super Lawyers*, 2011; *Distinguished Honor Award*, United *States Department of State*, 2001. *Publications & Presentations*: Panelist, "Fraud and Consumer Protection: Plaintiff and Defense Strategies", Current Issues in Pharmaceutical and Medical Device Litigation, ABA Section of Litigation (2012). Participant and Moderator, "Ask the EEOC: Current Insights on Enforcement and Litigation," ABA Section of Labor and Employment Law (2011); *The New York Employee Advocate*, Co-Editor (2005-Present); Regular Contributor (2008-present); Moderator, "Hot Topics in Wage and Hour Class and Collective Actions," American Association for Justice Tele-Seminar (2010); Author & Panelist, "Class Action Considerations: Certification, Settlement, and More," American Conference Institute Advanced Forum (2009); Panelist, "Rights Without Remedies," American Constitutional Society National Convention, Revitalizing Our Democracy: Progress and Possibilities (2008); Panelist, Fair Measure: Toward Effective Attorney Evaluations, American Bar Association Annual Meeting (2008); Panelist, "Getting to Know You: Use and Misuse of Selection Devices for Hiring and Promotion" ABA Labor & Employment Section Annual Meeting (2008); Author, "'Don't I Think I Know You Already?': Excessive Subjective Decision-Making as an Improper Tool for Hiring and Promotion," ABA Labor & Employment Section Annual Meeting (2008); Co-Author & Panelist, "Ethical Issues in Representing Workers in Wage & Hour Actions," Representing Workers in Individuals &

Collective Actions under the FLSA (2007); Author & Panelist, "Evidence and Jury Instructions in FLSA Actions," Georgetown Law Center/ACL-ABA (2007); Author & Panelist, "Crucial Events in the 'Life' of an FLSA Collective Action: Filing Considerations and the Two-step 'Similarly-Situated' Analysis," National Employment Lawyers Association, Annual Convention (2006); Author & Panelist, "Time is Money, Except When It's Not: Compensable Time and the FLSA," National Employment Lawyers Association, Impact Litigation Conference (2005); Panelist, "Electronic Discovery," Federal Judicial Center & Institute of Judicial Administration, Workshop on Employment Law for Federal Judges (2005); "Image-Based Discrimination and the BFOQ Defense," *EEO Today: The Newsletter of the EEO Committee of the ABA's Section of Labor and Employment Law*, Vol. 9, Issue 1 (2004); "Fair Labor Standards Act Overtime Exemptions: Proposed Regulatory Changes," *New York State Bar Association Labor and Employment Newsletter* (2004); Chair & Panelist, "Current Topics in Fair Labor Standards Act Litigation," Conference, Association of the Bar of the City of New York (2003); Moderator, "Workforce Without Borders," ABA Section of Labor & Employment Law, EEOC Midwinter Meeting (2003). *Member*: American Bar Association Labor and Employment Law Section, Standing Committee on Equal Employment Opportunity (Co-Chair, 2009-present); Association of the Bar of the City of New York; National Employment Lawyers' Association/New York (Board Member); Public Justice Foundation.

     **DANIEL P. CHIPLOCK**, Admitted to practice in New York, 2001; U.S. District Court, Southern District of New York, 2001; U.S. District Court, Eastern District of New York, 2001; U.S. District Court, District of Colorado, 2006; U.S. Court of Appeals for the Second Circuit (2009); U.S. Court of Appeals for the Sixth Circuit (2011); U.S. Supreme Court. *Education*: Stanford Law School (J.D., 2000); Article Review Board, *Stanford Environmental Law Journal*; Recipient, Keck Award for Public Service; Columbia University (B.A., *summa cum laude*, 1994); Phi Beta Kappa. *Member*: State Bar of New York; American Association for Justice; Fight for Justice Campaign; Public Justice; National Association of Shareholder and Consumer Attorneys (Executive Committee); American Constitution Society for Law and Policy (Advocate's Circle).

     **STEPHEN H. CASSIDY**, Admitted to practice in California, 1989; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1997. *Education*: Hastings College of the Law (J.D., *magna cum laude*, 1989); Associate Managing Editor, *Hastings International and Comparative Law Review*, 1988-1989; Order of the Coif; Member, Thurston Society; Recipient, American Jurisprudence Awards for Real Property, Evidence and American Legal History; Georgetown University (B.S.F.S., 1986). *Employment*: Law Clerk to Magistrate-Judge Joan S. Brennan, U.S. District, Northern District of California, 1989-90; Motions Attorney, U.S. Court of Appeals, Ninth Circuit, 1992-94, 1996-97. *Awards & Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell. *Publications & Presentations*: "Magnetix Toy Injuries: A Failure to Inform Safety Regulators," OpEd News (2009); "Restoring Patient Rights and Promoting Safer Medical Device," OpEd News (2009); "Internet Marketing for Plaintiffs' Firms," CAOC Conference (May 2004); "Enhancing the Role of Law Firm Marketing Departments," LexisNexis Law Firm Marketers' Roundtable (November 2003); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," in *Survey of State Class Action Law* (ABA 2001); "The Newest Member of the

Nuclear Club: Pakistan's Drive for a Nuclear Weapon's Capability," 12 *Hastings Int'l & Comp. L. Rev.* 679 (1989).  *Member*:  State Bar of California; Bar Association of San Francisco; American Bar Association (Litigation Section); Public Justice; Fight for Justice Campaign; Consumer Attorneys of California.

**ELIZABETH A. ALEXANDER,** Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 2001; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Eastern District of Tennessee, 2002.  *Education*: Vanderbilt University Law School (J.D., 1998); President, Criminal Law Association; Moot Court Board Member; Vanderbilt University Honor Committee; Hollins College (B.A., 1993).  *Honors & Awards*: "Mid-South Super Lawyer," *Super Lawyers*, 2011-2012; National Trial Lawyer's Top 100 Trial Lawyers, 2011; "Rising Stars," *Super Lawyers*, 2008-2010; "*Lawdragon* 500 New Stars" and "*Lawdragon* 3000 Leading Plaintiffs' Lawyers in America," *Lawdragon*, 2006-2007. *Publications & Presentations*: Editor, Tennessee Chapter of the *ABA Survey of State Class Action Law* (2003-2010); "Consumer Class Actions Against Financial Institutions," Lorman Education Services, July 2004; Panelist, National Consumer Law Center, Consumer Rights Litigation Conference, "Pleading Standards—the Impact of *Twombly* and *Iqbal* on Class Action Complaints." *Prior Employment*: Associate, Dodson, Parker, Dinkins & Behm (2002-03); Associate, Wyatt, Tarrant & Combs (2000-2002); Law Clerk, Honorable Thomas A. Higgins, U.S. District Court for the Middle District of Tennessee (1998-2000).  *Member*: American Bar Association (Labor and Employment Law Section Equal Employment Opportunity Committee, Co-Chair, Basics Committee 2005-2006; Chair of Internal Marketing and Mentoring Committee 2006-2007); Lawyers' Association for Women (Director, 2003-2005); Nashville Bar Association (Board of Directors, Young Lawyers Division); National Bar Association; National Employment Lawyers' Association; Tennessee Association for Justice (Board of Governors, 2012); Tennessee Bar Association.

**MARK P. CHALOS**, Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 1998; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Western District of Tennessee, 2002; U.S. District Court, Eastern District of Tennessee, 2006; U.S. District Court, Northern District of Florida, 2006; U.S. District Court, Northern District of California, 2007; U.S. Supreme Court, 2012. *Education*:  Emory University School of Law (J.D., 1998); Dean's List; Award for Highest Grade, Admiralty Law; Research Editor, *Emory International Law Review*; Phi Delta Phi Legal Fraternity; Vanderbilt University (B.A., 1995). *Honors & Awards*: *The Best Lawyers in America*, based on peer and blue ribbon panel review, selected for list of "*Nashville's Best Lawyers*," 2012; "Mid-South Super Lawyer," *Super Lawyers*, 2011; AV Peer Review Rated, Martindale-Hubbell; "Best of the Bar," *Nashville Business Journal*, 2008-2009; "Top 40 Under 40," *The Tennessean*, 2004; "Rising Stars," *Super Lawyers*, 2008-2010. *Publications & Presentations*: "Legislation Protects the Guilty [in Deadly Meningitis Outbreak]," Tennessean, December 2012. Litigating International Torts in United States Courts, 2012 ed., Thomson Reuters/West (2012). "Successfully Suing Foreign Manufacturers," TRIAL Magazine, November 2008; "Washington Regulators Versus American Juries: The United States Supreme Court Shifts the Balance in Riegel v. Medtronic," *Nashville Bar Journal*, 2008; "Washington Bureaucrats Taking Over American Justice System," *Tennessean.com* (December 2007); "The End of Meaningful Punitive Damages," *Nashville Bar Journal*, November 2001; "Is Civility Dead?" *Nashville Bar Journal*, October 2003; "The FCC: The Constitution, Censorship, and a Celebrity Breast," Nashville Bar Journal, April 2005.

*Member*:  American Association for Justice; American Bar Association; (Past-Chair, YLD Criminal & Juvenile Justice Committee; Tort Trial and Insurance Practice Section Professionalism Committee); First Center for the Visual Arts (Founding Member, Young Professionals Program); Harry Phillips American Inn of Court; Kappa Chapter of Kappa Sigma Fraternity Alumni Association (President); Metropolitan Nashville Arts Commission (Grant Review Panelist); Nashville Bar Association (YLD Board of Directors; Nashville Bar Association YLD Continuing Legal Education and Professional Development Director); Nashville Bar Journal (Editorial Board); Tennessee Association for Justice (Board of Directors, 2008-2011; Legislative Committee); Tennessee Bar Association (Continuing Legal Education Committee); Tennessee Trial Lawyers Association (Board of Directors); Historic Belcourt Theatre (Past Board Chair; Board of Directors); Nashville Cares (Board of Directors).

**KRISTEN LAW SAGAFI**, Admitted to practice in California (2002); U.S. District Court, Northern District of California (2002); U.S. District Court, Central District of California (2005); US District Court; Northern District of Florida (2009); U.S. Court of Appeals for the Eleventh Circuit (2010).  *Education*:  Boalt Hall School of Law, University of California, Berkeley (J.D. 2002); Executive Editor, *Ecology Law Quarterly*; Moot Court Advocacy Award; Moot Court Board; Hopi Appellate Clinic; Ohio Wesleyan University (B.A., *summa cum laude,* 1995); Presidential Scholar.  *Litigation Experience:* Ms. Sagafi and Lieff Cabraser received recognition in *The National Law Journal's* Plaintiffs' Hot List for their outstanding success in *Grays Harbor Adventis Christian School v. Carrier Corp*. The case resulted in a settlement worth $300 million for consumers who had purchased certain Carrier furnaces that were allegedly made with inferior materials that caused them to fail prematurely.  *Honors & Awards*: "50 Lawyers on the Fast Track," *The Recorder*, 2012; "Northern California Rising Stars," *Super Lawyers*, 2009-2011. *Member*: Phi Beta Kappa; State Bar of California.

**JAHAN C. SAGAFI**, Admitted to practice in California, 2003; U.S. Court of Appeals for the Second Circuit, 2006; U.S. District Court, Central District of California; U.S. District Court, Northern District of California.  *Education*:  Harvard Law School (J.D., 2001); Senior Editor, *Harvard Civil Rights-Civil Liberties Law Review* (1999-2001); President, Board of Student Advisers; Harvard College (B.A., *magna cum laude*, 1994).  *Employment*: Law Clerk to Judge William W Schwarzer, U.S. District Court, Northern District of California, 2001-02.  *Honors & Awards*: "Top 20 Under 40," *Daily Journal*, 2011; "Northern California Rising Stars," *Super Lawyers*, 2009-2011; "Community Justice Award," Centro Legal de la Raza, 2008. *Publications & Presentations:* Co-author with Richard B. Rosenthal, "Ten things every trial lawyer must know about appeals: A primer for success in California's appellate courts," *Plaintiff* (December 2011). *Member*: American Constitution Society (Chair of Bay Area Lawyer Chapter); ACLU of Northern California (Board Member; Chair of the Legal Committee, 2010; Vice Chair, 2010; Executive Committee, 2009-present); National Employment Lawyers' Association; Consumer Attorneys of California; American Bar Association; Bar Association of San Francisco.

**KENT L. KLAUDT,** Admitted to practice in California, 1996; U.S. District Court, Northern District of California, 1997; U.S. District Court, Eastern District of California, 1998; U.S. District Court, Central District of California, 2007; California Supreme Court, 1996; U.S. Supreme Court, 2013; U.S. District Court, Eastern District of Wisconsin, 2013.  *Education*: University of Minnesota Law School (J.D., 1996); Outside Articles Editor, *Journal of Law & Inequality: A Journal of Theory & Practice*; National Association of Public Interest Law

(Summer Fellowship, 1995); University of Minnesota (B.A., 1991). *Employment*: BlueDog, Olson & Small, PLLP, 1995-96; Cartwright & Alexander, LLP, 1996-2001; The Cartwright Law Firm, Inc., 2001-2004. *Publications & Presentations*: "Hungary After the Revolution: Privatization, Economic Ideology, and the False Promise of the Free Market," 13 *Law & Inequality: A Journal of Theory & Practice* 301. *Member*: American Trial Lawyers Association; Consumer Attorneys of California; Public Justice; San Francisco Trial Lawyers Association; National Lawyers Guild.

**JENNIFER GROSS**, Admitted to practice in California, 1994; U.S. District Court, Central District of California, 1994. *Education*:  RAND Graduate School (M. Phil., 1997); University of Southern California (J.D., 1994); Emory University (B.A., 1991). *Publications & Presentations*: Co-Author, *Intelligence, Surveillance, and Reconnaissance Force Mix Study: Final Report* (RAND 2003); Co-Author, *Asbestos Litigation Costs and Compensation: An Interim Report* (RAND 2002); Co-Author, *Asbestos Litigation in the U.S.: A New Look at an Old Issue* (RAND 2001); Co-Author, *Class Action Dilemmas: Pursuing Public Goals for Private Gain* (RAND, 2000); Co-Author, *Potential Vulnerabilities of U.S. Air Force Information Systems* (RAND, 1999); Co-Author, "Preliminary Results of the RAND Study of Class Action Litigation," (RAND, 1997). *Member*: State Bar of California.

**LEXI J. HAZAM**, Admitted to practice in California, 2003; U.S. District Court, Northern District of California, 2003; U.S. Court of Appeals for the Seventh Circuit, 2006. *Education*: Stanford University (B.A., 1995, M.A., 1996), Phi Beta Kappa; Boalt Hall School of Law, University of California, Berkeley (J.D., 2001). *Employment*:  Law Clerk, Mexican American Legal Defense and Education Fund, 1999; Law Clerk, Judge Henry H. Kennedy, Jr., U.S. District Court for the District of Columbia, 2001-2002; Associate, Lieff Cabraser Heimann & Bernstein, LLP, 2002-2006; Partner, Lieff Global LLP, 2006-2008. *Honors & Awards*: "Northern California Rising Stars," *Super Lawyers*, 2009-2011. *Member*: State Bar of California; American Association for Justice; Consumer Attorneys of California; Bar Association of San Francisco; San Francisco Trial Lawyers Association.

**HEATHER A. FOSTER**, Admitted to practice in California in 1996; U.S. District Court, Northern District of California, 1996; U.S. Court of Appeals for the Seventh Circuit. *Education*: University of the Pacific, McGeorge School of Law (J.D., 1996); Moot Court Honors Board, 1995-96; Trial Advocacy Honors 1996; Boston College (B.A., 1992). *Employment*: Adjunct Professor, San Francisco State University—College of Extended Learning, Paralegal and LNC program (Fall 2000–Spring 2001). *Publications & Presentations*: Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study, 1999). *Member*: American Association for Justice; American Bar Association (Litigation Section); Association of Legal Administrators; Bar Association of San Francisco; Legal Assistant Management Association; Phi Alpha Delta; State Bar of California (Volunteer Legal Services Program: Liaison for the Summer Associate Public Service Program—Homeless Advocacy Program, 2002; Teachers in the Schools Program, 2002; Pro Bono Attorney—Family Law Clinic, 1999); Trial Lawyers for Public Justice.

**BRENDAN P. GLACKIN**, Admitted to practice in California, 1998; New York, 2000; U.S. District Court, Northern, Central, Eastern and Southern Districts of California, 2001; U.S. Court of Appeals for the Ninth Circuit, 2004; U.S. District Court, Southern District of New

York, 2001; U.S. District Court, District of Colorado, 2001. *Education*: Harvard Law School (J.D., *cum laude*, 1998); University of Chicago (A.B., Phi Beta Kappa, 1995). *Employment*: Contra Costa Public Defender, 2005-2007; Boies, Schiller & Flexner, 2000-2005; Willkie Farr & Gallagher, 1999-2000; Law Clerk to Honorable William B. Shubb, U.S. District Court, Eastern District of California, 1998-1999. *Member*: State Bar of California; BASF Antitrust Section, Executive Committee. *Seminars:* Ramifications of *American Needle, Inc. v. National Football League,* 2010; Antitrust Institute 2011: Developments & Hot Topics, 2011.

     **DANIEL E. SELTZ**, Admitted to practice in New York, 2004; U.S. District Court, Southern District of New York; U.S. District Court, Eastern District of New York; U.S. Court of Appeals for the First Circuit; U.S. Court of Appeals for the Ninth Circuit. *Education*: New York University School of Law (J.D., 2003); *Review of Law and Social* Change, Managing Editor; Hiroshima University (Fulbright Fellow, 1997-98); Brown University (B.A., *magna cum laude*, Phi Beta Kappa, 1997). *Employment*: Law Clerk to Honorable John T. Nixon, U.S. District Court, Middle District of Tennessee, 2003-04. *Publications & Presentations*: Panelist, "Taking and Defending Depositions," New York City Bar, May 20, 2009; Contributing Author, *California Class Actions Practice & Procedures* (Elizabeth J. Cabraser, Editor-in-Chief, 2008); "Remembering the War and the Atomic Bombs: New Museums, New Approaches," in *Memory and the Impact of Political Transformation in Public Space* (Duke University Press, 2004), originally published in *Radical History Review*, Vol. 75 (1998); "Issue Advocacy in the 1998 Congressional Elections," with Jonathan S. Krasno (Urban Institute, 2001); *Buying Time: Television Advertising in the 1998 Congressional Elections*, with Jonathan S. Krasno (Brennan Center for Justice, 2000); "Going Negative," in *Playing Hardball*, with Kenneth Goldstein, Jonathan S. Krasno and Lee Bradford (Prentice-Hall, 2000). *Member*: American Association for Justice; State Bar of New York.

     **TODD A. WALBURG**, Admitted to practice in California, 2001; U.S. District Court, Northern District of California, 2001; U.S. District Court, Eastern, Central and Southern Districts of California, 2006; U.S. Court of Appeals for the Ninth Circuit, 2001. *Education*: University of San Francisco School of Law (J.D. 1999); Founder and President, USF Student Chapter, Association of Trial Lawyers of America (1997-1999); Investigation Intern, San Francisco Public Defender's Office; Mediation Intern, San Francisco Small Claims Court; Mediation Intern, U.S. Equal Employment Opportunity Commission; University of California at Los Angeles (B.A., 1995). *Community Service*: Pro Bono Trial Attorney, Eviction Defense Project, Volunteer Legal Services Program of the Bar Association of San Francisco (2012-present). *Awards*: "Rising Star for Northern California," Super Lawyers, 2010-2011; Leesfield / Association of Trial Lawyers of America Scholarship, National Winner (1998). *Prior Employment*: Partner, Emison Hullverson Bonagofsky, LLP (2007-2008); Associate, Lieff Cabraser Heimann & Bernstein, LLP, 2005-2007); Associate, Bennett, Johnson & Galler (2001-2005). *Publications and Presentations*: "Burn Injury Cases," SFTLA/CAOC Webinar (December 2012); "Toyota Unintended Acceleration Litigation," CAOC Annual Convention (November 2011); "Product Liability Strategies Before Trial," SFTLA Roundtable (October, 2008); "Powerful Mediation Briefs," in The Verdict (ACCTLA 2006). *Member*: Public Justice; American Association for Justice (Attorneys Information Exchange Group; Burn Injury Litigation Group; Motor Vehicle Collision, Highway and Premises Liability Section; Products Liability Section; Section on Toxic, Environmental and Pharmaceutical Torts; Spinal Cord Injury Litigation Group); American Bar Association (Tort, Trial and Insurance Practice Section);

Consumer Attorneys of California; State Bar of California; San Francisco Trial Lawyers Association (Experts Committee, 2012; Education Committee, 2005-2007, 2012; Carlene Caldwell Scholarship Committee, 2005-2007); Alameda-Contra Costa Trial Lawyers Association (Board of Governors, 2003-2005, 2012-2013); Bar Association of San Francisco (Pro Bono Trial Attorney, Eviction Defense Project, Volunteer Legal Services Program).

   **DANIEL M. HUTCHINSON**, Admitted to practice in California, 2005; U.S. Court of Appeals for the First Circuit, 2012; U.S. Court of Appeals for the Ninth Circuit, 2005; U.S. District Court, Northern District of California, 2005; U.S. Court of Appeals for the Fourth Circuit, 2008.  *Education:*  Boalt Hall School of Law, University of California, Berkeley (J.D., 2005), Senior Articles Editor, *African-American Law & Policy Report*, Prosser Prizes in Constitutional Law and Employment Law; University of California, Berkeley Extension (Multiple Subject Teaching Credential, 2002); Brown University (B.A., 1999), Mellon Mays Fellowship (1997-1999).  *Employment:*  Judicial Extern to the Hon. Martin J. Jenkins, U.S. District Court, Northern District of California, 2004; Law Clerk, Lewis & Feinberg, P.C., 2003-2004; Teacher, Oakland Unified School District, 1999-2002.  *Honors & Awards:* "50 Lawyers on the Fast Track," *The Recorder*, 2012; "Northern California Rising Stars," *Super Lawyers*, 2009-2011. *Publications & Presentations:*  Panelist, "Employment Discrimination Class Actions Post-*Dukes*," Consumer Attorneys of California 50th Annual Convention (2011); "Ten Points from *Dukes v. Wal-Mart Stores, Inc.*," 20(3) *CADS Report 1* (Spring 2010); Panelist, "Rethinking Pro Bono: Private Lawyers and Public Service in the 21st Century," UCLA School of Law (2008); Author and Panelist, "Pleading an Employment Discrimination Class Action" and "EEO Litigation:  From Complaint to the Courthouse Steps," ABA Section of Labor and Employment Law Second Annual CLE Conference (2008); Co-Presenter, "Rule 23 Basics in Employment Cases," Strategic Conference on Employment Discrimination Class Actions (2008). *Member*: American Bar Association (Section of Labor & Employment Law Leadership Development Program); Association of Business Trial Lawyers (Leadership Development Committee, 2008-2010); Bar Association of San Francisco; Consumer Attorneys of California; Lawyer's Committee for Civil Rights of the San Francisco Bay Area (Board Secretary, 2011-present; Board of Directors, 2009-2011); National Bar Association; State Bar of California.

   **SHARON M. LEE**, Admitted to practice in New York 2002; U.S. District Court, Southern District of New York, 2003; U.S. District Court, Eastern District of New York, 2003; Washington State, 2005.  *Education*: St. John's University School of Law (J.D. 2001); *New York International Law Review*, Notes & Comments Editor, 2000-2001; St. John's University (M.A. 1998); St. John's University (B.A. 1997).  *Employment*:  Milberg Weiss & Bershad, LLP, 2003-2007.  *Member*: American Bar Association; Washington State Bar Association; Asian Bar Association of Washington.  *Publications & Presentations*: Author, *The Development of China's Securities Regulatory Framework and the Insider Trading Provisions of the New Securities Law*, 14 N.Y. Int'l L.Rev. 1 (2001); Co-author, *Post-Tellabs Treatment of Confidential Witnesses in Federal Securities Litigation*, 2 J. Sec. Law, Reg. and Compliance 205 (3d ed. 2009).

   **HEATHER H. WONG**, Admitted to practice in California, 2005; U.S. Court of Appeals, Ninth Circuit, 2005; U.S. District Court, Central and Northern Districts of California, 2005, 2006; U.S. District Court, District of Colorado, 2006.  *Education*:  University of San Francisco (J.D. & M.B.A., 2005); Beta Gamma Sigma Honor Society (2005); Technical Editor, *Maritime Law Journal*; Staff Editor, *Journal of Law and Social Challenges*; University of California,

Berkeley (B.A., 2000). *Awards & Honors*: "Northern California Rising Stars," *Super Lawyers*, 2009-2011. *Publications & Presentations*: Panelist, "It Don't Matter If You're Black or White"—or Female or Older—Primer on Title VII and ADEA," ABA Section of Labor & Employment Law's 4th Annual CLE Conference, Chicago, IL (November 2010); Panelist, "Labor and Employment Law Career Opportunities," ABA Section of Labor & Employment Law's Outreach to Law School Students Task Force Seminar, Santa Clara, CA (March 2010); Presenter, "Rule 23 Basics in Employment Cases," Impact Fund's 8th Annual Employment Discrimination Class Action Conference, Oakland, CA (February 2010); Presenter, "Updates on Employment Law," ALRP MCLE Program, San Francisco, CA (December 2009); Panelist, "EEO Law: Overview and Current Issues under Title VII, the ADEA, and the ADA," ABA Section of Labor & Employment Law's 3rd Annual CLE Conference, Washington, D.C. (November 2009); Panelist, "The Nuts & Bolts of Class and Collective Actions," National Employment Lawyers Association's 19th Annual Convention, Atlanta, GA (June 2008); (Young Lawyers Division; Labor & Employment Law Section; Section of Litigation; Employment Discrimination Law Treatise, Chapter Monitor (2007-present); California Class Action Practice and Procedure Treatise, Chapter Editor (2007-present)). *Member*: American Association for Justice; American Bar Association (Co-Chair, Leadership Development Program; Young Lawyers Division; Labor & Employment Law Section; Section of Litigation; *Employment Discrimination Law Treatise*, Chapter Monitor, 2007-present); American Constitution Society (Mentor); Asian American Bar Association; Asian American Legal Defense and Education Fund; Association of Business Trial Lawyers; Bar Association of San Francisco (Barristers Club; Labor & Employment Law Section; Litigation Section); *California Class Action Practice and Procedure Treatise* (Chapter Editor, 2007-present); Carver Healthy Environments and Response to Trauma in Schools ("HEARTS") Project (Steering Committee, 2007-present); Consumer Attorneys of California; Legal Services for Children (Pro Bono Awards Luncheon Committee, 2010-present); Minority Bar Coalition (2008 Unity Conference Planning Committee); National Employment Lawyers Association; State Bar of California (Labor & Employment Law Section; Litigation Section).

**ROGER N. HELLER**, Admitted to practice in California, 2001; U.S. District Court, Northern District of California, 2001). *Education*: Columbia University School of Law (J.D., 2001); Columbia Law Review, Senior Editor; Emory University (B.A., 1997). *Employment*: Extern, Honorable Michael Dolinger, U.S. District Court, Southern District of new York, 1999; Associate, O'Melveny & Myers LLP, 2001-2005; Senior Staff Attorney, Disability Rights Advocates, 2005-2008. *Honors & Awards*: "Trial Lawyer of the Year Finalist," Public Justice, 2012; "Northern California Rising Stars," *Super Lawyers*, 2011; Harlan Fiske Stone Scholar. *Publications & Presentations*: Co-author, <u>Fighting For Troops on the Homefront</u>, Trial Magazine (September 2006). *Member*: American Bar Association.

**NIMISH R. DESAI**, Admitted to practice in California, 2006; US District Court, Northern District of California, 2007; US District Court, Central District of California, 2008; US District Court, Northern District of Florida, 2009; U.S. Court of Appeals, Ninth Circuit, 2009. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D., 2006), Finalist and Best Brief, McBaine Moot Court Competition (2006), Moot Court Best Brief Award (2004); University of Texas, Austin, (B.S. & B.A., High Honors, 2002). *Employment*: Extern, Sierra Club Environmental Law Program, 2004; Researcher, Public Citizen, 2003; Center for Energy and Environmental Resources, 2001-2002. *Publications & Presentations*: "BP, Exxon Valdez,

and Class-Wide Punitive Damages," 21 Class Action and Derivative Suit Committee Newsletter (Fall 2010); "American Chemistry Council v. Johnson: Community Right to Know, But About What? D.C. Circuit Takes Restrictive View of EPCRA," 33 *Ecology L.Q.* 583 (Winter 2006); "Lessons Learned and Unlearned: A Case Study of Medical Malpractice Award Caps in Texas," *The Subcontinental*, (Winter 2004, Vol. 1, Issue 4, pp. 81-87); "Separation of Fine Particulate Matter Emitted from Gasoline and Diesel Vehicles Using Chemical Mass Balancing Techniques", *Environmental Science Technology*, (2003; 37(17) pp. 3904-3909); "Analysis of Motor Vehicle Emissions in a Houston Tunnel during Texas Air Quality Study 2000," *Atmospheric Environment*, 38, 3363-3372 (2004). *Member*: State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California; American Bar Association; American Constitution Society; East Bay Community Law Center (Board Member, 2010-present); South Asian Bar Association (Board Member, 2010-present). *Languages*: Gujarati (conversational).

   **MICHAEL J. MIARMI**, Admitted to practice New York, 2006; U.S. District Court, Eastern District of New York; U.S. District Court, Southern District of New York; U.S. Court of Appeals for the Second Circuit; U.S. Court of Appeals for the Third Circuit, 2007; U.S. Court of Appeals for the Sixth Circuit; U.S. Court of Appeals for the Eighth Circuit, 2007; U.S. Supreme Court. *Education*: Fordham Law School (J.D., 2005); Yale University (B.A., *cum laude*, 2000). *Publications & Presentations*: Co-Author with Steven E. Fineman, "The *Basic*s of Obtaining Class Certification in Securities Fraud Cases: U.S. Supreme Court Clarifies Standard, Rejecting Fifth Circuit's 'Loss Causation' Requirement," *Bloomberg Law Reports* (July 5, 2011). *Employment*: Milberg Weiss LLP, Associate, 2005-2007. *Member:* State Bar of New York; New York State Trial Lawyers Association; Public Justice Foundation; American Bar Association.

**OF COUNSEL**

   **ROBERT L. LIEFF**, Admitted to practice in California, 1966; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1969; U.S. Supreme Court, 1969; U.S. Court of Appeals, Seventh Circuit, 1972; U.S. Tax Court, 1974; U.S. District Court, District of Hawaii, 1986. *Education*: Columbia University (M.B.A., 1962; J.D., 1962); Cornell University; University of Bridgeport (B.A., 1958). Member, Columbia Law School Dean's Council; Member, Columbia Law School Board of Visitors (1992-present); Member, Columbia Law School Center on Corporate Governance Advisory Board (2004). *Awards & Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell; "Northern California Super Lawyers," *Super Lawyers*, 2005-09, "*Lawdragon* Finalist," *Lawdragon*, 2005. *Member*: Bar Association of San Francisco; State Bar of California (Member: Committee on Rules of Court, 1971-74; Special Committee on Multiple Litigation and Class Actions, 1972-73); American Bar Association (Section on Corporation, Banking and Business Law); Lawyers Club of San Francisco; San Francisco Trial Lawyers Association; California Trial Lawyers Association; Consumer Attorneys of California; Fight for Justice Campaign.

   **BRUCE W. LEPPLA**, Admitted to practice in California, New York, Ninth Circuit Court of Appeals, California District Courts (Northern, Central, Eastern), New York District Courts (Southern, Eastern), District of Colorado. *Education*: University of California (J.D., Boalt Hall School of Law, M.G. Reade Scholarship Award); University of California at Berkeley (M.S., Law and Economics, Quantitative Economics); Yale University (B.A., *magna cum laude*,

Highest Honors in Economics). *Prior Employment*: California-licensed Real Estate Broker (2009-present); FINRA and California-licensed Registered Investment Adviser (2008-present); Chairman, Leppla Capital Management LLC (2008-present); Chairman, Susquehanna Corporation (2006-present); Partner, Lieff Cabraser Heimann & Bernstein, LLP (2004-2008), Counsel (2002-2003); CEO and President, California Bankers Insurance Services Inc., 1999-2001; CEO and President, Redwood Bank (1985-1998), CFO and General Counsel (1981-1984); Brobeck, Phleger & Harrison (1980); Davis Polk & Wardwell (1976-80). *Publications*: Author or co-author of 11 different U.S. and International patents in electronic commerce and commercial product design, including "A Method for Storing and Retrieving Digital Data Transmissions," United States Patent No. 5,659,746, issued August 19, 1997; "*Stay in the Class or Opt-Out? Institutional Investors Are Increasingly Opting-Out of Securities Class Litigation*," Securities Litigation Report, Vol. 3, No. 8, September 2006, West LegalWorks; reprinted by permission of the author in Wall Street Lawyer, October 2006, Vol. 10, No. 10, West LegalWorks; "*Selected Waiver: Recent Developments in the Ninth Circuit and California, Part 1*;" Elizabeth J. Cabraser, Joy A. Kruse and Bruce W. Leppla; Securities Litigation Report, May 2005, Vol. I, No. 9, pp. 1, 3-7; "*Selected Waiver: Recent Developments in the Ninth Circuit and California, Part 2*;" Elizabeth J. Cabraser, Joy A. Kruse and Bruce W. Leppla; Securities Litigation Report, June 2005, Vol. I, No. 10, pp. 1, 3-9; Author, "*Securities Powers for Community Banks,*" California Bankers Association Legislative Journal (Nov. 1987). *Teaching Positions*: Lecturer, University of California at Berkeley, Haas School of Business, Real Estate Law and Finance (1993-96); Lecturer, California Bankers Association General Counsel Seminars, Lending Documentation, Financial Institutions Litigation and similar topics (1993-96). *Panel Presentations*: Union Internationale des Avocats, Spring Meeting 2010, Frankfurt, Germany, "*Recent Developments in Cross-Border Litigation;*" Union Internationale des Avocats, Winter Meeting 2010, Park City, Utah, "*Legal and Economic Aspects of Securities Class and Opt-out Litigation;*" EPI European Pension Fund Summit, Montreux, Switzerland, "*Legal and Global Economic Implications of the U.S. Subprime Lending Crisis*," May 2, 2008; Bar Association of San Francisco, "*Impact of Spitzer's Litigation and Attempted Reforms on the Investment Banking and Insurance Industries*," May 19, 2005; Opal Financial Conference, National Public Fund System Legal Conference, Phoenix, AZ, "*Basic Principles of Securities Litigation*," January 14, 2005; American Enterprise Institute, "*Betting on the Horse After the Race is Over—In Defense of Mutual Fund Litigation Related to Undisclosed After Hours Order Submission*," September 30, 2004. *Member*: State Bar of California; State Bar of New York; Member, Editorial Board, *Wall Street Lawyer*; National Association of Public Pension Attorneys; Union Internationale des Avocats (Seminar Chairman, 2012 Winter Corporate Governance Seminar); Yale University Alumni Board of Directors (Director, 2001-2005); California Bankers Association (Director, 1993-99); California State Small Business Development Board (1989-1997); University of California at Berkeley, Boalt Hall Alumni Board of Directors (1993-96); Leadership Council, San Francisco Chamber of Commerce (1990-1992); Community Reinvestment Institute (Founding Director, 1989-1990); Member, Yale Whiffenpoofs.

   **NICHOLAS DIAMAND**, Admitted to practice in New York, 2003; U.S. District Court, Southern, Eastern, Northern, and Western Districts of New York; US. Court of Appeals, Seventh Circuit. *Education*: Columbia University School of Law (LL.M., Stone Scholar, 2002); College of Law, London, England (C.P.E.; L.P.C.; Commendation, 1997); Columbia University (B.A., *magna cum laude,* 1992). *Awards & Honors:* "Rising Star for New York," *Super*

*Lawyers*, 2012. *Employment*: Solicitor, Herbert Smith, London (1999-2001); Law Clerk to the Honorable Edward R. Korman, Chief Judge, U.S. District Court, Eastern District of New York (2002-03). *Publications & Presentations*: Contributing Author, *California Class Actions Practice and Procedure* (Elizabeth J. Cabraser, Editor-in-Chief), 2006; Panelist, "Obstacles to Access to Justice in Pharmaceutical Cases," *Pharmaceutical Regulation and Product Liability*, British Institute of International and Comparative Law, April 21, 2006; Panelist, "Pre-Trial Discovery in the United States," Union Internationale des Avocats, Winter Seminar, February 2006; Columnist, *The New York Employee Advocate*, NELA/NY, February 2006-present. *Member*: New York City Bar Association, New York State Bar Association; Public Justice Foundation.

**LYDIA LEE**, Admitted to practice in Oklahoma 1983; U.S. District Court, Western and Eastern Districts of Oklahoma; U.S. Court of Appeals, 10th Circuit. *Education*: Oklahoma City University, School of Law (J.D., 1983); University of Central Oklahoma (B.A., 1980). *Prior Employment*: Partner, Law Office of Lydia Lee (2005-2008); Partner, Oklahoma Public Employees Retirement System (1985-2005); Associate, law firm of Howell & Webber (1983-1985). *Publications & Presentations*: "QDROs for Oklahoma's Public Pension Plans," *Oklahoma Family Law Journal*, Vol. 13, September, 1998; Co-Author, "Special Problems in Dividing Retirement for Employees of the State of Oklahoma," *OBA/FLS Practice Manual*, Chapter 27.3, 2002; Featured Guest Speaker, *Saturday Night Law*, KTOK Radio; Contributor and Editor, INFRE Course Books for CRA program. *Member*: Oklahoma Bar Association (1983–present), Member OBA Women in Law Committee (2007-present); National Association of Public Pension Attorneys (1988-present), President (2002-2004), Vice-President (2001-2002), Executive Board member (1998-2004), Chair of Benefits Section, Emeritus Board member, (2004-present); Edmond Neighborhood Alliance Board of Directors (2005-present), President (2006-2007), Past President and Director (2007-present); Central Edmond Urban Development Board (2006-present); Midwest City Regional Hospital, Board of Governors (1992-1996), Served on Physician/Hospital Organization Board, Pension and Insurance Trust Committees, and Chairman of Woman's Health Committee; City of Midwest City, Planning Commission (1984-1998), Chairman (1990-1995), Vice-Chairman (1987– 990), Served on Capital Improvement Committee, Airport Zoning Commission (Tinker AFB), and Parkland Review Board, served on 1991 Midwest City Legislative Reapportionment Committee.

**MORRIS A. RATNER**, Admitted to practice in California, 1991; District of Columbia, 1999; New York, 2000; U.S. District Court, Northern, Central and Southern Districts of California; and U.S. Court of Appeals, Second, Third, Sixth and Ninth Circuits. *Education*: Harvard University (J.D., 1991); Stanford University (B.A., with distinction, 1988); Phi Beta Kappa. *Publications & Presentations*: Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003); "Factors Impacting the Selection and Positioning of Human Rights Class Actions in United States Courts: A Practical Overview," 58 *New York University Annual Survey of American Law* 623 (2003); "The Settlement of Nazi-Era Litigation Through the Executive and Judicial Branches," 20 *Berkeley Journal of International Law* 212 (No. 1, March 2002). *Faculty Appointments*: University of California, Hastings College of the Law, Professor (2012-present): "Legal Profession," "Civil Procedure"; Harvard Law School, Visiting Professor (2010-2011): "Class Actions and Other Aggregate Litigation," "Remedies," "Legal Profession," and "Holocaust Litigation"; Harvard Law School, Visiting Lecturer on Law for Winter Term 2009, teaching "Holocaust Litigation." *Lectures*:

Stanford University, History Department (guest lecturer, June 2008, re Holocaust-era litigation); UC Berkeley School of Law Boalt Hall (guest lecturer, 2007, re legal ethics); Columbia Law School (guest lecturer, 2004, re Holocaust litigation); New York University School of Law (guest panelist, 2003, re developments in international law).  *Member*: State Bar of California; State Bar of New York; Bar of the District of Columbia.

**DAVID RUDOLPH**, Admitted to practice in California, 2004; U.S. District Court, Northern District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals for the Ninth Circuit. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 2004); Moot Court Board; Appellate Advocacy Student Advisor; *Berkeley Technology Law Journal; Berkeley Journal of International Law*. Rutgers University (Ph.D. Program, 1999-2001). University of California, Berkeley (B.A. 1998). *Employment*:  Associate, Quinn Emanuel Urquhart & Sullivan, LLP, 2008-2012; Law Clerk to the Honorable Saundra Brown Armstrong, U.S. District Court for the Northern District of California, 2007-2008; Associate, Sagy Law Associates, 2004-2007.

**ASSOCIATES**

**KENNETH S. BYRD**, Admitted to practice in Tennessee, 2004; U.S. District Court of Appeals, 6th Circuit, 2009; U.S. District Court, Western District of Tennessee, 2007; U.S. District Court, Eastern District of Tennessee, 2006; U.S. District Court, Middle District of Tennessee, 2005. *Education*: Boston College Law School (J.D., *cum laude*, 2004), Law Student Association (President, 2003-2004), National Moot Court Team (Regional Champion, 2003-2004), American Constitution Society (Secretary, 2002-2003), Judicial Process Clinic (2003), Criminal Justice Clinic (2003-2004); Samford University (B.S., *cum laude*, in Mathematics with Honors, minor in Journalism, 1995). *Employment:* Harwell Howard Hyne Gabbert & Manner, P.C., 2004-2010. *Member:* American Bar Association; American Constitution Society, Nashville Chapter (Member & Chair of 2008 Supreme Court Preview Event); Camp Ridgecrest Alumni & Friends (Board Member); Harry Phillips American Inn of Court, Nashville Chapter (Associate Member, 2008-2010; Barrister, 2010-2014); Historic Edgefield, Inc. (President, 2009-2011); Nashville Bar Association; Tennessee Bar Association.

**LISA J. CISNEROS**, Admitted to practice in California, 2007, U.S. District Court, Northern District of California, 2012; U.S. Court of Appeals for the First Circuit, 2012; U.S. Court of Appeals for the Eleventh Circuit, 2013; Supreme Court of California, 2007; U.S. Supreme Court, 2013. *Education*:  Boalt Hall School of Law, University of California, Berkeley (J.D. 2007); Brown University (B.A. *cum laude*, 2001). *Employment*:  Law Clerk to the Honorable Claudia Wilken, U.S. District Court, Northern District of California, 2010-2012; California Rural Legal Assistance and the National Center for Lesbian Rights, 2007-2010. *Awards & Honors*: Pride Law Fellowship, 2007-2009; Monterey County Democratic Central Committee 2009-2010; Local Heroes Award, *Monterey County Weekly*, 2009; Emerging Leadership Award, Chicana/Latina Foundation, 2009.  *Publications & Presentations*: "Recognizing and Responding to the Needs of Low-Income Lesbian, Gay, Bisexual, and Transgender Clients," *Clearinghouse Review Journal of Poverty Law and Policy*, 2009.

**NANCY CHUNG**, U.S. Court of Appeals for the Ninth Circuit, 2003; U.S. District Court, Northern and Central Districts of California (2007, 2008).  *Education*: Hasting College of Law

(J.D., 2002); University of California, Santa Cruz (B.A., Language Studies, 1995). *Employment*: International Labor Organization, Geneva, Switzerland (2000-2001); Peace Corps Volunteer, Romania (1995-1997). *Member*: Bar Association of San Francisco. *Languages*: French, Romanian and Korean.

**DOUGLAS CUTHBERTSON**, Admitted to practice in New York, 2008; U.S. District Court, Eastern District of New York (2008); U.S. District Court, Southern District of New York (2008). *Education*:  Fordham University School of Law (J.D. *cum laude* 2007); President, Fordham Law School Chapter of Just Democracy; Senior Articles Editor, *Fordham Urban Law Journal*; Bowdoin College (B.A. *summa cum laude*, 1999), Sarah and James Bowdoin Scholar for Academic Excellence (1995-1999). *Employment*: Associate, Debevoise & Plimpton, LLP, 2009-2012; Law Clerk to Honorable Magistrate Judge Andrew J. Peck, U.S. District Court, Southern District of New York, 2007-2009. *Member*:  New York Civil Liberties Union Board of Directors.

**MELISSA GARDNER**, Admitted to practice in California, 2013. *Education*: Harvard Law School (J.D. 2011); Student Attorney, Harvard Prison Legal Assistance Project and South Brooklyn Legal Services; Semi-Finalist, Harvard Ames Moot Court Competition; Western Washington University (B.A. *magna cum laude,* 2005). *Employment*: Associate, Emery Celli Brinckherhoff & Abady (2012); Law Clerk, South Brooklyn Legal Services (2011-2012); Peace Corps Volunteer, China (2005-2008).

**JORDAN ELIAS**, Admitted to practice in California, 2003; U.S. Court of Appeals, Seventh Circuit, 2010; U.S. District Court, District of Arizona, 2009; U.S. District Court, District of Colorado, 2009; U.S. District Court, Southern District of Florida, 2009; U.S. District Court, District of Minnesota, 2009; U.S. District Court, District of Nevada, 2009; U.S. District Court, Eastern District of Pennsylvania, 2008. *Education*:  Stanford Law School (J.D., 2003); Member, *Stanford Law Review*; Yale University (B.A., Phi Beta Kappa, *magna cum laude*, 1998). *Employment*: Associate, Wilson Sonsini Goodrich & Rosati, 2004-2008; Law Clerk to the Honorable Cynthia Holcomb Hall, U.S. Court of Appeals for the Ninth Circuit, 2003-2004; Law Clerk, City Attorney of San Francisco, Summer 2002; Judicial Extern to the Honorable Charles R. Breyer, U.S. District Court, Northern District of California, Summer 2001; Website Editor, Public Agenda, 1999-2000. *Awards & Honors:* "Trial Lawyer of the Year Finalist," Public Justice, 2012; "Rising Star for Northern California," *Super Lawyers*, 2012. *Member*: State Bar of California; Bar Association of San Francisco; Arbitrator, Bar Association of San Francisco, Attorney-Client Fee Disputes Program; Member, Committee on *Iqbal v. Ashcroft*, Public Justice.

**JOSEPH P. FORDERER**, Admitted to practice in California, 2011; U.S. District Court, Northern District of California, 2011. *Education*: Columbia University School of Law (J.D. 2011); Harlan Fiske Stone Scholar; Articles Editor, *Journal of Environmental Law*; Outreach Coordinator, Columbia Health Law Association. *Employment*:  Fellowship attorney in the Antitrust section, California Department of Justice, 2011-2012; Law Clerk, Alaska Department of Law, Summer 2010; Judicial Intern for Judge Richard Goldberg, U.S. Court of International Trade, Summer 2009. *Awards & Honors:* Harlan Fiske Stone Scholar, Columbia University School of Law.  *Publications & Presentations*:  "State Sponsored Global Warming Litigation: Federalism Properly Utilized or Abused?", 18 Mo. Envtl. L. & Pol'y Rev. 23 (2010).

**CECILIA HAN**, Admitted to practice in California, 2005; U.S. District Court, Northern District of California, 2008; U.S. District Court, Central District of California, 2009; U.S. Court of Appeals for the Ninth Circuit (2010). *Education*: University of California, Hastings College of the Law (J.D., 2004); Executive Editor, *Hasting Constitutional Law Quarterly*, (2003-2004); Judicial Extern to Judge Anthony Kline of California Appellate Court, 2002; Judicial Extern to Magistrate Judge Edward M. Chen, 2003; University of California, Berkeley (BA., Phi Beta Kappa, 2000). *Employment*: Associate, Brayton Purcell, (2005-2007). *Member*: State Bar of California; Minority Bar Coalition; CAOC; Bar Association of San Francisco.

**DEAN M. HARVEY**, Admitted to practice in California, 2007; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. District Court, Eastern District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals for the Ninth Circuit; U.S. District Court, Eastern District of Wisconsin. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 2006); Articles Editor, *California Law Review* (2005-2006); Assistant Editor, *Berkeley Journal of International Law* (2004); University of Minnesota, Twin Cities (B.A. *summa cum laude*, 2002). *Prior Employment*: Associate, Boies, Schiller & Flexner LLP (2007-2009); Law Clerk, The Honorable James V. Selna, U.S. District Court for the Central District of California (2006-2007); Law Clerk, U.S. Department of Justice, Antitrust Division, San Francisco Field Office (2006); Summer Law Intern, U.S. Department of Justice (2005); Summer Associate, Boies, Schiller & Flexner LLP (2005). *Awards & Honors*: "Rising Star for Northern California," Super Lawyers, 2010-2011; "William E. Swope Antitrust Writing Prize," 2006. *Publications*: Contributing Author, *ABA Annual Review of Antitrust Law Developments* (2011); Panelist, "In the Wake of *AT&T Mobility v. Concepcion*: Perspectives on the Future of Class Litigation," American Bar Association (2011). Co-Editor, *California Class Actions Practice and Procedures* (2010-2011); *New Guidance for Standard Setting Organizations: Broadcom Corp. v. Qualcomm Inc. and In the Matter of Rambus, Inc.*, 5 ABA Sherman Act Section 1 Newsl. 35 (2008); *Anticompetitive Social Norms as Antitrust Violations*, 94 Calif. L. Rev. 769 (2006). *Member*: American Bar Association (Antitrust Section).

**DANIEL R. LEATHERS**, Admitted to practice in New York, 2010; New Jersey, 2010; Pennsylvania, 2009; U.S. Court of Appeals, Third Circuit, 2012; U.S. District Court of New Jersey, 2010; U.S. District Court, Eastern District of New York, 2012; U.S. District Court, Southern District of New York, 2012; U.S. District Court, Eastern District of Wisconsin, 2013. *Education*: Case Western Reserve University School of Law (J.D., *cum laude*, 2009); Executive Articles Editor, *Case Western Reserve Journal of International Law*; Pennsylvania State University (B.A. in History & Journalism, 2009). *Awards & Honors*: International Academy of Trial Lawyers Award for overall Trial Advocacy excellence (May 2009); Paul J. Hergenroeder Award for excellence in Trial Tactics (May 2009); Federal Bar Association Award for excellence in Constitutional Law (May 2009); CALI Excellence for the Future Awards: Trial Tactics (May 2009), Constitutional Law I (May 2007), Constitutional Law II (December 2007). *Employment*: Judicial Law Clerk to Honorable Carol Higbee, New Jersey Superior Court, Vicinage I Civil Division Presiding Judge, 2009-2010; Summer Associate—Consumer Law Unit, The Legal Aid Society of Cleveland, 2008; Law Clerk, Zipkin Whiting Co., LPA, 2007. *Member*: New Jersey State Bar Association; New York State Bar Association, 2010; Pennsylvania State Bar Association, 2009; American Association for Justice; New Jersey Association of Justice; American Bar Association. *Publications*: "Giving Bite to the EU-U.S.

Data Privacy Safe Harbor," 41 Case W. Res. J. Int'l L. 193, Vol. 41, No. 1 (2009).

   **JASON L. LICHTMAN**, Admitted to practice in Illinois; New Jersey; New York; U.S. Supreme Court; District of Columbia; U.S. Court of Appeals, Third Circuit; U.S. Court of Appeals, Sixth Circuit; U.S. Court of Appeals, Seventh Circuit; U.S. Court of Appeals, Ninth Circuit; U.S. District Court, Northern District of Illinois; U.S. District Court, New Jersey; U.S. District Court, Northern District of Ohio; U.S. District Court, Eastern District of New York, U.S. District Court, Southern District of New York. *Education*: University of Michigan Law School (J.D., *cum laude*, 2006), Campbell Moot Court Executive Board; Clarence T. Darrow Scholar; Northwestern University (B.A. in Economics, 2000). *Employment*: Judicial Law Clerk to Honorable Kathleen M. O'Malley, United States District Court, Northern District of Ohio, 2008-2010; Litigation Associate, Howrey LLP, 2006-2008; Summer Associate, Howrey LLP, 2005; Summer Associate, Reed Smith LLP, 2004. *Member*: Bar Association of the District of Columbia; Bar Association of Illinois. *Publications and Presentations:* Contributing Author, "Ninth Circuit Reshapes California Consumer-Protection Law," American Bar Association (July 2012).

   **SARAH R. LONDON**, Admitted to practice in California, 2009; U.S. District Court, Northern District of California, 2009; U.S. Court of Appeals for the Ninth Circuit, 2009; U.S. District Court, Central District of California, 2010. *Education*: Boalt Hall School of Law, University of California (J.D., 2009); Northwestern University (B.A., 2002). *Member*: New Lawyers' Division, Consumer Attorneys of California.

   **ANNIKA K. MARTIN**, Admitted to practice in New York, 2005; U.S. District Court, Southern District of New York, 2005; U.S. District Court Eastern District of New York. *Education:* Law Center, University of Southern California (J.D., 2004); Review of Law & Women's Studies; Jessup Moot Court; Medill School of Journalism, Northwestern University (B.S.J., 2001); Stockholm University (Political Science, 1999). *Publications & Presentations*: "Stick a Toothbrush Down Your Throat: An Analysis of the Potential Liability of Pro-Eating Disorder Websites," *Texas Journal of Women & the Law* (Volume 14 Issue 2, Spring 2005); "Welcome to Law School," monthly column on www.vault.com (2001-2004). *Awards and Honors*: 2005 Wiley W. Manuel Award for Pro Bono Legal Services awarded by the State Bar of California for voluntary provision of legal services to the poor. *Member*: New York State Bar Association; Swedish American Bar Association; American Association for Justice; New York State Trial Lawyers Association; New York County Lawyer's Association; New York City Bar Association. *Languages*: Swedish (fluent); French (DFA1-certified in Business French); Spanish (conversational).

   **MARC A. PILOTIN**, Admitted to practice in California, 2009. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D., 2009); Supervising Editor, *California Law Review*; Executive Editor, *Berkeley Journal of Employment and Labor Law*; University of California, Los Angeles, Graduate School of Education and Information Studies (M.Ed., 2005); University of California, Los Angeles, College of Letters and Science (B.A., *cum laude* and College Honors, 2001). *Publications & Presentations*: "Finding a Common Yardstick: Implementing a National Student Assessment and School Accountability Plan Through State-Federal Collaboration," 98 Calif. L. Rev. 545 (2010). *Employment*: Law Clerk to the Honorable Claudia Wilken, U.S. District Court for the Northern District of California, 2009-2011; Graduate

Student Instructor for Professor Goodwin Liu, Constitutional Law, 2008; Summer Associate, O'Melveny & Myers, LLP, 2008; Judicial Extern to the Honorable Edward M. Chen, U.S. District Court for the Northern District of California, 2007; Law Clerk, ACLU Foundation of Southern California, 2007; Teacher and Grade-Level Chairperson, Ninety-Sixth Street Elementary School, 2004-2006; Administrative Director, UCLA Center for American Politics and Public Policy, 2001-2003. *Member*: Filipino Bar Association of Northern California (Board Member, 2013-present).

**PHONG-CHAU G. NGUYEN**, Admitted to practice in California, 2012; U.S. District Court, Northern District of California, 2013; U.S. District Court, Central District of California, 2013. *Education:* University of San Francisco School of Law (J.D., 2012); Development Director, USF Moot Court Board; Merit Scholar; Zief Scholarship Recipient; University of California, Berkeley (B.A., Highest Honors; Distinction in General Scholarship, 2008). *Employment:* Attorney, Minami Tamaki, 2013; Post-Bar Law Clerk, Velton Zegelman PC, 2012; Legal Intern, Greenlining Institute, 2012; Law Clerk, Minami Tamaki, 2011-2012. *Member:* State Bar of California; Asian American Bar Association for the Greater Bay Area.

**NICOLE D. REYNOLDS**, Admitted to practice in California; U.S. Court of Appeals for the Ninth Circuit; U.S. District Court, Central District of California; U.S. District Court, Eastern District of California; U.S. District Court, Northern District of California. *Education*: University of California, Hastings College of the Law (J.D., 2006); Moot Court Best Oral Advocate; Senior Articles Editor, *Hastings Law Journal*; Lewis & Clark College (B.A., *magna cum laude*, 2000). *Employment*: Associate, Green Welling, P.C., 2006-2012; Law Clerk, Family Violence Law Center, 2005; Law Clerk, Law Offices of Waukeen Q. McCoy, 2004. *Member*: Antitrust and Unfair Competition Law Section of the California State Bar; Labor and Employment Law Section of the California State Bar. *Publications & Presentations*: Co-author with Kirsten Gibney Scott, "Consumer Protection and Employment Cases after Concepcion," *ABA Section of Litigation, Class Action & Derivative Suits Committee Newsletter* (Summer 2011). *Member*: Antitrust and Unfair Competition Law Section of the California State Bar; Labor and Employment Law Section of the California State Bar.

**ANNE SHAVER**, Admitted to practice in California, 2008; Colorado, 2008; U.S. District Court, Northern District of California, 2009; U.S. Court of Appeals for the Second Circuit, 2012. *Education*: Boalt Hall School of Law, University of California (J.D., 2007), Order of the Coif; University of California, Santa Cruz (B.A. *cum laude*, 2003), Phi Beta Kappa. *Employment*: Law Clerk to Honorable Betty Fletcher, U.S. Court of Appeals for the Ninth Circuit, 2008-2009; Davis, Graham & Stubbs, LLP, Litigation Associate, 2008; Public Defender's Office of Contra Costa County, 2007; Davis, Cowell & Bowe, LLP, Summer Law Clerk, 2006; Centro Legal de la Raza, Student Director, Workers' Rights Clinic, 2005-2006; Human Rights Watch, Legal Intern, 2005. *Publications*: "*U.S. v. Fort* and the Future of Work-Product in Criminal Discovery," 44 Cal. W. L. Rev. 127, 12293 (Fall 2007). *Member*: State Bar of California.

**DARSANA SRINIVASAN**, Admitted to practice in New York, 2008; U.S. Court of Appeals for the Second Circuit, 2010. *Education:* Yale Law School (J.D., 2007); Mary A. McCarthy Fellowship in Public Interest Law; Project Manager, *Yale Law Journal*; Submissions Editor, *Yale Journal of Law & Feminism*. Stanford University (B.A., with Honors and with Distinction; 2003), Phi Beta Kappa. *Employment:* Assistant Solicitor General, New York State

Office of the Attorney General Appeals & Opinions Bureau, 2009-2013; Assistant Attorney General, New York State Office of the Attorney General Civil Rights Bureau, 2008-2009; Health Law and Reproductive Rights Fellow, National Women's Law Center, 2007-2008.

Notice on the Firm's AV Rating:  AV is a registered certification mark of Reed Elsevier Properties, Inc., used in accordance with the Martindale-Hubbell certification procedures, standards and policies.  Martindale-Hubbell is the facilitator of a peer review process that rates lawyers.  Ratings reflect the confidential opinions of members of the Bar and the Judiciary.  Martindale-Hubbell Ratings fall into two categories—legal ability and general ethical standards.

# EXHIBIT B

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement" or "Settlement") is made by and among plaintiffs Walter Bradley and Andrew Steinfeld (each individually, "Plaintiff"; collectively, "Plaintiffs"), on behalf of themselves and the Settlement Class (as defined below), on the one hand, and Discover Financial Services, DFS Services LLC and Discover Bank, on behalf of themselves and their affiliates or subsidiaries (collectively, "Discover"), on the other hand.  Discover, Settlement Class Counsel (as defined below) and Plaintiffs hereby stipulate and agree that, in consideration of the promises and covenants set forth in this Agreement and upon entry by the Court (as defined below) of a Final Approval Order (as defined below), all claims of Plaintiffs and the Settlement Class Members (as defined below) against Discover in the actions entitled Walter Bradley v. Discover Financial Services, U.S.D.C., Northern District of California Case No. 4:11-cv-5746-YGR ("Bradley"), and Andrew Steinfeld v. Discover Financial Services, et al., U.S.D.C., Northern District of California Case No. 3:12-cv-01118-JSW ("Steinfeld") (collectively, the "Actions") shall be settled, compromised and released upon the terms and conditions contained herein.

## I.     RECITALS

This Agreement is made with reference to and in contemplation of the following facts and circumstances:

A.     On November 30, 2011, Plaintiff Walter Bradley filed the Class Action Complaint in Bradley, seeking monetary damages and injunctive relief against Discover Financial Services based on its alleged violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. (the "TCPA"), by placing calls to cellular telephones through the use of an automatic telephone dialing system or an artificial or prerecorded voice without the prior express consent of Plaintiff and the putative class members.

B.     On March 6, 2012, Plaintiff Andrew Steinfeld filed the Class Action Complaint in Steinfeld, seeking monetary damages and injunctive relief against Discover Financial Services,

1

DFS Services LLC and Discover Bank based on their alleged violation of the TCPA, by placing calls to cellular telephones through the use of an automatic telephone dialing system or an artificial or prerecorded voice without the prior express consent of Plaintiff and the putative class members.

C.     Discover vigorously denies all claims asserted in the Actions and denies all allegations of wrongdoing and liability.  Discover desires to settle the Actions on the terms set forth herein solely for the purpose of avoiding the burden, expense, risk and uncertainty of continuing these proceedings.

D.     On February 28, 2012, Discover filed its Motion to Compel Arbitration and Stay Action in Bradley (the "Bradley Arbitration Motion").  On March 30, 2012, Plaintiff filed his response to the Bradley Arbitration Motion and, on April 20, 2012, Discover filed its reply in support of the Bradley Arbitration Motion.  The Bradley Arbitration Motion was fully briefed and scheduled for hearing on May 22, 2012.

E.     On or about May 8, 2012, Class Counsel and Discover agreed to attend mediation with a private mediator and devote their time to matters that would advance their ability to engage in meaningful settlement negotiations.  Thereafter, Class Counsel and Discover entered into multiple stipulations to continue the hearing on the Bradley Arbitration Motion and the deadline in Steinfeld for Discover to respond to the complaint.  On August 15, 2012, Plaintiffs and Discover filed a stipulation in Bradley whereby they agreed to withdraw without prejudice the Bradley Arbitration Motion while the parties continued to negotiate a settlement.

F.     Plaintiffs and Class Counsel have investigated the facts and law underlying the claims asserted in the Actions.  Plaintiffs and Class Counsel requested, and Discover produced, data and documents regarding Plaintiffs' claims.  Class Counsel also have engaged in numerous discussions with Discover regarding those claims.

G.     This Agreement resulted from and is the product of days of mediation, meetings and negotiations.  Over the course of months, Class Counsel and counsel for Discover have

engaged in extensive, good faith arm's length negotiations concerning the possible settlement of the Actions, including, without limitation, by participating in three formal mediation sessions before the Honorable Carl West (Ret.) of JAMS. Discover and Plaintiffs submitted detailed mediation briefs to Judge West, setting forth their respective views as to the strengths of their cases.

H. As a result of these negotiations, the Parties (as defined below) signed a Memorandum of Understanding on April 5, 2013, which memorialized, subject to negotiation and execution of this Agreement and subject to preliminary approval and final approval by the Court as required by Rule 23 of the Federal Rules of Civil Procedure, the Parties' good faith intention to fully, finally and forever resolve, discharge and release all rights and claims of Plaintiffs and the Settlement Class Members in exchange for Discover's agreement to implement the practice change set forth herein and pay the sum of Eight Million Seven Hundred Thousand Dollars ($8,700,000) to create a common fund for the benefit of the Settlement Class.

I. The Parties understand, acknowledge and agree that the execution of this Agreement constitutes the settlement and compromise of disputed claims. This Agreement is inadmissible as evidence against any Party except to enforce the terms of the Settlement and is not an admission of wrongdoing or liability on the part of any Party to this Agreement. It is the Parties' desire and intention to effect a full, complete and final settlement and resolution of all existing disputes and claims as set forth herein.

**NOW, THEREFORE,** in light of the foregoing, for good and valuable consideration, the receipt of which is hereby mutually acknowledged, Plaintiffs and Discover agree to the Settlement, subject to approval by the Court, as follows:

## II. DEFINITIONS

A. In addition to the terms defined at various points within this Agreement, the following defined terms apply throughout this Agreement and the attached exhibits:

3

1.      "Amended Complaint" means the Consolidated Amended Complaint to be filed by Plaintiffs in <u>Steinfeld</u>, substantially in the form appended hereto as Exhibit A, incorporating all claims which are the subject of the Settlement.

2.      "CAFA Notice" refers to the notice requirements imposed by 28 U.S.C. § 1715(b).

3.      "Cash Award" means a cash payment to an eligible Settlement Class Member pursuant to Section III.G of this Agreement.

4.      "Claim Form" means the claim form to be submitted by Settlement Class Members in order to receive a Settlement Award pursuant to Section III.G.3 of this Agreement, subject to approval by the Court, substantially in the form attached hereto as Exhibit B.

5.      "Claim Period" means the period of time in which a Settlement Class Member must submit a Claim Form to be eligible to receive a Settlement Award as part of the Settlement.  The last day of the Claim Period will be 120 days following entry of the Preliminary Approval Order.

6.      "Claims Administrator" or "Settlement Administrator" means Kurtzman Carson Consultants ("KCC"), subject to approval by the Court.

7.      "Class Counsel" means Lieff Cabraser Heimann & Bernstein, LLP, Meyer Wilson Co., LPA, Casey Gerry Schenk Francavilla Blatt & Penfield LLP and Terrell Marshall Daudt & Willie PLLC.

8.      "Class Notice" means all types of notice that will be provided to the Settlement Class, pursuant to Section III.F of this Agreement, including E-mail Notice, Mail Notice, Publication Notice, Website Notice and any additional notice that might be ordered by the Court.

9.      "Class Period" means the period from November 30, 2007 through, and including, the date of Preliminary Approval (defined below).

4

10. "Court" means the United States District Court for the Northern District of California.

11. "Credit Award" means a credit to a Settlement Class Member's Discover credit card account, pursuant to Sections III.G.2 and III.H.2 of this Agreement.

12. "Cy Pres Distribution" means monies that may be distributed in connection with the Settlement, pursuant to Section III.J of this Agreement.

13. "Discover's Counsel" means Stroock & Stroock & Lavan LLP.

14. "Effective Date" means the fifth business day after the last of the following dates:

a. All Parties, Discover's Counsel and Class Counsel have executed this Agreement;

b. The Court has entered, without material change, the Final Approval Order; and

c. The final disposition of any related appeals, and in the case of no appeal or review being filed, expiration of the applicable appellate period.

15. "E-mail Notice" means the notice that will be provided pursuant to Section III.F.1 of this Agreement, subject to approval by the Court, substantially in the form attached hereto as Exhibit C.

16. "Escrow Account" means the account to be established consistent with the terms and conditions described in Section III.D.2.b of this Agreement.  The Escrow Account shall be held at a bank to be selected by Class Counsel and Discover.

17. "Escrow Agent" means JPMorgan Chase Bank, N.A.  The Escrow Agent shall administer the Escrow Account.

18. "Final Approval Hearing" means the date of the hearing when the Court considers the Parties' request to enter the Final Approval Order granting final approval of the

Settlement and determining the amount of fees, costs and expenses awarded to Class Counsel and the amount of the incentive awards to Plaintiffs.

19.     "Final Approval Order" or "Final Approval" means the order and judgment that the Court enters upon finally approving the Settlement in connection with the Final Approval Hearing, the proposed form of which is attached hereto as Exhibit D.  Among other things, the Final Approval Order shall dismiss all claims in the Actions with prejudice.

20.     "Fund" means the total cash sum of eight million seven hundred thousand dollars ($8,700,000) to be paid pursuant to Section III.D.2.a of this Agreement.

21.     "Mail Notice" means the notice that will be made available pursuant to Section III.F.1 of this Agreement, subject to approval by the Court, substantially in the form attached hereto as Exhibit C.

22.     "Notice" or "Notice Program" means the methods provided for in this Agreement for giving notice of the Settlement and includes the E-mail Notice, Mail Notice, Publication Notice and Website Notice.  A description of the contemplated Notice Program is provided in Section III.F of this Agreement.

23.     "Parties" means Plaintiffs and Discover.

24.     "Preliminary Approval" means the date that the Court enters, without material change, an order preliminarily approving the Settlement in the form jointly agreed upon by the Parties.

25.     "Preliminary Approval Order" means the order to be submitted to the Court in connection with the preliminary approval hearing on the Settlement, the proposed form of which is attached hereto as Exhibit E.

26.     "Publication Notice" means the summary notice of the Settlement that will be published pursuant to Section III.F.2 of this Agreement, subject to approval by the Court, substantially in the form attached hereto as Exhibit F.

6

27.     "Reduction Award" means a one-time reduction from the balance of an eligible Settlement Class Member's outstanding extension of credit, pursuant to Section III.G.2 of this Agreement.

28.     "Released Claims" means all claims to be released as set forth in Section III.P of this Agreement.  The "Releases" means all of the releases contained in Section III.P of this Agreement.

29.     "Released Parties" means those persons and entities released as set forth in Section III.P of this Agreement.

30.     "Releasing Parties" means all Plaintiffs and each and all Settlement Class Members, on behalf of themselves and their respective heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors-in-interest, assigns and any authorized users of their accounts, as set forth in Section III.P of this Agreement.

31.     "Revocation Request" means a valid and timely request, pursuant to Section III.D.1.a of this Agreement, by a Settlement Class Member not to receive calls or text messages from Discover to cellular telephones by use of an automatic telephone dialing system and/or an artificial or prerecorded voice.

32.     "Revocation Request Form" means the form as set forth in Section III.D.1.b of this Agreement that a Settlement Class Member must submit to make a Revocation Request, subject to approval by the Court, substantially in the form attached hereto as Exhibit G.

33.     "Revocation Request Period" means 30 days after entry of the Preliminary Approval Order and continuing until 30 days after entry of the Final Approval Order, during which a Settlement Class Member may submit a Revocation Request Form.

34.     "Settlement" means the settlement into which the Parties have entered to resolve the Actions.  The terms of the Settlement are as set forth in this Agreement and the attached exhibits.

7

35.     "Settlement Award" means the Cash Award, Credit Award and/or Reduction Award that may be payable to Settlement Class Members pursuant to Section III.G of this Agreement.

36.     "Settlement Class" means all persons to whom, on or after November 30, 2007 through the date of Preliminary Approval, Discover Financial Services or any of its affiliates or subsidiaries placed a non-emergency telephone call to a cellular telephone through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice. Excluded from the Settlement Class are the Judges to whom the Actions are assigned and any member of the Judges' staff and immediate family, as well as all persons who validly request exclusion from the Settlement Class.

37.     "Settlement Class Member" means any person in the Settlement Class who does not opt out of the Settlement.

38.     "Settlement Costs" means (i) any award of attorneys' fees and costs to Class Counsel approved by the Court; (ii) any incentive awards to Plaintiffs approved by the Court; (iii) all costs of printing and providing notice to persons in the Settlement Class (including, but not limited to, costs for E-mail Notice, Mail Notice, Publication Notice and Website Notice and any additional notice that might be ordered by the Court); (iv) all costs of administering the Settlement, including, but not limited to, the cost of printing and mailing settlement payments, Claim Forms and/or Revocation Requests, the cost of maintaining a designated post office box for receiving Claim Forms and the costs of processing Revocation Requests; and (v) the fees, expenses and all other costs of the Claims Administrator.

39.     "Website Notice" means the website notice made available pursuant to Section III.F.2 of this Agreement, substantially in the form attached hereto as Exhibit C.

B.     Capitalized terms used in this Agreement but not defined above shall have the meaning ascribed to them in this Agreement, including the attached exhibits.

8

III.    **TERMS OF SETTLEMENT**

A.      <u>Dismissal of Bradley</u>.  Prior to seeking Preliminary Approval of the Settlement, Plaintiffs shall file in <u>Steinfeld</u> the Amended Complaint incorporating all claims addressed by this Settlement, and shall dismiss <u>Bradley</u> without prejudice.  Discover shall not be required to respond to the Amended Complaint and, pursuant to this Agreement, all material allegations thereof shall be deemed to have been denied by Discover.

B.      <u>Conditional Certification of the Settlement Class</u>.  Solely for the purposes of settlement, providing Class Notice and implementing this Agreement, the Parties agree to conditional certification of the Settlement Class which shall be certified in <u>Steinfeld</u> for settlement purposes only.  Preliminary certification of the Settlement Class shall not be deemed a concession that certification of a litigation class is appropriate, nor is Discover precluded from challenging class certification in further proceedings in the Actions or in any other action if the Settlement is not finalized or finally approved.  If the Settlement is not finally approved by the Court for any reason whatsoever, the certification of the Settlement Class will be void, and no doctrine of waiver, estoppel or preclusion may be asserted in any litigated certification proceedings in the Actions.  No agreements made by or entered into by Discover in connection with the Settlement may be used by Plaintiffs, any person in the proposed Settlement Class or any other person to establish any of the elements of class certification in any litigated certification proceedings, whether in the Actions or any other judicial proceeding.

C.      <u>Preliminary Approval</u>:  On or before May 17, 2013, Plaintiffs will move the Court in <u>Steinfeld</u> for entry of the Preliminary Approval Order, which shall specifically include provisions that: (a) preliminarily approve the Settlement reflected herein as fair, adequate and reasonable to the Settlement Class, and within the reasonable range of possible final approval; (b) conditionally certify the Settlement Class for settlement purposes only and appoint Class Counsel as counsel for the Settlement Class for settlement purposes only; (c) approve the forms of Class Notice and find that the Notice Program constitutes the best notice practicable under the

9

circumstances, provides due and sufficient notice to the Settlement Class and fully satisfies the requirements of due process and Federal Rule of Civil Procedure 23; (d) direct that notice be provided to the Settlement Class, in accordance with this Agreement, within sixty (60) to ninety (90) days following entry of the Preliminary Approval Order (the "Notice Deadline"); (e) establish a procedure for Settlement Class Members to object to the Settlement or exclude themselves from the Settlement Class, and set a date forty-five (45) days after the Notice Deadline, after which no one shall be allowed to object to the Settlement or exclude himself or herself from the Settlement Class or seek to intervene in Steinfeld (the "Opt-Out and Objection Deadline"); (f) approve the Claim Form and the claims process described herein; (g) pending final determination of whether the Settlement should be approved, bar all Settlement Class Members, directly, on a representative basis or in any other capacity, from commencing or prosecuting against any of the Released Parties any action, arbitration, or proceeding in any court, arbitration forum or tribunal asserting any of the Released Claims; (h) pending final determination of whether the Settlement should be approved, stay all proceedings in Steinfeld except those related to effectuation of the Settlement; and (i) schedule a hearing on Final Approval of the Settlement, which shall be scheduled no earlier than thirty (30) days after the Opt-Out and Objection Deadline.

D.   Settlement Consideration.  As full and complete consideration for the Settlement, Discover will implement the prospective practice changes set forth in Section III.D.1 below and contribute the monetary relief set forth in Section III.D.2 below.

1.   Prospective Practice Changes.   Discover agrees to implement the following practices by no later than one hundred (100) days after the Effective Date:

a.   Revocation Request.  Neither Discover, nor any of its affiliates or subsidiaries, shall make use of, or knowingly authorize anyone acting on its or their behalf to make use of, an automatic telephone dialing system and/or an artificial or prerecorded voice, to call the cellular telephones, or to send text messages to the cellular telephones, of Settlement

Class Members who make a Revocation Request during the Revocation Request Period and in compliance with Section III.D.1.b below.  The Parties agree that Discover reserves its right to call a Settlement Class Member's cellular telephone number using an automatic telephone dialing system, text message and/or an artificial or prerecorded voice message if, subsequent to submitting a Revocation Request Form, Discover obtains that Settlement Class Member's prior express consent within the meaning of the TCPA to receive such calls on his or her cellular telephone number.

      b. <u>Revocation Request Form</u>.  In order to provide Settlement Class Members the opportunity to make a Revocation Request, the E-mail Notice, Mail Notice and Website Notice will include instructions regarding how to make a Revocation Request.  The Revocation Request Form shall be available on the Website Notice website during the Revocation Request Period.  As an alternative, Settlement Class Members may check a box and sign and return a one-page document containing the Revocation Request Form to the Claims Administrator during the Revocation Request Period to effect their Revocation Request.

      c. <u>Future Changes In Laws Or Regulations</u>.  To the extent Congress, the Federal Communications Commission or any other relevant regulatory authority promulgates different requirements under the TCPA, or any other law or regulatory promulgation that would govern any conduct affected by the Settlement, those laws and regulatory provisions shall control.

      2. <u>Monetary Relief</u>.

      a. <u>The Settlement Fund</u>.  In addition to the prospective practice changes set forth above, Discover will pay the total cash sum of $8,700,000 (the "Settlement Amount") in full and complete settlement of all claims of Plaintiffs and the Settlement Class Members described herein.  The Fund shall include all Settlement Awards to claiming Settlement Class Members, as discussed in Section III.G below, any Cy Pres Distribution, and the Settlement Costs. The Fund shall be reduced by the Settlement Costs prior to making any

11

Settlement Awards to Settlement Class Members, as set forth in Section III.H below.  Discover shall not, under any circumstances, be obligated to pay any amounts in addition to the Fund in connection with the Settlement.

      b.    <u>The Escrow Account</u>.  Discover shall deposit the Fund into the Escrow Account as follows:  (1) Discover shall advance the amounts necessary to pay for the Notice Program and settlement administration, which advances shall be credited against the Settlement Amount;  and (2) Discover shall pay the balance of the Settlement Amount into the Fund within five (5) business days following the Effective Date.  The Escrow Agent may, but shall not be obligated to, invest the Fund in interest-bearing instruments backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof, or in an account fully insured by the United States Government, and shall reinvest the proceeds of these instruments as they mature in similar instruments at their then-current market rates.  The Fund shall bear all risks and costs related to investment of the Fund. The Escrow Agent shall not disburse any portion of the Fund except as provided in this Agreement and with the written agreement of Class Counsel and Discover's Counsel or by order of the Court.  Subject to further order or direction as may be made by the Court, the Escrow Agent is authorized to execute such transactions on behalf of the Settlement Class Members as are consistent with the terms of this Agreement.  All funds held by the Escrow Agent shall be deemed and considered to be *in custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds are distributed pursuant to this Agreement or further order of the Court.

      c.    <u>Termination</u>.  In the event that the Settlement is not approved, or is terminated, canceled or fails to become effective for any reason, the remaining Fund (including accrued interest), less expenses and taxes incurred or due and owing and payable from the Fund in accordance with this Agreement, shall be refunded to Discover.

12

E.       Claims Administrator.  The Claims Administrator shall administer the Settlement distribution process.  Discover will reasonably cooperate in the notice and administration process by providing the Claims Administrator, on a confidential basis, with access to the names and mailing addresses for persons in the Settlement Class (as reflected in reasonably available computerized account records) to the extent required to administer the Settlement.

F.       Settlement Class Notice.  Discover and/or the Claims Administrator, as specified below, shall provide Class Notice in the forms approved by the Court, as detailed below, by the Notice Deadline.

1.       E-mail or Mail Notice.  The Claims Administrator will provide individual notice via either:  (i) electronic mail, to the most recent e-mail address as reflected in Discover's reasonably available computerized account records, to all persons in the Settlement Class for whom such records exist and who have not opted out of receiving electronic mail from Discover, in accordance with Discover's currently existing e-mail opt-out policies (the "E-mail Notice"); or (ii) direct mail, to the most recent mailing address as reflected in Discover's reasonably available computerized account records, for those persons in the Settlement Class for whom Discover does not have an e-mail address (as reflected in reasonably available computerized account records) and/or who have opted out of receiving e-mails from Discover, in accordance with Discover's currently existing e-mail opt-out policies, and to those Settlement Class Members whose e-mails are undeliverable (the "Mail Notice").  Skip tracing shall be performed for all returned electronic and direct mail; all costs of skip tracing will be considered Settlement Costs and deducted from the Fund.  At Discover's discretion, subject to approval of Class Counsel and the Court, the E-mail Notice and Mail Notice may instead be provided by way of a bill-stuffer in a periodic or billing statement, a solo electronic mailing or direct mailing, or a combination thereof.  The E-mail Notice and Mail Notice shall direct recipients to the Website Notice website.

2.       Publication Notice.  For all Class Members for whom Discover does not possess contact information, the Claims Administrator will design and conduct a nationwide

13

publication notice program which the Parties believe will fully satisfy the requirements of due process.   The nationwide publication notice program will be agreed to by the Parties and submitted to the Court on or before June 14, 2013.  The Publication Notice shall refer Settlement Class Members to the Website Notice website and provide a toll-free number for the Claim Form and details regarding the Settlement.

        3.    <u>Website Notice</u>.  The Claims Administrator will establish and maintain the Website Notice website.   The Website Notice website will be established by the Claims Administrator dedicated to the Settlement on which will be posted the E-mail Notice, Mail Notice, Revocation Request Form, Claim Form, a copy of this Agreement, the Preliminary Approval Order, and any other materials the Parties agree to include.   The Website Notice website shall also provide for online submission of Claim Forms and Revocation Requests. These documents shall be available on the Website Notice website beginning five (5) days following Preliminary Approval and remain at least until Final Approval and, in the case of the Revocation Request, 30 days following Final Approval.  The Claims Administrator shall secure a URL for the Website Notice website selected by Class Counsel and approved by Discover.  The Website Notice website shall not include any advertising, and shall not bear or include Discover's logo or trademarks.   Ownership of the Website Notice website URL shall be transferred to Discover within 10 days of the date on which operation of the Website Notice website ceases.

        4.    <u>CAFA Notice</u>.  Discover shall be responsible for timely compliance with all CAFA notice requirements.

       G.    <u>Settlement Awards</u>.

        1.    <u>Awards</u>.  Except as set forth herein, Settlement Class Members shall be entitled to make a claim upon the Fund for a Settlement Award.  The amount of each Settlement Class Member's Award will be based on a *pro rata* distribution, depending on the number of valid and timely claims, as set forth in Section III.G.3 below.  Settlement Class Members may

14

elect to have Settlement Awards payable as either a Cash Award in the form of a check or a Credit Award in the form of a one-time credit against the balance of the Settlement Class Member's Discover credit card account, as set forth in Section III.H.2 below.

2.      Revoked Or Charged-Off Extensions of Credit.   If a Settlement Class Member has, as of the Effective Date, one or more extensions of credit with Discover that has been revoked or charged off, Discover at its option may apply a Reduction Award from the balance of those extensions of credit in lieu of the Settlement Class Member receiving a Cash Award or Credit Award, as set forth in Section III.H.3.

3.      Claims-Made Basis. Settlement Awards shall be made to eligible Settlement Class Members on a claims-made basis.

4.      Conditions For Claiming Settlement Awards.   To make a claim for a Settlement Award, Settlement Class Members must submit a valid and timely Claim Form, which shall include:  (i) the Settlement Class Member's full name and the last four digits of the Settlement Class Member's applicable account number(s) or, if the Settlement Class Member is not a Discover account holder at the time of making a claim or was not a Discover account holder in the past, the cellular telephone number at which Discover allegedly contacted the Settlement Class Member; (ii) the last four digits of the Settlement Class Member's social security number; (iii) the Settlement Class Member's current mailing address; (iv) affirmation that the Settlement Class Member, on or after November 30, 2007, received one or more non-emergency contacts from Discover Financial Services or any of its affiliates or subsidiaries, to the Settlement Class Member's cellular telephone through the use of an automatic telephone dialing system, text message and/or an artificial or prerecorded voice; (v) for mailed Claim Forms, the Settlement Class Member's signature; (vi) for Claim Forms submitted via the Website Notice website, the Settlement Class Member's electronic signature; and (vii) if the Settlement Class Member elects a Credit Award, the last four digits of the Discover credit card account to which the Credit Award payment should be posted.  The Claim Forms shall be

15

submitted by mail or via the Website Notice website.  Only one valid Claim Form will be honored per Settlement Class Member, regardless of the number of calls/text messages the Settlement Class Member received and/or the number of Discover accounts held at any time. Discover shall have the right to review the submitted Claim Forms and to deny claims if Discover has a good faith belief that such claims are improper or fraudulent.  In order to be deemed timely, Claim Forms must be submitted or postmarked by the date specified in the Claim Form.  There will be no obligation to honor any Claim Forms submitted or postmarked after the end of the Claim Period, even if such Claim Form otherwise would be valid.

    5.  <u>Publication Of Award Estimates</u>.  Class Counsel estimates Settlement Awards in the range of $20 to $40.  The Notices will reference that estimate.

    H.  <u>Distribution of Settlement Awards</u>.

    1.  <u>Cash Award Payments</u>.  Cash Award payments shall be mailed by the Claims Administrator within 30 days after the Effective Date.  The Claims Administrator shall mail, by first class mail, a check to each eligible Settlement Class Member receiving a Cash Award.  The Claims Administrator will perform skip tracing and remailing, as necessary; all costs of such work will be considered Settlement Costs and deducted from the Fund.  Checks will be valid for 180 days from the date on the check.  In the event that the combined amounts of any checks that remain uncashed more than 180 days after the date on the checks exceed $50,000, a second distribution shall be made of all such amounts on a *pro rata* basis as either a Credit Award or a Reduction Award to the claiming Settlement Class Members who were eligible for a Settlement Award.  There will not be a second distribution of Cash Awards; to the extent that a Settlement Class Member previously received a Cash Award, the second distribution to that person shall be made as a Credit Award; if a Credit Award cannot be paid, the amount shall be distributed as *cy pres* pursuant to Section III.I below.

    2.  <u>Credit Award Payments</u>.  Credit Award payments shall be applied to the Discover credit card account identified by the Settlement Class Member in the Claim Form

within 120 days after the Effective Date.  Discover will provide the Claims Administrator and Class Counsel with a declaration confirming that a credit was applied to the Settlement Class Members' credit card accounts in accordance with Section III.G.1 above.  If the Settlement Class Member does not have an open credit card account as of the posting date of the Credit Award or an open credit card account cannot be located by Discover, a Cash Award will be paid rather than a Credit Award.  For each Settlement Class Member receiving a Credit Award, Discover shall receive a credit against the Fund in an amount equal to the Credit Award within five (5) business days of providing such confirmation to the Claims Administrator.

        3.      <u>Reduction Award Payments</u>.  Reduction Awards shall be applied within 120 days after the Effective Date.  Discover will provide the Claims Administrator and Class Counsel with a declaration confirming that the Settlement Class Members' accounts were reduced in accordance with Section III.G.2 above.  Where a Settlement Class Member has multiple open Discover accounts with outstanding balances, the reduction will be applied to the Settlement Class Member's credit card account with the highest outstanding balance as of the posting date of the Reduction Award, to the extent that the Settlement Class Member's accounts can be readily identified by Discover.  If the Settlement Class Member does not have an outstanding credit card debt as of the posting date of the Reduction Award, Discover at its option may credit the outstanding balance of any other Discover account of the Settlement Class Member.  For each Settlement Class Member receiving a Reduction Award, Discover shall receive a credit against the Fund in an amount equal to the Reduction Award within five (5) business days of providing such confirmation to the Claims Administer.

        I.      <u>Cy Pres Distribution</u>.  In the event that the combined amounts of any checks attributable to Cash Awards that remain uncashed more than 180 days after the date on the checks are equal to or less than $50,000, such monies will be equally distributed to one or more charitable organizations to be agreed to by the Parties and submitted to the Court on or before June 14, 2013 (the "Cy Pres Distribution"). The Cy Pres Distribution shall be made 240 days

after the last day to complete the processing of the Reduction Awards set forth in Section III.H.2 above.  If, for any reason, the Parties determine that the proposed recipient is no longer an appropriate recipient, or the Parties no longer agree on the proposed recipient, or the Court determines that the proposed recipient is not or is no longer an appropriate recipient, the Parties shall agree on a replacement recipient of such monies, subject to Court approval.

J.      Incentive Awards.  Discover will not object to incentive awards to Plaintiffs so long as they do not exceed $2,000 for each of them, to be paid out of the Fund, subject to Court approval.  Such incentive awards shall be paid at the time the attorneys' fees and costs payments to Class Counsel are due.  Court approval of the incentive awards, or their amount, will not be a condition of the Settlement.  In addition, no interest will accrue on such amounts at any time.

K.      Attorneys' Fees And Costs.  Plaintiffs shall move the Court for an award of attorneys' fees and costs to be paid to Class Counsel from the Fund.  Discover shall not object to such a motion so long as the amount requested is not more than $2,175,000, which is 25% of the Fund.  Class Counsel may receive payment of the fees and costs awarded by the Court out of the Fund upon the Court's entry of both the Final Approval Order and an order awarding fees and costs, provided that Class Counsel deliver to Discover a Stipulated Undertaking and Order requiring repayment of fees by Class Counsel to Discover, on a joint and several basis, if the Final Approval Order is reversed or the fee order is reversed or reduced on appeal.  Court approval of attorneys' fees and costs, or their amount, will not be a condition of the Settlement. In addition, no interest will accrue on such amounts at any time.

L.      Opt-Out Right/Termination.

1.      Opt-Out Requirements.  Settlement Class Members may opt out of the Settlement by sending a written request to the Claims Administrator at the address designated in the Class Notice by the Opt-Out and Objection Deadline.  Exclusion requests must: (i) be signed by the Settlement Class Member for whose account(s) exclusion is requested; (ii) include the full name, address, and account number(s) of the Settlement Class Member requesting exclusion

18

(except that persons in the Settlement Class who do not have and have not had some lending or servicing relationship with Discover shall not be required to include an account number); and (iii) include the following statement: "I/we request to be excluded from the settlement in the Steinfeld action." No request for exclusion will be valid unless all of the information described above is included. For any Settlement Class Member who has more than one account, the exclusion request shall include all accounts. No Settlement Class Member, or any person acting on behalf of or in concert or participation with that Settlement Class Member, may exclude any other Settlement Class Member from the Settlement Class.

2. <u>Retention of Exclusions</u>. The Claims Administrator will retain a copy of all requests for exclusion and will, upon written request, provide copies of any such requests to counsel for the Parties. Class Counsel will keep any such opt-out information confidential and use it only for purposes of determining whether a Settlement Class Member has properly opted out.

3. <u>Cap On Opt-Outs</u>. All Settlement Class Members who do not opt out in accordance with the terms set forth herein will be bound by all determinations and judgments in the Actions. In the event that the number of valid opt-out requests exceeds 500 or more persons, Discover, in its sole discretion, may terminate the Settlement. Discover shall inform Class Counsel within 30 days after it is advised in writing that the number of valid opt-out requests is higher than 500 as to whether it will exercise the right of termination. In the event that the Settlement is terminated pursuant to this provision, the Parties will be returned to the *status quo ante* as if no settlement had been negotiated or entered into.

M. <u>Objections To The Settlement</u>.

1. <u>Right To Object</u>. Any Settlement Class Member who has not previously opted out in accordance with the terms of this Agreement may appear at the Final Approval Hearing to object to the proposed settlement and/or to the application of Class Counsel for an award of attorneys' fees and costs and/or the incentive awards, but only if the Settlement Class

19

Member has first filed a written objection with the Clerk of Court, in accordance with the requirements set forth in Section III.M.2 below, by the Opt-Out and Objection Deadline.  Any Settlement Class Member who does not provide a written objection in the manner described in this Section III.M shall be deemed to have waived any objection and shall forever be foreclosed from making any objection to the fairness, reasonableness, or adequacy of the proposed Settlement, the plan of allocation, or the award of any attorney fees and/or service awards. Further, any Settlement Class Member who intends to appear at the Final Approval Hearing, must file and serve on all parties a Notice of Intention to Appear with the Court.

       2.    <u>Objection Requirements</u>.  To be heard at the hearing, the Settlement Class Member must make any objection in writing and file it with the Court by the Opt-Out and Objection Deadline.  The objection must also be mailed to each of the following, postmarked not later than the last day to file the objection: (i) Class Counsel – Daniel Hutchinson, Lieff Cabraser Heimann & Bernstein, LLP, 275 Battery Street, 29th Floor, San Francisco, CA  94111-3339; and (ii) Discover's Counsel - Julia B. Strickland, Stroock & Stroock & Lavan LLP, 2029 Century Park East, 16th Floor, Los Angeles, California 90067.  An objection must:  (a) attach documents establishing, or provide information sufficient to allow the Settling Parties to confirm, that the objector is a member of the Settlement Class; (b) include a statement of such Settlement Class Member's specific objections; and (c) state the grounds for such objections, as well as identify any documents which such objector desires the Court to consider.

       N.    <u>Final Approval</u>.  Following provision of the Notice Program and expiration of the Opt-Out and Objection Period, Plaintiffs shall promptly request that the Court enter the Final Approval Order, which shall specifically include provisions that: (a) finally approve the Settlement as fair, reasonable and adequate to the Settlement Class; (b) find that the Class Notice as given was the best notice practicable under the circumstances, is due and sufficient notice to the Settlement Class, and fully satisfies the requirements of due process and Federal Rule of Civil Procedure 23; (c) approve the plan of distribution of the Fund and any interest accrued

20

thereon; (d) finally certify the Settlement Class; (e) confirm that Plaintiffs and the Settlement Class Members (except those who have timely and validly requested to opt out of the Settlement Class) have released all Released Claims and are permanently barred and enjoined from asserting, commencing, prosecuting, or continuing any of the Released Claims against the Released Parties; and (f) dismiss Steinfeld with prejudice, without costs to any party, except as provided in this Agreement, and subject to the Court retaining continuing jurisdiction over the Parties and the Fund for the purpose of enforcement of the terms of this Agreement.

O.     Dismissal.  Upon entry of the Final Approval Order, Steinfeld shall be dismissed with prejudice as to Plaintiffs and all Settlement Class Members.

P.     Releases.  Plaintiffs and the Settlement Class Members provide the following releases:

> Plaintiffs and each and all Settlement Class Members, on behalf of themselves and their respective heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors-in-interest, assigns and any authorized users of their accounts, will be deemed to have fully released and forever discharged Discover Financial Services and each and all of its present, former and future direct and indirect parent companies, affiliates, subsidiaries, agents, successors, and/or predecessors in interest (including, without limitation, DFS Services LLC; Discover Bank; Discover Products, Inc.; DB Servicing Corporation; The Student Loan Corporation and Discover Home Loans, Inc.), and all of the aforementioneds' respective officers, directors, employees, attorneys, shareholders, agents, vendors and assigns (together, the "Released Parties") from any and all rights, duties, obligations, claims, actions, causes of action or liabilities,

21

whether arising under local, state or federal law, whether by Constitution, statute, contract, rule, regulation, any regulatory promulgation (including, but not limited to, any opinion or declaratory ruling), common law or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated, punitive or compensatory as of the date of the Final Approval Order: (a) that arise out of or are related in any way to the use of an "automatic telephone dialing system" and/or an "artificial or prerecorded voice" to make "calls" to a cellular telephone (to the fullest extent that those terms are used, defined or interpreted by the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq., relevant regulatory or administrative promulgations and case law, and which the Parties agree includes text messages) by or on behalf of the Released Parties in connection with efforts to contact or attempt to contact Settlement Class Members by or on behalf of the Released Parties including, but not limited to, claims under or for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq., and any other statutory or common law claim arising from the use of automatic telephone dialing systems and/or an artificial or prerecorded voice, including any claim under or for violation of federal or state unfair and deceptive practices statutes, violations of any federal or state debt collection practices acts (including, but not limited to, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.), invasion of privacy, conversion, breach of contract, unjust enrichment, specific

22

performance and/or promissory estoppel; or (b) that arise out of or relate in any way to the administration of the Settlement, whether the claims are brought directly by or on behalf of any Settlement Class Member in an individual or class action, representative action or in any other capacity, with respect to any form of relief, including, without limitation, damages, restitution, disgorgement, penalties and injunctive or declaratory relief (the "Released Claims"). The parties agree and understand that the Released Claims do not include claims brought by a State for civil penalties recoverable by a State for its own benefit.

Without limiting the foregoing, the Released Claims specifically extend to claims that Settlement Class Members do not know or suspect to exist in their favor at the time that the Settlement, and the releases contained therein, becomes effective. This Section constitutes a waiver of, without limitation as to any other applicable law, Section 1542 of the California Civil Code, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Plaintiffs and the Settlement Class Members understand and acknowledge the significance of these waivers of California Civil Code Section 1542 and any other applicable federal or state statute, case law, rule or regulation relating to limitations on releases.  In connection with such waivers and relinquishment, Plaintiffs and the Settlement Class Members acknowledge that they are aware that they may hereafter discover facts in addition to, or different

23

from, those facts that they now know or believe to be true with respect to the subject matter of the Settlement, but that it is their intention to release fully, finally and forever all Released Claims with respect to the Released Parties, and in furtherance of such intention, the releases of the Released Claims will be and remain in effect notwithstanding the discovery or existence of any such additional or different facts.

Q.    Stay/Bar Of Proceedings.  All proceedings in the Actions will be stayed following entry of the Preliminary Approval Order, except as may be necessary to implement the Settlement or comply with the terms of the Settlement.  Pending determination of whether the Settlement should be granted final approval, the Parties in the Actions agree not to pursue any claims or defenses otherwise available to them, and no person in the Settlement Class and no person acting or purporting to act directly or derivatively on behalf of a Settlement Class Member, or acting on a representative basis or in any other capacity, will commence or prosecute against any of the Released Parties any action or proceeding asserting any of the Released Claims.  The proposed order submitted on a motion for preliminary approval will contain an injunction enjoining the commencement or prosecution of the Released Claims.  The Settlement will be conditioned upon the entry of such an injunction in both the Preliminary Approval Order and the Final Approval Order.

R.    Confirmatory Discovery.  This Settlement was negotiated based on information, data and documents provided to Class Counsel by Discover.  The Settlement shall be subject to additional reasonable confirmatory discovery by Plaintiffs of Discover, to be completed by June 4, 2013 (the "Confirmatory Discovery Deadline"), of facts necessary to reasonably confirm the material information provided to Class Counsel during settlement negotiations and administrative plans and procedures for compliance with the terms of the Settlement.  Plaintiffs and Class Counsel agree to work cooperatively with Discover to assure that confirmatory discovery is timely completed, not overbroad and does not compromise the privacy of Discover's customers, employees or third parties.

24

S.     No Admissions.   Discover expressly disclaims and denies any wrongdoing or liability whatsoever.   This Settlement, and any and all negotiations, statements, documents, and/or proceedings in connection with this Settlement, shall not be construed or deemed to be evidence of an admission or concession by Discover of any liability or wrongdoing by Discover or any of its affiliates, agents, representatives, vendors, or any other person or entity acting on its behalf, and shall not be construed or deemed to be evidence of an admission or concession that any person suffered compensable harm or is entitled to any relief.   Neither the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Settlement:  (i) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of Discover; (ii) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of Discover in any civil, criminal, or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed a waiver of Discover's right to challenge class certification if this Settlement for any reason does not become Final; or (iv) is or may be deemed to be a waiver of Discover's right to seek to enforce any arbitration provision in other cases or against Settlement Class Members who opt out of the Settlement.

T.     No Publicity Beyond Notice Procedures.  Class Counsel and/or Plaintiffs will not issue press releases or initiate any public statements regarding the Settlement, with the exception of the Notices.  Class Counsel and/or Plaintiffs will make no statements of any kind to any third party regarding the Settlement prior to filing a motion for Preliminary Approval with the Court, with the exception of the Claims Administrator.  The Parties may make public statements to the Court as necessary to obtain Preliminary or Final Approval of the Settlement and Class Counsel will not be prohibited from communicating with any person in the Settlement Class regarding the Actions or the Settlement.   In all communications, Class Counsel must comply with all confidentiality agreements in the Actions and not disclose information that is not a part of the public record.  Plaintiffs and Class Counsel shall refrain from disparaging any of the Released

Parties publicly or taking any action designed or reasonably foreseeable to cause harm to the public perception of any of the Released Parties regarding any issue related in any way to the Actions or the Settlement.

        U.    <u>Destruction of Confidential Documents</u>.  It is agreed that, within thirty (30) days after the Effective Date, the originals and all copies of all confidential or highly confidential documents and/or information subject to all confidentiality agreements and any protective orders in the Actions shall be returned to the producing party or destroyed.  Nothing in the Agreement shall require attorney work product or pleading files to be returned or destroyed.

        V.    <u>Notices</u>.  All notices to counsel provided for herein shall be sent by e-mail with a hard copy sent by overnight mail to:

<u>As to Plaintiffs and the Settlement Class:</u>

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Daniel M. Hutchinson
dhutchinson@lchb.com
Nicole D. Reynolds
nreynolds@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Jonathan D. Selbin
jselbin@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013

CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP
Mark Ankcorn
mark@cglaw.com
110 Laurel Street
San Diego, CA  92101

TERRELL MARSHALL DAUDT & WILLIE
PLLC

<u>As to Discover:</u>

STROOCK & STROOCK & LAVAN LLP
Julia B. Strickland
jstrickland@stroock.com
Lisa M. Simonetti
lsimonetti@stroock.com
Shannon  E. Ponek
sponek@stroock.com
2029 Century Park East
Los Angeles, CA 90067-3086

26

Beth E. Terrell
bterrell@tmdwlaw.com
936 North 34th Street, Suite 400
Seattle, WA  98103-8869

MEYER WILSON CO., LPA
Matthew R. Wilson
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215

## IV.    **GENERAL PROVISIONS**

A.    <u>Settlement Conditioned Upon Approval</u>.  The Settlement is conditioned upon entry of the Preliminary Approval Order and Final Approval Order without material modification by the Court.  In the event of failure to obtain any of the required provisions of such orders, including, but not limited to, the denial of any motion seeking preliminary or final approval, the Parties will return, without prejudice, to the *status quo ante* as if no Settlement had been negotiated or entered into and the Settlement and its existence shall be inadmissible to establish any fact relevant to any alleged liability of the Released Parties for the matters alleged in the Actions or for any other purpose.

B.    <u>Evidentiary Preclusion</u>.  Neither the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Settlement (including, but not limited to, the Memorandum of Understanding):  (i) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Released Parties; (ii) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of the Released Parties in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be a waiver of Discover's right to seek to enforce any arbitration provision in other cases or against persons in the Settlement Class who opt out of the Settlement.  In addition, neither the fact of, nor any documents relating to, Discover's withdrawal from the Settlement, any failure of the Court to approve the Settlement and/or any objections or interventions may be used as evidence for any purpose whatsoever.  The Released Parties may file the Settlement

27

Agreement and/or the judgment in any action or proceeding that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

C.     <u>Time Periods</u>.   The time periods and dates described in this Agreement with respect to the giving of Class Notice and hearings will be subject to Court approval and modification by the Court with the consent of the parties.

D.     <u>No Construction Against Drafter</u>.   This Settlement Agreement will be deemed to have been drafted by the Parties, and any rule that a document shall be interpreted against the drafter will not apply.

E.     <u>Entire Agreement</u>.   This Agreement contains the entire agreement between the parties and supersedes all prior understandings, agreements, or writings regarding the subject matter of this Agreement.   This Agreement may be amended or modified only by a written instrument signed by all parties or their successors in interest or their duly authorized representatives.

F.     <u>Modification and Amendment</u>.   This Agreement may be amended or modified only by a written instrument signed by the Parties and their respective counsel and approved by the Court.

G.     <u>Governing Law</u>.   The Agreement is governed by the laws of the State of Delaware, without reference to choice of law principles.

H.     <u>Authority</u>.   Plaintiffs and Discover represent and warrant that the persons signing this Agreement on their behalf have full power and authority to bind every person, partnership, corporation, or entity included within the definitions of Plaintiffs and Discover to all terms of this Agreement.   Any person executing this Agreement in a representative capacity represents and warrants that he or she is fully authorized to do so and to bind the Party on whose behalf he or she signs this Agreement to all of the terms and provisions of this Agreement.

28

I.   <u>Receipt of Advice of Counsel</u>.  Each Party acknowledges, agrees and specifically warrants that he, she or it has fully read this Agreement and the Releases contained in Section III.P above, received independent legal advice with respect to the advisability of entering this Agreement and the Releases, and the legal effects of this Agreement and the Releases, and fully understands the effect of this Agreement and the Releases.

J.   <u>Agreement Binding on Successors in Interest</u>.  This Agreement is binding on and shall inure to the benefit of the respective heirs, successors and assigns of the parties.

K.   <u>Execution In Counterparts</u>.  The Parties may execute this Agreement in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

L.   <u>Miscellaneous Provisions</u>.

1.   Each and every exhibit to this Agreement is incorporated herein by this reference as though fully set forth herein.

2.   The provisions of the Agreement may be waived only in a writing executed by the waiving party.  The waiver by one party of any breach of this Agreement by any other party shall not be deemed a waiver, by that party or by any other party, of any other prior or subsequent breach of this Agreement.

3.   Each party to this Agreement warrants that he, she, or it is acting upon his, her or its independent judgment and upon the advice of his, her, or its own counsel and not in reliance upon any warranty or representation, express or implied, of any nature or kind by any other party, other than the warranties and representations expressly made in this Agreement.

4.   This Agreement has been carefully read by each of the parties, or the responsible officers thereof, and its contents are known and understood by each of the parties. This Agreement is signed freely by each party executing it.

5.    No party to this Agreement has heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the claims, demands, or cause or causes of action disposed of by this Agreement.

6.    In the event any one or more of the provisions contained in this Agreement shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalid, illegal, or unenforceable provision shall be ineffective but shall not in any way invalidate or otherwise affect any other provision.

7.    The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Agreement, and all parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of May **17**, 2013:

**PLAINTIFFS:**

Walter Bradley

_____

Andrew Steinfeld

**DISCOVER FINANCIAL SERVICES:**

By:    _____

Its:    _____

**DFS SERVICES LLC:**

By:    _____

Its:    _____

30

5.     No party to this Agreement has heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the claims, demands, or cause or causes of action disposed of by this Agreement.

6.     In the event any one or more of the provisions contained in this Agreement shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalid, illegal, or unenforceable provision shall be ineffective but shall not in any way invalidate or otherwise affect any other provision.

7.     The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Agreement, and all parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of May 17, 2013:

**PLAINTIFFS:**

_____
Walter Bradley

_____
Andrew Steinfeld

**DISCOVER FINANCIAL SERVICES:**

By:     _____

Its:     _____

**DFS SERVICES LLC:**

By:     _____

Its:     _____

30

5.      No party to this Agreement has heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the claims, demands, or cause or causes of action disposed of by this Agreement.

6.      In the event any one or more of the provisions contained in this Agreement shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalid, illegal, or unenforceable provision shall be ineffective but shall not in any way invalidate or otherwise affect any other provision.

7.      The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Agreement, and all parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of May __, 2013:

**PLAINTIFFS:**

_____

Walter Bradley

_____

Andrew Steinfeld

**DISCOVER FINANCIAL SERVICES:**

By: _____

Its: *Executive Vice President, Chief Credit Risk Officer*

**DFS SERVICES LLC:**

By: _____

Its: *Executive Vice President*

30

**DISCOVER BANK:**

By: _____

Its: _Deputy General Counsel and Secretary_

**APPROVED AS TO FORM AND
CONTENT:**

**CLASS COUNSEL**

TERRELL MARSHALL DAUDT & WILLIE                Dated:  May 17 , 2013
PLLC

By: _____
              Beth E. Terrell


LIEFF, CABRASER, HEIMANN &                      Dated:  May ___, 2013
BERNSTEIN, LLP


By: _____
              Jonathan D. Selbin


MEYER WILSON CO., LPA                            Dated:  May ___, 2013


By: _____
              Matthew R. Wilson

31

**DISCOVER BANK:**

By: _____

Its: _____


**APPROVED AS TO FORM AND
CONTENT:**

**CLASS COUNSEL**

TERRELL MARSHALL DAUDT & WILLIE
PLLC

Dated: May ___, 2013


By: _____

              Beth E. Terrell


LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP

Dated: May ___, 2013

By: _____

              Jonathan D. Selbin


MEYER WILSON CO., LPA

Dated: May _17_, 2013

By: _____

              Matthew R. Wilson


31

CASEY GERRY SCHENK FRANCAVILLA
BLATT & PENFIELD LLP

Dated:  May 17 , 2013

By:  _____

Mark Ankcorn

**APPROVED AS TO FORM:**

**DISCOVER'S COUNSEL**
STROOCK & STROOCK & LAVAN LLP

Dated:  May 17, 2013

By:  _____

Julia B. Strickland

32

## EXHIBIT A

## AMENDED COMPLAINT

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Jonathan D. Selbin (State Bar No. 170222)
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Daniel M. Hutchinson (State Bar No. 239458)
Nicole D. Reynolds (State Bar No. 246255)
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

TERRELL, MARSHALL, DAUDT,
& WILLIE PLLC
Beth E. Terrell (State Bar No. 178181)
bterrell@tmdwlaw.com
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 350-3528

MEYER WILSON CO., LPA
David P. Meyer (admitted *pro hac vice*)
Matthew R. Wilson (admitted *pro hac vice*)
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066

CASEY, GERRY, SCHENK,
FRANCAVILLA, BLATT, & PENFIELD
LLP
Mark Ankcorn (State Bar No. 166871)
mark@cglaw.com
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO / OAKLAND DIVISION

ANDREW STEINFELD and WALTER
BRADLEY on behalf of themselves and all
others similarly situated,

                    Plaintiffs,

          v.

DISCOVER FINANCIAL SERVICES,
DFS SERVICES, LLC, and DISCOVER
BANK,

                    Defendants.

Case No. 3:12-cv-01118-JSW

**FIRST AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF PURSUANT TO 47
U.S.C. § 227 *ET SEQ.* (TELEPHONE
CONSUMER PROTECTION ACT)**

CLASS ACTION

**DEMAND FOR JURY TRIAL**

966418.2

Plaintiffs Andrew Steinfeld and Walter Bradley (hereinafter referred to as "Plaintiffs"), individually and on behalf of all others similarly situated, allege on personal knowledge, investigation of their counsel, and on information and belief as follows:

## NATURE OF ACTION

1.      On June 26, 2007, the Federal Communications Commission ("FCC" or "Commission") issued a citation to Defendant Discover Financial Services for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (hereinafter referred to as the "TCPA"). The FCC found that Discover Financial Services made prerecorded telephone calls to consumers who "had not expressly invited or authorized the call(s)."

2.      The FCC admonished Discover Financial Services that "[i]f, after receipt of this citation, you or your company violate the Communications Act or the Commission's rules in any manner described herein, the Commission may impose monetary forfeitures not to exceed $11,000 for each such violation or each day of a continuing violation."

3.      Notwithstanding these prior violations of the TCPA and the FCC's citation, Defendants Discover Financial Services, DFS Financial Services, LLC, and Discover Bank, and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or related entities (hereinafter referred to as "Discover" or "the Company" or "Defendant") have knowingly, willfully, and/or negligently contacted Plaintiffs and Class Members on their cellular telephones without their prior express consent within the meaning of TCPA.

4.      Plaintiffs bring this action for injunctive relief and damages resulting from Discover's illegal actions.

## JURISDICTION AND VENUE

5.      This matter in controversy exceeds $5,000,000, as each member of the proposed Class of tens of thousands is entitled to up to $1,500.00 in statutory damages for each call that has violated the TCPA. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Further, Plaintiffs allege a national class, which will result in at least one Class

1    member belonging to a different state.  Therefore, both elements of diversity jurisdiction under

2    the Class Action Fairness Act of 2005 ("CAFA") are present, and this Court has jurisdiction.

3              6.       Venue is proper in the United States District Court for the Northern District

4    of California pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1441(a), because Defendant is deemed to

5    reside in any judicial district in which it is subject to personal jurisdiction at the time the action is

6    commenced, and because Defendant's contacts with this District are sufficient to subject it to

7    personal jurisdiction.  Venue is also proper in this District because Plaintiff Steinfeld has resided

8    in this District at all times relevant to these claims such that a substantial part of the events giving

9    rise to the claims occurred in this District.

10                                          **PARTIES**

11              7.       Plaintiff Andrew Steinfeld is, and at all times mentioned herein was, an

12    individual citizen of the State of California, who resides in San Francisco, California.

13              8.       Plaintiff Walter Bradley is, and at all times mentioned herein was, an

14    individual citizen of the State of California, who resides California.

15              9.       On information and belief, Plaintiffs allege that Discover Financial

16    Services, is, and at all times mentioned herein was, a Delaware corporation and the parent

17    company of Defendants DFS Services, LLC, and Discover Bank, with its primary business

18    address in the State of Illinois, and does business throughout the country, including this District.

19              10.       On information and belief, Plaintiffs allege that DFS Services, LLC, is, and

20    at all times mentioned herein was, a Delaware corporation, with its primary business address in

21    the State of Illinois, and does business throughout the country, including this District.

22              11.       On information and belief, Plaintiffs allege that Discover Bank, is, and

23    all times mentioned herein was, a Delaware corporation, with its primary business address in the

24    State of Delaware, and does business throughout the country, including this District.

25

26

27

28

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

## (TCPA), 47 U.S.C. § 227

12.     In 1991, Congress enacted the TCPA,[1] in response to a growing number of consumer complaints regarding certain telemarketing practices.

13.     The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers."  Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party.[2]

14.     According to findings by the FCC, the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.  The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[3]

15.     On January 4, 2008, the FCC released a Declaratory Ruling wherein it confirmed that autodialed and prerecorded message calls to a wireless number by a creditor (or on behalf of a creditor) are permitted only if the calls are made with the "prior express consent" of the called party.[4]  The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."[5]

---

[1] Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA).  The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*
[2] 47 U.S.C. § 227(b)(1)(A)(iii).
[3] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).
[4] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("*FCC Declaratory Ruling*"), 23 F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg. (P&F) 877, 2008 WL 65485 (F.C.C.) (2008).
[5] *FCC Declaratory Ruling*, 23 F.C.C.R. at 564-65 (¶ 10).

---

**FACTUAL ALLEGATIONS**

**Plaintiff Steinfeld's Allegations**

16.     At all times relevant, Plaintiff Steinfeld was an individual residing in the State of California.  Plaintiff Steinfeld is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(10).

17.     On or around January 23, 2011, Plaintiff Steinfeld took out a credit card with Discover.

18.     Beginning in or around December 2011, Discover repeatedly contacted Plaintiff Steinfeld on his cellular telephone.  Plaintiff received repeated, harassing calls at all hours of the day.  Because these calls were prerecorded, Plaintiff had no ability to request that the calls end or to voice his complaints to a real person.

**Plaintiff Bradley's Allegations**

19.     At all times relevant, Plaintiff Bradley was an individual residing in the State of California.  Plaintiff Bradley is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(10).

20.     At least 25 calls were placed by Discover to Plaintiff Bradley's cellular telephone using an automatic telephone dialing system.

21.     During several of the calls, Plaintiff Bradley clearly and unequivocally instructed Discover to stop calling his cell phone.

**Plaintiffs' Joint Allegations**

22.     Discover is, and at all times mentioned herein was, a "person", as defined by 47 U.S.C. § 153(10).

23.     All telephone contact by Discover to Plaintiffs on their cellular telephone occurred via an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), and used "an artificial or prerecorded voice" as described in 47 U.S.C. § 227(b)(1)(A).

24.     The telephone number that Discover used to contact Plaintiffs, with a "prerecorded voice" made by an "automatic telephone dialing system," were assigned to a cellular telephone service as specified in 47 U.S.C. § 227(b)(1)(A)(iii).

25.     The complained of telephone calls constituted calls not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A)(i).

26.     "During the transaction that resulted in the debt owed," Plaintiffs did not provide express consent to receive prerecorded calls by Discover on Plaintiffs' cellular telephones.[6]

27.     Plaintiffs did not provide "express consent" allowing Discover to place telephone calls to Plaintiffs' cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system," within the meaning of 47 U.S.C. § 227(b)(1)(A).

28.     Discover did not make telephone calls to Plaintiffs' cellular phone "for emergency purposes" utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system," as described in 47 U.S.C. § 227(b)(1)(A).

29.     Discover's telephone calls to Plaintiffs' cellular phone utilizing an "artificial or prerecorded voice" or placed by an "automatic telephone dialing system" for non-emergency purposes and in the absence of Plaintiff's prior express consent violated 47 U.S.C. § 227(b)(1)(A).

30.     Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Discover to demonstrate that Plaintiffs provided express consent within the meaning of the statute.[7]

## CLASS ACTION ALLEGATIONS

31.     Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated (hereinafter referred to as "the Class").

32.     Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons to whom, on or after November 30, 2007 through the date of Preliminary Approval, Discover Financial Services or any of its affiliates or subsidiaries placed a non-emergency telephone call to a cellular telephone through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice.

---

[6] *See FCC Declaratory Ruling*, 23 F.C.C.R. at 564-65 (¶ 10).
[7] *See FCC Declaratory Ruling*, 23 F.C.C.R. at 565 (¶ 10).

1   Collectively, all these persons will be referred to as "Class members."  Plaintiffs represent, and

2   are members of, the Class.  Excluded from the Class are the Judges to whom the Actions are

3   assigned and any member of the Judges' staff and immediate family, as well as all persons who

4   validly request exclusion from the Settlement Class.  Plaintiffs do not know the exact number of

5   members in the Class, reasonably believes that Class members number in the millions.

6         33.    Plaintiffs and all members of the Class have been harmed by the acts of

7   Discover.

8         34.    This Class Action Complaint seeks injunctive relief and money damages.

9         35.    The joinder of all Class members is impracticable due to the size and

10  relatively modest value of each individual claim.  The disposition of the claims in a class action

11  will provide substantial benefit the parties and the Court in avoiding a multiplicity of identical

12  suits.  The Class can be identified easily through records maintained by Discover.

13        36.    There are well defined, nearly identical, questions of law and fact affecting

14  all parties.  The questions of law and fact involving the class claims predominate over questions

15  which may affect individual Class members.  Those common questions of law and fact include,

16  but are not limited to, the following:

17            a.    Whether Discover made non-emergency calls to
         Plaintiffs and Class members' cellular telephones using an
18       automatic telephone dialing system or an artificial or prerecorded
         voice;
19

20            b.    Whether Discover can meet its burden of showing it
         obtained prior express consent (*i.e.*, consent that is clearly and
21       unmistakably stated), during the transaction that resulted in the debt
         owed, to make such calls;

22            c.    Whether Discover's conduct was knowing and/or willful;

23            d.    Whether Discover is liable for damages, and the amount of such

24       damages; and

25            e.    Whether Discover should be enjoined from engaging
         in such conduct in the future.
26

27        37.    As persons who received numerous and repeated telephone calls using an

28  automatic telephone dialing system or an artificial or prerecorded voice, without their prior

1    express consent within the meaning of the TCPA, Plaintiffs assert claims that are typical of each

2    Class member.  Plaintiffs will fairly and adequately represent and protect the interests of the

3    Class, and has no interests which are antagonistic to any member of the Class.

4            38.     Plaintiffs have retained counsel experienced in handling class action claims

5    involving violations of federal and state consumer protection statutes, including claims under the

6    TCPA.

7            39.     A class action is the superior method for the fair and efficient adjudication

8    of this controversy.  Class wide relief is essential to compel Discover to comply with the TCPA.

9    The interest of Class members in individually controlling the prosecution of separate claims

10   against Discover is small because the statutory damages in an individual action for violation of

11   the TCPA are small.  Management of these claims is likely to present significantly fewer

12   difficulties than are presented in many class claims because the calls at issue are all automated

13   and the Class members, by definition, did not provide the prior express consent required under the

14   statute to authorize calls to their cellular telephones.

15           40.     Discover has acted on grounds generally applicable to the Class, thereby

16   making final injunctive relief and corresponding declaratory relief with respect to the Class as a

17   whole appropriate.  Moreover, on information and belief, Plaintiffs allege that the TCPA

18   violations complained of herein are substantially likely to continue in the future if an injunction is

19   not entered.

20                                **CAUSES OF ACTION**

21                                  **FIRST COUNT**

22       **KNOWING AND/OR WILLFUL VIOLATIONS OF THE TELEPHONE
         CONSUMER PROTECTION ACT, 47 U.S.C. §  227 *ET SEQ.***
23

24           41.     Plaintiffs incorporate by reference the foregoing paragraphs of this

25   Complaint as if fully stated herein.

26           42.     The foregoing acts and omissions of Discover constitute numerous and

27   multiple knowing and/or willful violations of the TCPA, including but not limited to each of the

28   above-cited provisions of 47 U.S.C. §  227 *et seq.*

1    43.    As a result of Discover's knowing and/or willful violations of 47 U.S.C. §

2    227 *et seq.*, Plaintiffs and each member of the Class are entitled to treble damages of up to

3    $1,500.00 for each and every call in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

4    44.    Plaintiffs and all Class members are also entitled to and do seek injunctive

5    relief prohibiting such conduct violating the TCPA by Discover in the future.

6    45.    Plaintiffs and Class members are also entitled to an award of attorneys'

7    fees and costs.

8    ## SECOND COUNT

9    **STRICT LIABILITY VIOLATIONS OF THE TELEPHONE CONSUMER
PROTECTION ACT 47 U.S.C. §  227 *ET SEQ.*.**

10

11    46.    Plaintiffs incorporate by reference the foregoing paragraphs of this

12    Complaint as if fully set forth herein.

13    47.    The foregoing acts and omissions of Discover constitute numerous and

14    multiple negligent violations of the TCPA, including but not limited to each of the above cited

15    provisions of 47 U.S.C. §  227 *et seq.*

16    48.    As a result of Discover's negligent violations of 47 U.S.C. §  227 *et seq.*,

17    Plaintiffs and Class members are entitled to an award of $500.00 in statutory damages for each

18    and every call in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

19    49.    Plaintiffs and Class members are also entitled to and do seek injunctive

20    relief prohibiting Discover's violation of the TCPA in the future.

21    50.    Plaintiffs and Class members are also entitled to an award of attorneys'

22    fees and costs.

23    ## PRAYER FOR RELIEF

24    WHEREFORE, Plaintiffs respectfully request that the Court grant Plaintiffs and all

25    Class members the following relief against Defendant:

26    A.    Injunctive relief prohibiting such violations of the TCPA by Discover in

27    the future;

28    B.    As a result of Discover's willful and/or knowing violations of 47 U.S.C.

1 § 227(b)(1), Plaintiffs seek for themselves and each Class member treble damages, as provided by

2 statute, of up to $1,500.00 for each and every call that violated the TCPA;

3         C.      As a result of Discover's negligent violations of 47 U.S.C. § 227(b)(1),

4 Plaintiffs seek for themselves and each Class member $500.00 in statutory damages for each and

5 every call that violated the TCPA;

6         D.      An award of attorneys' fees and costs to counsel for Plaintiffs and the

7 Class;

8         E.      An order certifying this action to be a proper class action pursuant to

9 Federal Rule of Civil Procedure 23, establishing an appropriate Class and any Subclasses the

10 Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and

11 appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

12         F.      Such other relief as the Court deems just and proper.

13

14 Dated: May 17, 2012             By:  _/s/ Jonathan D. Selbin_____

15                                   Jonathan D. Selbin

16                         LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP

17                         Jonathan D. Selbin
Email:  jselbin@lchb.com

18                         250 Hudson Street, 8th Floor
New York, NY  10013

19                         Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

20                         LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

21                         Daniel M. Hutchinson
Email:  dhutchinson@lchb.com

22                         Nicole D. Reynolds
Email:  nreynolds@lchb.com

23                         275 Battery Street, 29th Floor
San Francisco, California  94111-3339

24                         Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

25

26

27

28

1
2
3
4
5

TERRELL MARSHALL DAUDT
& WILLIE PLLC
Beth E. Terrell
bterrell@tmdwlaw.com
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 350-3528

6
7
8
9
10

CASEY, GERRY, SCHENK, FRANCAVILLA, BLATT,
& PENFIELD LLP
Mark Ankcorn
mark@cglaw.com
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

11
12
13
14
15
16

MEYER WILSON CO., LPA
David P. Meyer
(admitted *pro hac vice*)
Email:  dmeyer@meyerwilson.com
Matthew R. Wilson
(admitted *pro hac vice*)
Email:  mwilson@meyerwilson.com
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066

17

*Attorneys for Plaintiffs and the Proposed Class*

18
19
20
21
22
23
24
25
26
27
28

1

## **DEMAND FOR JURY TRIAL**

2
Plaintiffs demand a trial by jury on all counts so triable.

3

Dated: May 17, 2013

4

By: _/s/ Jonathan D. Selbin_____
Jonathan D. Selbin

5

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP

6
Jonathan D. Selbin
Email:  jselbin@lchb.com

7
250 Hudson Street, 8th Floor
New York, NY  10013

8
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

9

TERRELL MARSHALL DAUDT

10
& WILLIE PLLC
Beth E. Terrell

11
bterrell@tmdwlaw.com

12
936 North 34th Street, Suite 400
Seattle, Washington  98103-8869

13
Telephone: (206) 816-6603
Facsimile: (206) 350-3528

14

CASEY, GERRY, SCHENK, FRANCAVILLA, BLATT,

15
& PENFIELD LLP
Mark Ankcorn

16
mark@cglaw.com

17
110 Laurel Street
San Diego, CA  92101

18
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

19

MEYER WILSON CO., LPA

20
David P. Meyer
(admitted *pro hac vice*)

21
Email:  dmeyer@meyerwilson.com
Matthew R. Wilson

22
(admitted *pro hac vice*)
Email:  mwilson@meyerwilson.com

23
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215

24
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066

25

*Attorneys for Plaintiffs and the Proposed Class*

26

27

28

966418.2

- 11 -

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT B**

**CLAIM FORM**

LA 51641542

*Andrew Steinfeld v. Discover Financial Services, et al., U.S.D.C.,*
*Northern District of California Case No. 3:12-cv-01118-JSW*

## <u>CLAIM FORM</u>

**To receive benefits from this Settlement, your Claim Form must be received on or before _____.**

**Mail your completed and signed Claim Form to:**          **Complete a Claim Form via the Internet at:**

[_____] Settlement Administrator          **OR**          [ _____ ]
[ _____ ]
[ _____ ]

**YOU MUST PROVIDE ALL OF THE INFORMATION BELOW, AND YOU MUST SIGN THIS CLAIM FORM, AS DIRECTED, TO APPLY FOR A SETTLEMENT PAYMENT.**

1.  **CLAIMANT INFORMATION:**

_____   _____   _____
FIRST NAME                      MIDDLE NAME      LAST NAME

_____
ADDRESS 1

_____
ADDRESS 2

_____   _____   _____ - _____
CITY                                                          STATE       ZIP       (optional)

_____
LAST FOUR DIGITS OF SOCIAL SECURITY NUMBER

2.  **EITHER** provide the last four digits of **ALL** of your Discover account(s) as to which you received one or more non-emergency contacts from Discover Financial Services or related parties (including one of Discover Bank, The Student Loan Corporation and/or Discover Home Loans) between November 30, 2007 and [date of preliminary approval of the settlement] (the "Class Period") here:

_____
ACCOUNT NUMBER(S) (IF APPLICABLE) AS TO WHICH YOU RECEIVED A CALL OR CALLS

**OR**, if you have not been a Discover account holder, state your cellular telephone number at which Discover contacted you

_____
CELLULAR TELEPHONE NUMBER

3.  **CHOOSE AN AWARD.  Check <u>One</u> Box Only:**

[  ]   **Cash Award.**  By checking the box for Cash Award, you are electing to receive a Settlement Award in the form of a check.

[  ]   **Credit Award.**  By checking the box for Credit Award, you are electing to receive a Settlement Award in the form of a credit to your Discover credit card account.  To receive a Credit Award, you must indicate the last four digits of your credit card account to which you elect to receive a credit: _____.
                                              LAST FOUR DIGITS OF ACCOUNT

Please note that if you have one or more extensions of credit with Discover that has been revoked or charged off, Discover at its option may apply a one-time reduction to the balance of such extensions of credit in lieu of you receiving a Cash Award.

4.  **AFFIRMATION:**

I declare that, on or after November 30, 2007 until [date of preliminary approval of settlement], I received one or more non-emergency telephone calls and/or text messages from Discover Financial Services or related parties (including one of Discover Bank, The Student Loan Corporation and/or Discover Home Loans) to my cellular telephone through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice.

Signature: _____   Name (please print): _____   Date: _____

## QUESTIONS? VISIT [Internet URL] OR CALL [_____].

**<u>EXHIBIT C</u>**

**<u>E-MAIL, MAIL AND WEBSITE NOTICE</u>**

Exhibit C
E-mail, Mail and Website Notice

LA 51641542

**IF YOU RECEIVED A CALL THROUGH THE USE OF AN AUTOMATIC TELEPHONE DIALING SYSTEM AND/OR A PRE-RECORDED VOICE FROM DISCOVER TO YOUR CELLULAR TELEPHONE ON OR AFTER NOVEMBER 30, 2007, THIS NOTICE DESCRIBES YOUR RIGHTS IN CONNECTION WITH SETTLEMENT OF A LAWSUIT AND YOUR POTENTIAL RECOVERY.**

You may be entitled to a payment under a proposed class action settlement.  In the lawsuit entitled <u>Andrew Steinfeld v. Discover Financial Services, et al.</u>, U.S.D.C., Northern District of California Case No. 3:12-cv-01118-JSW (the "Action"), Plaintiffs claim that Discover Financial Services or related parties (including Discover Bank, The Student Loan Corporation and Discover Home Loans) ("Discover") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. (the "TCPA"), by placing calls on or after November 30, 2007 to cellular telephones through the use of an automatic telephone dialing system or an artificial or prerecorded voice without the prior express consent of Plaintiffs and the putative class members.  Discover denies these claims and denies any claim of wrongdoing.  The Court has not decided who is right.  However, in settlement of the Action, Discover has agreed to implement practice changes and establish a settlement fund of $8.7 million.  **This notice is only a summary.  Details of the settlement, including information on how to file a claim, are available at _____ or by writing to or calling the Claims Administrator at the address or toll-free number below.**

Discover's records indicate that you may be a member of the Settlement Class because Discover may have placed a call to your cellular telephone number using an automatic telephone dialing system or an artificial or prerecorded voice at some time between November 30, 2007 and _____.   Settlement Class Members may (1) submit Revocation Request Forms requesting that Discover cease making calls to their cellular telephone numbers using an automatic telephone dialing system or an artificial or prerecorded voice, (2) submit Claim Forms requesting money from the settlement in the form of a check or in the form of a one-time credit against the balance of the their Discover credit card account, (3) exclude themselves from the settlement, (4) object to the settlement, and/or (5) do nothing.  Class Counsel estimate that settlement payments or credits will be between $20 and $40, but could be more or less based on factors including the number of claims submitted.

**You cannot receive a payment unless your claim is received by _____.**  In addition to payments to the Settlement Class members, the settlement provides for not more than $2,175,000 in attorneys' fees and costs and $2,000 service awards for the two representative plaintiffs to be sought from the Court by counsel for the Settlement Class.  In the event that there are any remaining monies from uncashed checks totaling $50,000 or less, such monies will be paid to charity.

If you do not want to be legally bound by the settlement, you may opt out of the settlement by sending a request for exclusion to the Claims Administrator **no later than _____**.  If you exclude yourself from the settlement, you will not receive any money or other benefits from the settlement.  If you stay in the settlement (*i.e.* do not exclude yourself from the settlement), you may object to the settlement by explaining in writing why you do not like the settlement by **no later than _____**.  You will be bound by the settlement if your objection is rejected.  If you do nothing (*i.e.* submit no claim or request for exclusion) you will not receive any benefits from the settlement but will nevertheless be bound to the settlement.  All Settlement Class Members who do not exclude themselves will be bound by any judgment approving the settlement and will give up any right to sue Discover or related parties for any known or unknown claims relating to calls made to their cellular telephone numbers, including alleged violations of the TCPA.

**TO OBTAIN FULL INSTRUCTIONS FOR EXCLUDING YOURSELF, FILING AN OBJECTION, SUBMITTING A REVOCATION REQUEST FORM, OR SUBMITTING A CLAIM FORM, GO TO _____, OR WRITE OR CALL THE CLAIMS ADMINISTRATOR AT _____ OR (___) ___-___ (TOLL-FREE).**

**THIS IS ONLY A SUMMARY OF THE SETTLEMENT AND YOUR RIGHTS.  DO NOT CALL OR WRITE TO THE COURT OR THE CLERK OF THE COURT.  DO NOT CONTACT DISCOVER ABOUT THE SETTLEMENT.  TELEPHONE REPRESENTATIVES ARE NOT AUTHORIZED TO CHANGE THE TERMS OF THE SETTLEMENT OR THIS NOTICE.**

**[E-MAIL, MAIL AND WEBSITE NOTICE]**

**<u>EXHIBIT D</u>**

**<u>FINAL APPROVAL ORDER</u>**

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

8

**NORTHERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| 10 ANDREW STEINFELD, on behalf of himself and all others similarly situated, | ) Case No. 3:12-cv-01118-JSW |
| 11 | ) [Assigned to the Hon. Jeffrey S. White] |
| Plaintiff, | ) |
| 12 | ) |
| vs. | ) **[PROPOSED] FINAL JUDGMENT AND** |
| 13 | ) **ORDER OF DISMISSAL** |
| DISCOVER FINANCIAL SERVICES, DFS | ) |
| 14 SERVICES LLC, and DISCOVER BANK, | ) |
| | ) |
| 15 Defendants. | ) |
| 16 | ) |
| | ) |
| 17 | ) |

18
19
20
21
22
23
24
25
26
27
28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

## [PROPOSED] FINAL JUDGMENT AND ORDER OF DISMISSAL

The Court having held a Final Approval Hearing on _____, notice of the Final Approval Hearing having been duly given in accordance with this Court's Order (1) Conditionally Certifying a Settlement Class, (2) Preliminarily Approving Class Action Settlement, (3) Approving Notice Plan, and (4) Setting Final Approval Hearing ("Preliminary Approval Order"), and having considered all matters submitted to it at the Final Approval Hearing and otherwise, and finding no just reason for delay in entry of this Final Judgment and good cause appearing therefore,

It is hereby ORDERED, ADJUDGED AND DECREED as follows:

1.     The Settlement Agreement dated _____, including its exhibits (the "Settlement Agreement"), and the definition of words and terms contained therein are incorporated by reference in this Order.  The terms of this Court's Preliminary Approval Order are also incorporated by reference in this Order.

2.     This Court has jurisdiction over the subject matter of the Actions and over the Parties, including all members of the following Settlement Class certified for settlement purposes in this Court's Preliminary Approval Order:

SETTLEMENT CLASS:  All persons to whom, on or after November 30, 2007 through [the date of Preliminary Approval Order], Discover Financial Services or any of its affiliates or subsidiaries placed a non-emergency telephone call to a cellular telephone through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice.  Excluded from the Settlement Class are the Judges to whom the Actions are assigned and any member of the Judges' staff and immediate family, as well as all persons who validly request exclusion from the Settlement Class.

3.     The Court hereby finds that the Settlement Agreement is the product of arm's length settlement negotiations between the Plaintiffs and Class Counsel, and Discover.

4.     The Court hereby finds and concludes that Class Notice was disseminated to members of the Settlement Class in accordance with the terms set forth in Section III.F of the Settlement Agreement, that the Publication Notice was published in accordance with the terms set

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1   forth in the Settlement Agreement, and that Class Notice and its dissemination were in compliance

2   with this Court's Preliminary Approval Order.

3          5.      The Court further finds and concludes that the Class Notice and claims submission

4   procedures set forth in  Section III.F and III.G of the Settlement Agreement fully satisfy Rule 23 of

5   the Federal Rules of Civil Procedure and the requirements of due process, were the best notice

6   practicable under the circumstances, provided individual notice to all members of the Settlement

7   Class who could be identified through reasonable effort, and support the Court's exercise of

8   jurisdiction over the Settlement Class as contemplated in the Settlement and this Order.

9          6.      This Court hereby finds and concludes that the notice provided by Discover to the

10  appropriate State and federal officials pursuant to 28 U.S.C. § 1715 fully satisfied the requirements

11  of that statute.

12         7.      The Court hereby finally approves the Settlement Agreement and the Settlement

13  contemplated thereby, and finds that the terms constitute, in all respects, a fair, reasonable, and

14  adequate settlement as to all Settlement Class Members in accordance with Rule 23 of the Federal

15  Rules of Civil Procedure, and directs its consummation pursuant to its terms and conditions.

16         8.      This Court hereby dismisses, with prejudice, without costs to any party, except as

17  expressly provided for in the Settlement Agreement, the Actions.

18         9.      Upon Final Approval (including, without limitation, the exhaustion of any judicial

19  review, or requests for judicial review, from this Final Judgment and Order of Dismissal), the

20  Plaintiffs and each and every one of the Settlement Class Members unconditionally, fully, and

21  finally releases and forever discharges the Released Parties from the Released Claims.  In addition,

22  any rights of the Settlement Class representatives and each and every one of the Settlement Class

23  Members to the protections afforded under Section 1542 of the California Civil Code and/or any

24  other similar, comparable, or equivalent laws, are terminated.

25         10.     Each and every Settlement Class Member, and any person actually or purportedly

26  acting on behalf of any Settlement Class Member(s), is hereby permanently barred and enjoined

27  from commencing, instituting, continuing, pursuing, maintaining, prosecuting, or enforcing any

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

1    Released Claims (including, without limitation, in any individual, class or putative class,

2    representative or other action or proceeding), directly or indirectly, in any judicial, administrative,

3    arbitral, or other forum, against the Released Parties.  This permanent bar and injunction is

4    necessary to protect and effectuate the Settlement Agreement, this Final Judgment and Order of

5    Dismissal, and this Court's authority to effectuate the Settlement Agreement, and is ordered in aid

6    of this Court's jurisdiction and to protect its judgments.

7    　　　　11.　　The Settlement Agreement (including, without limitation, its exhibits), and any and

8    all negotiations, documents, and discussions associated with it, shall not be deemed or construed to

9    be an admission or evidence of any violation of any statute, law, rule, regulation or principle of

10   common law or equity, of any liability or wrongdoing, by Discover, or of the truth of any of the

11   claims asserted by Plaintiffs in the Actions, and evidence relating to the Settlement Agreement

12   shall not be discoverable or used, directly or indirectly, in any way, whether in the Actions or in

13   any other action or proceeding, except for purposes of enforcing the terms and conditions of the

14   Settlement Agreement, the Preliminary Approval Order, and/or this Order.

15   　　　　12.　　If for any reason the Settlement terminates or Final Approval does not occur, then

16   certification of the Settlement Class shall be deemed vacated.  In such an event, the certification of

17   the Settlement Class for settlement purposes shall not be considered as a factor in connection with

18   any subsequent class certification issues, and the Parties shall return to the *status quo ante* in the

19   Actions, without prejudice to the right of any of the Parties to assert any right or position that could

20   have been asserted if the Settlement had never been reached or proposed to the Court.

21   　　　　13.　　In the event that any provision of the Settlement or this Final Judgment and Order of

22   Dismissal is asserted by Discover as a defense in whole or in part to any Claim, or otherwise

23   asserted (including, without limitation, as a basis for a stay) in any other suit, action, or proceeding

24   brought by a Settlement Class Member or any person actually or purportedly acting on behalf of

25   any Settlement Class Member(s), that suit, action or other proceeding shall be immediately stayed

26   and enjoined until this Court or the court or tribunal in which the claim is pending has determined

27   any issues related to such defense or assertion.  Solely for purposes of such suit, action, or other

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

1   proceeding, to the fullest extent they may effectively do so under applicable law, the Parties

2   irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim

3   or objection that they are not subject to the jurisdiction of the Court, or that the Court is, in any

4   way, an improper venue or an inconvenient forum.  These provisions are necessary to protect the

5   Settlement Agreement, this Order and this Court's authority to effectuate the Settlement, and are

6   ordered in aid of this Court's jurisdiction and to protect its judgment.

7   　　　　14.　　By attaching the Settlement Agreement as an exhibit and incorporating its terms

8   herein, the Court determines that this Final Judgment complies in all respects with Federal Rule of

9   Civil Procedure 65(d)(1).

10  　　　　15.　　The Court approves Class Counsel's application for $_____ in attorneys'

11  fees and costs, and for service awards to the Settlement Class representatives in the amount of

12  $_____.

13  　　　　16.　　Finding that there is no just reason for delay, the Court orders that this Final

14  Judgment and Order of dismissal shall constitute a final judgment pursuant to Rule 54 of the

15  Federal Rules of Civil Procedure.  The Clerk of the Court is directed to enter this Order on the

16  docket forthwith.

17  　　　　SO ORDERED.

18  Dated:_____       _____

19  　　　　　　　　　　　　　　　　　　　Hon. Jeffrey S. White
    　　　　　　　　　　　　　　　　　　　United States District Court Judge

20

21

22

23

24

25

26

27

28

**EXHIBIT E**

**PRELIMINARY APPROVAL ORDER**

LA 51641542

1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

10

11

12

13

14

15

16

17

| | |
|---|---|
| ANDREW STEINFELD, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>  vs.<br><br>DISCOVER FINANCIAL SERVICES, DFS SERVICES LLC, and DISCOVER BANK,<br><br>    Defendants. | Case No. 3:12-cv-01118-JSW<br><br>[Assigned to the Hon. Jeffrey S. White]<br><br>**[PROPOSED] ORDER (1) CONDITIONALLY CERTIFYING A SETTLEMENT CLASS, (2) PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT, (3) APPROVING NOTICE PLAN, AND (4) SETTING FINAL APPROVAL HEARING** |

18

19

20

21

22

23

24

25

26

27

28

1

### [PROPOSED] ORDER

2       Subject to Court approval, Plaintiffs Andrew Steinfeld and Walter Bradley ("Plaintiffs" or

3  "Settlement Class Representatives"), on the one hand, and Discover Financial Services, DFS

4  Services LLC and Discover Bank, acting on behalf of themselves, their affiliated persons and

5  entities and all persons and entities acting for or on its or their behalf (collectively, "Discover") on

6  the other hand, entered into an Agreement dated May 17, 2013 in proposed settlement of the

7  actions entitled <u>Walter Bradley v. Discover Financial Services</u>, U.S.D.C., Northern District of

8  California Case No. 4:11-cv-5746-YGR ("<u>Bradley</u>"), and <u>Andrew Steinfeld v. Discover Financial</u>

9  <u>Services, et al.</u>, U.S.D.C., Northern District of California Case No. 3:12-cv-01118-JSW

10 ("<u>Steinfeld</u>") (<u>Bradley</u> and <u>Steinfeld</u> are collectively referred to herein as the "Actions") (together

11 with its exhibits, the "Agreement").

12      Application has been made for preliminary approval of the settlement set forth in the

13 Agreement (the "Settlement"), upon the terms and conditions in the Agreement.  The Court has

14 received and reviewed (1) the Agreement and all exhibits attached thereto; (2) Plaintiffs'

15 Memorandum in Support of the Motion for Preliminary Approval of Settlement, Conditional

16 Certification of the Settlement Class, Approval of Notice Plan, and Setting of Final Approval

17 Hearing and all exhibits attached thereto; and (3) all other pleadings and matters of record.

18      The Court preliminarily considered the Settlement to determine, among other things,

19 whether the Settlement is sufficient to warrant the issuance of notice to members of the Settlement

20 Class (as defined below).  Upon review of the Agreement, it is hereby ORDERED as follows:

21      1.      The Court has jurisdiction over the subject matter of the Actions, the Parties and all

22 Settlement Class Members.

23      2.      The definitions and terms set forth in the Agreement are hereby adopted and

24 incorporated into this Preliminary Approval Order.

25      3.      Subject to this Court's authority to determine whether to finally approve the

26 Settlement at the final approval hearing ("Final Approval Hearing") described in Paragraph 21 of

27 this Preliminary Approval Order:

28

-1-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

(a)     The Court hereby preliminarily approves the Agreement and the Settlement contemplated thereby, as being a fair, reasonable and adequate settlement as to all members of the Settlement Class within the meaning of Rule 23 of the Federal Rules of Civil Procedure, and as being the product of informed, arm's length negotiation by counsel, and directs the Parties to proceed with the Settlement pursuant to the terms and conditions of the Agreement and exhibits thereto.

(b)     The terms of the Agreement are preliminarily approved for the purpose of providing Class Notice to the Settlement Class.

4.      The Court, pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, conditionally certifies, for purposes of this Settlement only, the following Settlement Class in <u>Steinfeld</u>, subject to further consideration at the Final Approval Hearing:

> All persons to whom, on or after November 30, 2007 through the date of this Preliminary Approval Order, Discover Financial Services or any of its affiliates or subsidiaries placed a non-emergency telephone call to a cellular telephone through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice. Excluded from the Settlement Class are the Judges to whom the Actions are assigned and any member of the Judges' staff and immediate family, as well as all persons who validly request exclusion from the Settlement Class.

5.      The Court hereby approves Plaintiffs as representatives of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and finds that, for settlement purposes only, these representative plaintiffs have and will fairly and adequately protect the interests of the Settlement Class.

6.      The Court hereby also approves Lieff Cabraser Heimann & Bernstein, LLP, Meyer Wilson Co., LPA, Casey Gerry Schenk Francavilla Blatt & Penfield LLP and Terrell Marshall Daudt & Willie PLLC, as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure, and finds that for settlement purposes, Class Counsel have and will fairly and adequately protect the interests of the Settlement Class.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

7.      Class Counsel are authorized to act on behalf of the Settlement Class with respect to all acts required by the Agreement or such other acts which are reasonably necessary to consummate the proposed Settlement set forth in the Agreement.

8.      Neither certification of the Settlement Class for settlement purposes only, nor any other act relating to the negotiation, execution or implementation of the Agreement, shall be considered as a factor in connection with any class certification issue(s) if the Agreement terminates or final approval does not occur.

9.      Pending final approval of the Settlement, Discover shall advance the amounts necessary to pay for costs of Class Notice and settlement administration; these advances shall be credited against the Settlement Amount.  Prior to the Final Approval Hearing, the Settling Parties shall select the Escrow Agent and negotiate with the Escrow Agent a mutually acceptable escrow agreement (the "Escrow Agreement") that shall provide the terms and conditions governing the Fund to be established if the Settlement receives final approval.  Notwithstanding any deadlines to the contrary in the Agreement, Discover shall not be required to make any payment into the Fund until the Escrow Agreement has been executed.

10.     The Fund shall be subject to the continuing jurisdiction of the Court.  The Escrow Agent shall not disburse any portion of the Fund except as provided in the Agreement and with the written agreement of Class Counsel and counsel for Discover or by order of the Court.

11.     The Court hereby finds and orders that the proposed Class Notice program set forth in Section III.F of the Agreement, and the claims submission plan set forth in Section III.G of the Agreement, fully satisfy Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, provide the best notice practicable under the circumstances to the members of the Settlement Class, provide individual notice to all members of the Settlement Class who or which can be identified through reasonable effort, and provide publication notice to members of the Settlement Class.

12.     The Court hereby approves the form and substance of the Claim Form (attached to the Agreement as Exhibit B); the E-mail Notice, Mail and Website Notice (attached to the

-3-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

Agreement as Exhibit C); the Publication Notice (attached to the Agreement as Exhibit F); and the Revocation Request Form (attached to the Agreement as Exhibit G).  The Court hereby instructs the Parties to proceed with Class Notice in the manner and on the schedule set forth in Sections III.F of the Agreement, provided that the Parties, by agreement, may revise the E-Mail Notice, the Mail Notice, the Website Notice, the Publication Notice, the Claim Form and/or the Revocation Request Form in ways that are not material, or in ways that are appropriate to update those documents for purposes of accuracy and clarity and may adjust the layout of those documents for efficient mailing and/or electronic presentation.

13.    Discover and/or the Claims Administrator shall be responsible for providing Class Notice of the preliminarily approved Settlement to the Settlement Class in accordance with the provisions of the Agreement and this Preliminary Approval Order.

14.    Class Notice shall be completed no later than the Notice Deadline.  The deadline for submitting a claim shall be _____, 20__.

15.    Discover shall, at least _____ (_) days prior to the Final Approval Hearing, file with the Court a declaration or declarations confirming any notice that it provided in accordance with the Agreement and describing the notices it provided to the appropriate State and federal officials pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715.

16.    Class Counsel shall instruct the Claims Administrator to file with the Court, by at least _____ (_) days prior to the Final Approval Hearing, proof that Class Notice was provided in accordance with the Agreement.

17.    The Class Notice will inform members of the Settlement Class of their right to submit a request for exclusion, or "opt-out," from the conditionally certified Settlement Class.  The Class Notice will inform members of the Settlement Class that they may opt out of the Settlement by sending a written request ("Exclusion Request") to the Claims Administrator at the address designated in the Class Notice by the Opt-Out and Objection Deadline.

18.    Exclusion requests must:  (i) be signed by the Settlement Class Member for whose account(s) exclusion is requested; (ii) include the full name, address and account number(s) (if

-4-

known) of the Settlement Class Member requesting exclusion; and (iii) include the following statement: "I/we request to be excluded from the settlement in the <u>Steinfeld</u> action." No Exclusion Request will be valid unless all of the information described above is included. For any Settlement Class Member who has more than one account, the Exclusion Request must specify each separate account. No Settlement Class Member, or any person acting on behalf of or in concert or participation with that Settlement Class Member, may exclude any other Settlement Class Member from the Settlement Class.

19.     If a timely and valid Exclusion Request is made by a member of the Settlement Class, then that person shall not be a Settlement Class Member, and the Agreement and any determinations, judgments, and/or orders concerning it shall not bind the excluded person.

20.     All Settlement Class Members who do not opt out in accordance with the terms set forth in the Agreement shall be bound by all determinations and judgments concerning the Agreement and the Settlement contemplated thereby. In the event that the number of accounts which are opted out of the Settlement Class exceeds 500, Discover may terminate the Settlement.

21.     The Court's preliminary approval of the Settlement shall be subject to further consideration at a hearing to be held before this Court on _____ at _____ (the "Final Approval Hearing"). The Court will determine at or following the Final Approval Hearing whether the proposed settlement is fair, reasonable, and adequate and should be finally approved by the Court, the amount of attorneys' fees and costs that should be awarded to Class Counsel, and any amounts to be awarded to the Settlement Class Representatives for their contributions to the Settlement Class. The date and time of the Final Approval Hearing shall be set forth in the Class Notice. The Court retains jurisdiction to consider all further applications arising out of or in connection with the Agreement.

22.     The Parties shall make the following filings:

•     By no later than _____ (__) days prior to the Final Approval Hearing, Class Counsel shall file an application for attorneys' fees, Settlement Class Representatives' Awards, and reimbursement of costs, as contemplated in the Agreement.

-5-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

• By no later than _____ (__) days prior to the Final Approval Hearing, Class Counsel and/or counsel for Discover shall file with the Court any papers in support of final approval of the Settlement, including any response to any timely filed objections to the Settlement. Copies of all papers shall be served upon all persons or their counsel who file a valid and timely objection to the Settlement (as described in Paragraph 23 below).

• Not later than _____ (__) days before the date fixed by this Court for the Final Approval Hearing, Class Counsel shall cause to be filed with the Clerk of this Court: (a) a list of Settlement Class Members who made timely and proper Exclusion Requests; and (b) a response to any objection to the request for an award of Attorneys' Fees and Expenses of Class Counsel.

23. Any member of the Settlement Class may appear at the Final Approval Hearing, in person or by counsel (if an appearance is filed and served), and may be heard, to the extent allowed by the Court in support of, or in opposition to, the fairness, reasonableness, and adequacy of the Settlement, the application for an award of attorney's fees, costs, and expenses to Class Counsel, and any compensation to be awarded to the Settlement Class Representatives. Unless such requirement is excused by the Court, no person shall be heard in opposition to the Settlement, the application for an award of attorneys' fees and costs to Settlement Class Counsel, or to any compensation to be awarded to the Settlement Class Representatives unless, no later than the Opt-Out and Objection Deadline, such member of the Settlement Class files with the Clerk of the Court a notice of an intention to appear together with a statement that indicates all bases for such opposition along with any supporting documentation, including proof of membership in the Settlement Class, and legal authority, if any, supporting the objection. Copies of such notice, statement, and documentation, together with copies of any other papers or briefs filed with the Court, must be simultaneously delivered to Class Counsel and counsel for Discover. Any Settlement Class Member who does not object in the foregoing manner shall be deemed to have waived all objections and shall be foreclosed from making any objections to the Agreement.

24. The Court reserves the right to adjourn and/or reschedule the Final Approval Hearing without further notice of any kind; therefore, any Settlement Class Member intending to

-6-

attend the Final Approval Hearing should (in addition to complying with all instructions and requirements above) confirm the date, time, and location of the Final Approval Hearing with Class Counsel.

25. All members of the Settlement Class, except those members of the Settlement Class who validly opt-out and submit timely Exclusion Requests, shall be bound by all determinations and judgments in the Actions, whether favorable or unfavorable to the Settlement Class.

26. Pending the final determination of whether the Settlement should be approved, all pre-trial proceedings and briefing schedules in the <u>Steinfeld</u> are stayed. If the Settlement is terminated or final approval does not for any reason occur, the stay shall be immediately terminated.

27. Pending the final determination of whether the Settlement should be approved, the Settlement Class Representatives and each Settlement Class Member is hereby stayed and enjoined from commencing, pursuing, maintaining, enforcing, or prosecuting, either directly or indirectly, any Released Claims in any judicial, administrative, arbitral, or other forum, against any of the Released Parties; provided, that this injunction shall not apply to individual claims of any member of the Settlement Class who has timely and properly opted out from the Settlement Class as permitted by the Court. Such injunction shall remain in force until Final Approval or until such time as the Settling Parties notify the Court that the Settlement has been terminated. Nothing herein shall prevent any Settlement Class Member, or any person actually or purportedly acting on behalf of any Settlement Class Member(s), from taking any actions to stay and/or dismiss any Released Claim(s). This injunction is necessary to protect and effectuate the Agreement, and the Settlement contemplated thereby, this Preliminary Approval Order, and the Court's flexibility and authority to effectuate the Agreement and to enter Judgment when appropriate, and is ordered in aid of this Court's jurisdiction and to protect its judgments.

28. If the Settlement is not approved or consummated for any reason whatsoever, the Settlement and all proceedings in connection with the Settlement shall be without prejudice to the right of Discover or the Settlement Class Representatives to assert any right or position that could

-7-

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

1   have been asserted if this Agreement had never been reached or proposed to the Court, except

2   insofar as the Agreement expressly provides to the contrary.  In such an event, the Parties shall

3   return to the *status quo ante* in the Actions and the certification of the Settlement Class shall be

4   deemed vacated.  The certification of the Settlement Class for settlement purposes shall not be

5   considered as a factor in connection with any subsequent class certification issues.

6        29.    If the Settlement is finally approved by the Court, the Court shall retain jurisdiction

7   over the Parties and the Settlement Class Members with respect to all matters arising out of, or

8   connected with, the Settlement, and may issue such orders as necessary to implement the terms of

9   the Settlement.  The Court may approve the Settlement, with such modifications as may be agreed

10   to by the Parties, without further notice to the Settlement Class Members.

11        30.    In the event that any of the provisions of this Preliminary Approval Order is asserted

12   by Discover as a defense in whole or in part to any Released Claim or otherwise asserted in any

13   other suit, action or proceeding by a Settlement Class Member, that suit, action or other proceeding

14   shall be immediately stayed and enjoined until this Court or the court or tribunal in which the claim

15   is pending has determined any issues related to such defense or assertion.  Solely for purposes of

16   such suit, action, or other proceeding, to the fullest extent they may effectively do so under

17   applicable law, the Parties irrevocably waive and agree not to assert, by way of motion, as a

18   defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the

19   Court, or that the Court is, in any way, an improper venue or an inconvenient forum.  These

20   provisions are necessary to protect the Agreement, this Order and this Court's flexibility and

21   authority to effectuate the Agreement, and are ordered in aid of this Court's jurisdiction and to

22   protect its judgment.

23        31.    The Agreement (including, without limitation, its exhibits), and any and all

24   negotiations, documents and discussions associated with it, shall not be deemed or construed to be

25   an admission or evidence of any violation of any statute, law, rule, regulation or principle of

26   common law or equity, of any liability or wrongdoing, by Discover, or the truth of any of the

27   claims, and evidence relating to the Agreement shall not be discoverable or used, directly or

-8-

28

indirectly, in any way, whether in the Actions or in any other action or proceeding, except for purposes of demonstrating, describing, implementing or enforcing the terms and conditions of the Agreement, this Order and/or the Final Judgment and Order of Dismissal.

      SO ORDERED.

Dated:_____    _____

                                          Hon. Jeffrey S. White
                                          United States District Court Judge

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

**EXHIBIT F**

**PUBLICATION NOTICE**

LA 51641542

**TO ALL PERSONS IN THE UNITED STATES TO WHOM DISCOVER PLACED A NON-EMERGENCY TELEPHONE CALL TO THEIR CELLULAR TELEPHONES THROUGH THE USE OF AN AUTOMATIC TELEPHONE DIALING SYSTEM AND/OR AN ARTIFICIAL OR PRERECORDED VOICE BETWEEN NOVEMBER 30, 2007 AND [DATE OF PRELIMINARY APPROVAL OF SETTLEMENT]**

**Read This Notice Carefully.**

**<u>You Could Receive Benefits from this Class Action Settlement.</u>**

A settlement has been proposed in a class action lawsuit relating to calls allegedly made by Discover to cellular telephones through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice. This notice is only a summary.

**Description of Litigation.** Plaintiffs claim that Discover violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. (the "TCPA"), by placing calls on or after November 30, 2007 to cellular telephones through the use of an automatic telephone dialing system or an artificial or prerecorded voice without the prior express consent of Plaintiffs and the putative class members. Discover denies these allegations and denies any claim of wrongdoing. The Court has not ruled on the merits of Plaintiffs' claims or Discover's defenses.

**Settlement.** Class Counsel and Plaintiffs have concluded, after due investigation and carefully considering the relevant circumstances and applicable law, that it would be in the best interest of the Settlement Class to enter into a settlement agreement in order to avoid the uncertainties of litigation and to assure that the benefits reflected in the settlement agreement are obtained for the Class. Plaintiffs and Discover have negotiated a settlement agreement which they believe will, if approved by the Court, benefit Settlement Class Members.

**Who Is Included?** The Settlement Class includes all persons in the United States to whom Discover Financial Services or any related parties (including Discover Bank, The Student Loan Corporation or Discover Home Loans) placed a non-emergency telephone call to a cellular telephone through the use of an automatic telephone dialing system and/or an artificial or prerecorded voice between November 30, 2007 and [Date Of Preliminary Approval Of Settlement].

**Settlement Payments.** Discover has agreed to establish a settlement fund of $8.7 million. The settlement fund will be used to make payments to Plaintiffs and Settlement Class Members; to pay for notice and settlement administration; and to pay Class Counsel's attorneys' fees and costs. Discover also has agreed to make changes to cease calling the cellular telephone numbers of those Settlement Class Members who timely submit a valid Revocation Request Form.

The settlement fund will be used first to pay for notice and settlement administration costs, and then (subject to Court approval) to pay up to $2,175,000 in attorneys' fees and costs and $2,000 to each of the two Plaintiffs for their services in the case. The balance of the settlement fund will be paid to Settlement Class Members. If the settlement is approved, estimated claims payments will be between $20 and $40. Settlement Class Members may claim one settlement award. Claims will be paid either by a check mailed directly to Class Members or by a credit to Settlement Class Members' accounts. If there is any money left after all claims are paid, it will be paid to Settlement Class Members or to charity.

**How Do I Make A Claim?** Claim Forms and Revocation Request Forms are available at www._____.com or by calling (800) _____. You must complete and mail the Claim Form by _____ in order to receive a settlement payment.

**Other Options.** If you don't want to be legally bound by the settlement, you must request exclusion by _____, or you will not be able to independently sue about the legal claims in this case. If you request exclusion, you will not get money from this Settlement. If you do not request exclusion from the Settlement, you may nevertheless object to it by explaining in writing why you do not like the Settlement by _____. If you remain a member of the Settlement Class, you will be bound by any judgment entered whether or not it is favorable to the Settlement Class. You can find more information about these options at www._____.com or by calling (800) _____.

The Court will hold a hearing in this case (<u>Andrew Steinfeld v. Discover Financial Services, et al.</u>, U.S.D.C., Northern District of California Case No. 3:12-cv-01118-JSW) to consider whether to approve the Settlement on _____, at _____, before the Hon. Jeffrey S. White, United States District Judge, in Courtroom 11 of the U.S. District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California. Requests to appear at the hearing must be made by _____. You may also enter an appearance through your own attorney if you desire. For more information, visit www._____.com or call (800) _____.

**DO NOT CALL OR WRITE TO THE COURT OR THE CLERK OF THE COURT. DO NOT CONTACT DISCOVER ABOUT THE SETTLEMENT. TELEPHONE REPRESENTATIVES ARE NOT AUTHORIZED TO CHANGE THE TERMS OF THE SETTLEMENT OR THIS NOTICE.**

**[PUBLICATION NOTICE]**

# **EXHIBIT G**

## **REVOCATION REQUEST FORM**

Exhibit G
Revocation Request Form

*Andrew Steinfeld v. Discover Financial Services, et al., U.S.D.C.,*
*Northern District of California Case No. 3:12-cv-01118-JSW*

## REVOCATION REQUEST FORM

**To make a revocation request, your Revocation Request Form must be received on or before _____.**

| | | |
|---|---|---|
| **Mail your completed and signed Revocation Request Form to:** | | **Complete a Revocation Request Form via the Internet at:** |
| [_____] Settlement Administrator [_____] [_____] | **OR** | [ _____ ] |

**YOU MUST PROVIDE ALL OF THE INFORMATION BELOW, AND YOU MUST SIGN THIS FORM, AS DIRECTED, TO MAKE A VALID REVOCATION REQUEST.**

☐ By checking this box and providing my current cellular telephone number and my Discover account number(s) (for all of my outstanding accounts), Discover Financial Services and its affiliates and subsidiaries cannot contact me on that cellular telephone number by an automatic telephone dialing system, text message and/or an artificial or prerecorded voice message.

My current cellular telephone number is:  (\_\_\_) \_\_\_\_-\_\_\_\_\_.

My Discover account number(s) (if applicable) is/are: _____.

If I decline to allow contact as described above on my current cellular telephone number, I understand that I must provide a current non-cellular telephone number, if one exists.  That number is (\_\_\_) \_\_\_\_-\_\_\_\_\_.

I understand that Discover Financial Services and any of its affiliates or subsidiaries may call me, or continue to call me, concerning my account(s) by an automatic telephone dialing system, text message and/or an artificial or prerecorded voice message at any telephone number in their records if I do not:  (1) check the above box; (2) enter my current cellular telephone number; (3) enter my account number(s) (if applicable); and (4) enter a current non-cellular telephone number, if one exists.

By signing below, I declare that the foregoing (including as to the existence of a current non-cellular telephone number) is true and correct.  This Revocation Request Form relates only to the limitations of the Telephone Consumer Protection Act and does not change your rights under other federal or state statutes.

Signature: _____

Name (please print): _____

Date: _____

## QUESTIONS? VISIT [Internet URL] OR CALL [_____].